## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL ASSOCIATION OF
CONSUMER ADVOCATES; UNITED
STATES PUBLIC INTEREST RESEARCH
GROUP; and KATHLEEN ENGEL,

*Plaintiffs*,

v.                                                          Civil Action No. 1:20-cv-11141

KATHLEEN L. KRANINGER, in her
official capacity as Director of the Consumer
Financial Protection Bureau; and
CONSUMER FINANCIAL PROTECTION
BUREAU,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PARTIES ........................................................................................................................... 4

JURISDICTION AND VENUE ........................................................................................ 10

LEGAL BACKGROUND ................................................................................................ 10

   I.   Federal Advisory Committee Act ....................................................................... 10

   II.   The Administrative Procedure Act .................................................................... 14

FACTUAL ALLEGATIONS ........................................................................................... 14

   I.   The History and Purpose of the Consumer Financial Protection Bureau. ......................... 14

   II.   CFPB's Leaders Have Sabotaged the CFPB's Mission From Within Since 2017. ........... 22

   III.   Defendants Have Illegally Established and Utilized the Taskforce. .............................. 27

      a.   Defendants Illegally Chartered the Taskforce. ............................................... 29

      b.   Defendants Illegally Appointed Members to the Taskforce. ......................................... 31

      c.   Defendants Have Unlawfully Refused to Provide Public Notice and Participation in Meetings. ................................................................................................. 38

      d.   Defendants Have Unlawfully Withheld Taskforce Records. ......................................... 40

   IV.   The Taskforce Has Harmed Plaintiffs and Advocates for Consumer Protection. ........... 41

CLAIMS FOR RELIEF .................................................................................................. 46

## INTRODUCTION

1.      In this action, Plaintiffs National Association of Consumer Advocates, United States Public Interest Research Group, and Professor Kathleen Engel challenge the Consumer Financial Protection Bureau's ("CFPB" or "Bureau") Federal Consumer Financial Law Taskforce ("Taskforce") under the Federal Advisory Committee Act. The CFPB claims to have established the Taskforce to obtain recommendations about how to improve and strengthen consumer financial laws and regulations. The Taskforce's objective therefore goes to the heart of the Bureau's mission—and positions the Taskforce to provide a blueprint for the CFPB to revise the laws that protect financial consumers across the United States.

2.      Created in the wake of the 2008 financial crisis, the CFPB was tasked with protecting consumers as part of a major overhaul of financial regulation that culminated in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (the "Dodd-Frank Act"). That crisis was triggered in large part by financial institutions offering predatory and risky mortgages to homeowners who could not afford them. In response, consumer finance experts and advocates alike pushed for an overhaul of the regulatory regime governing the financial services industry in an effort to protect consumers from dangerous and incomprehensible financial products. Although its formation was met with opposition from the financial services industry and its allies, Congress created the CFPB in 2010 to protect consumers and to ensure that markets for financial products are fair, transparent, and competitive.

3.      The Taskforce has a broad mandate to recommend improvements in consumer financial law and regulations. But despite the profound implications of the Taskforce's work for consumer protections, Defendants have appointed to the Taskforce individuals who uniformly

represent industry views. Indeed, the Chairman of the Taskforce, Todd Zywicki, believes that consumer protections are paternalistic, has argued that the CFPB is a "menace" "guarantee[d]" to manifest "bureaucratic pathologies,"[1] and has worked on behalf of several large financial institutions to influence the Bureau and other agencies. All of his fellow Taskforce members have either expressed similar views or continue to work as industry consultants or lawyers.

4.      That lack of balance is no accident. It was the result of a selection process designed to ensure that the Taskforce and its recommendations reflect only the pre-existing views of the Bureau's leadership, who, since 2017, have rolled back consumer protections through rulemaking and guidance and dramatically reduced enforcement actions against financial institutions. Indeed, the Bureau received numerous applications from qualified consumer finance law experts and advocates who endorse robust protections, but ultimately selected none of them.

5.      The biased composition of the Taskforce not only undermines its purpose—it is unlawful. Enacted in 1972, the Federal Advisory Committee Act ("FACA") is a "sunshine law" designed to prevent special interest groups from exerting undue influence over the Executive Branch by using their membership on advisory committees to promote their private concerns. The law requires the Executive Branch to comply with strict requirements when it establishes an advisory committee, ensuring, among other things, that each committee is essential, in the public interest, fairly balanced between different points of view, and structured to avoid inappropriate influences. To ensure transparency and allow for public participation, advisory committees must also hold their meetings open to the public and disclose all records prepared for or by the committee.

---

[1] Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 Geo. Wash. L. Rev. 856, 856 (2013).

6.      From the outset, Defendants have violated each of these requirements in their creation and operation of the Taskforce. The fundamental flaw of the Taskforce is its single-minded focus on protecting the industry that the CFPB is supposed to regulate. Defendants could have avoided this problem by selecting some of the many applications they received from nationally prominent consumer finance law experts and consumer advocates, including Professor Engel. Compounding this error, Defendants never made the requisite findings that the Taskforce is essential and in the public interest, a requirement that helps ensure that such committees are only established when they are actually useful and beneficial to the public. And since its creation, Defendants have operated the Taskforce in secrecy: the Taskforce has already held closed-session meetings without providing any notice to the public. Nor has the Taskforce made available any of the records related to those meetings or its other work.

7.      The Taskforce's work—and its serious structural flaws—directly implicate the interests of consumer advocates and consumer financial law experts like Plaintiffs, who have long fought for robust consumer protections and whose efforts culminated in the creation of the CFPB. In the absence of any consumer representation on the Taskforce, and without the legally required public participation and transparency, consumer advocates and consumer finance law experts like Plaintiffs have been unable to participate in or follow along with the Taskforce's work. These flagrant and ongoing violations continue to injure Plaintiffs and are of great concern, as the Taskforce has already begun working towards producing a final report due in January 2021.  That report may well recommend measures that, if implemented, would unwind the stabilizing consumer protection regime put in place following the 2008 financial crisis.

8.      To stop these ongoing violations before they facilitate a biased set of recommendations generated in secrecy, Plaintiffs respectfully request that the Court issue an

order setting aside the Taskforce's charter, enjoining it from continuing its work, requiring it to make all Taskforce records available to the public, and barring Defendants from accepting advice or recommendations from the Taskforce.

## PARTIES

9.      Plaintiff National Association of Consumer Advocates ("NACA") is a non-profit association of more than 1,500 attorneys and consumer advocates committed to representing consumer interests. NACA's members include private and public sector attorneys, legal services attorneys, law professors, and law students. NACA's core mission is to advocate for the interests of consumers and for policies that protect consumers against predatory financial institutions.

10.     To accomplish its mission, NACA engages in a variety of activities. First, NACA educates and shares information with both its membership and its members' consumer clients on a variety of topics including consumer rights, common issues faced by consumers in the marketplace for financial services, and best practices in consumer advocacy. NACA's educational activities take on many forms, including blog posts, newsletters, webinars, and in-person trainings. For example, NACA has previously educated its members and consumers on various proposed rulemakings by the CFPB, such as a 2020 supplemental proposed rulemaking on time-barred debt,[2] a 2019 proposed rulemaking on debt collection practices,[3] and a 2017 final rule on arbitration.[4]

---

[2] NACA, *CFPB Disclosures on Time-Barred Debt: Will They Help or Hurt?* (Mar. 11, 2020), https://www.consumeradvocates.org/resources/training-library/cfpb-disclosures-time-barred-debt-will-they-help-or-hurt%C2%A0%C2%A0.
[3] NACA, *The CFPB's Proposed Debt Collection Rule: Overview and Potential Impact on FDCPA and Debt Defense Practice* (June 6, 2019), https://www.consumeradvocates.org/resources/training-library/cfpbs-proposed-debt-collection-rule-overview-and-potential-impact-fdcpa.
[4] Isaac Hoenig, NACA, *CFPB Rule Will Restore Consumers' Access to Court—and Possibly to Their Free Annual Credit Reports*, Medium (July 17, 2017),

11.     Second, NACA promotes the interests of consumers by serving as a voice for consumers in the ongoing struggle to curb unfair and abusive practices by the financial services industry. NACA does this in a variety of ways, including by submitting comments in response to CFPB Requests for Information and on proposed rulemakings,[5] by organizing comment campaigns on rulemakings,[6] by meeting with and educating financial services regulators on consumer issues,[7] and by interfacing with regulators in more formal capacities. For example, various NACA members have served on the CFPB's Consumer Advisory Board, which advises the CFPB on the impacts of emerging practices and trends in the consumer financial services industry. Similarly, NACA sends at least one of its staff members to the Consumer Advisory Board's meetings that are held open to the public in compliance with FACA.

12.     Consistent with this mission, NACA has a significant interest in the Taskforce's activities. If the Taskforce were operated transparently, NACA and its members would monitor the Taskforce's activities, attend its public meetings, participate in those meetings to advance consumer interests to the extent possible, and educate its members and clients on the Taskforce's work.

---

https://medium.com/@NACAdvocate/cfpb-rule-will-restore-consumers-access-to-court-and-possibly-to-their-free-annual-credit-ebd72ef24906.

[5] *See, e.g.*, NACA, *Comments from NACA Regarding the Proposed Rule on Debt Collection Practices* (Sep. 18, 2019), https://www.consumeradvocates.org/sites/default/files/NACA.CFPBdebtcollection.comments_0.pdf.

[6] *See, e.g.*, NACA, *Submit Your Comment: Tell CFPB That Its Debt Collection Rule Must Put Consumers First* (last visited June 15, 2020), https://contentsharing.net/actions/email_web_version.cfm?recipient_id=3879074274&message_id=17153571&user_id=NACA1&group_id=0&jobid=44830596.

[7] *See, e.g.*, Letter From State Chairs, NACA, to Kathleen Kraninger, Director, CFPB (Apr. 30, 2020), https://www.consumeradvocates.org/sites/default/files/NACA_statechairs_CFPB04302020.pdf.

13.     Plaintiff United States Public Interest Research Group ("U.S. PIRG") is a non-profit consumer advocacy organization with tens of thousands of members across the United States. To create a safer and heathier world, U.S. PIRG draws on a strong network of researchers, advocates, organizers, and students to improve government transparency and to stand up to powerful special interests on behalf of the public on a variety of issues. Among other things, U.S. PIRG has a long history of working to improve and reform consumer financial laws and regulations, including by defending the Bureau's core mission against efforts to unwind consumer protections.

14.     U.S. PIRG accomplishes its objectives through several activities. First, U.S. PIRG offers free education and information to its members and to the general public regarding the Bureau's regulatory activities, as well as the ongoing need for improvements in consumer protections. For example, U.S. PIRG has published extensive reports on a wide variety of problems faced by consumers in the financial services marketplace. Most recently, these include a report examining trends in consumer complaints received by CFPB since its inception in 2010, a report that analyzed debt-collection complaints to expose the worst debt collection companies, and a report informing the public about the need for continued public access to the Bureau's Consumer Complaint Database.[8] U.S. PIRG also educates the public through blog posts, emails to its members, webinars, and social media.[9]

---

[8] U.S. PIRG, *Reports: the CFPB Gets Results for Consumers* (updated June 2019), https://uspirg.org/page/usp/reports-cfpb-gets-results-consumers.

[9] *See, e.g.*, Ed Mierzwinksi, *I'm Reading the CFPB's Mail About the Pandemic's Effect of Family Finances*, U.S. PIRG (May 31, 2020), https://uspirg.org/blogs/eds-blog/usp/i%E2%80%99m-reading-cfpb%E2%80%99s-mail-about-pandemic%E2%80%99s-effect-family-finances (blog post highlighting the CFPB's failure to address the increasing numbers of credit reporting and debt collection complaints submitted by consumers since March 1, 2020).

15.     Second, U.S. PIRG provides an independent voice for consumers, advocating for improved consumer finance laws and regulations in a number of ways. Specifically, U.S. PIRG has regularly testified before Congress,[10] submitted comments in response to CFPB Requests for Information and on CFPB proposed rulemakings,[11] organized comment campaigns by its members,[12] provided expert testimony at CFPB-hosted events,[13] and met with the CFPB and other financial regulators to educate them on consumer issues.

16.     Consistent with this long track record of vigorous advocacy, U.S. PIRG has a significant interest in the Taskforce's activities. If the Taskforce were operated transparently and in compliance with FACA, U.S. PIRG would monitor the Taskforce's activities, attend its public meetings, participate in those meetings to advance consumer interests to the extent possible, and educate its members and clients on the Taskforce's work.

17.     Plaintiff Kathleen Engel ("Professor Engel") is a nationally prominent scholar of consumer law and finance, having written extensively on the law and economics of mortgage

---

[10] *See, e.g.*, Consumer Fin. Monitor: Ballard Spahr LLP, *House Holds Hearing on Legislative Proposals Relating to the CFPB* (May 28, 2014), https://www.consumerfinancemonitor.com/2014/05/28/house-holds-hearing-on-legislative-proposal-relating-to-the-cfpb/ (noting U.S. PIRG's testimony).
[11] *See, e.g.*, Ed Mierzwinksi, *Mulvaney Lobs One Last Softball To Industry Opponents of CFPB*, U.S. PIRG (Dec. 31, 2018), https://uspirg.org/blogs/eds-blog/usp/mulvaney-lobs-one-last-softball-industry-opponents-cfpb (describing an extensive series of Requests for Information that U.S. PIRG responded to); U.S. PIRG, *Comment on CFPB Request for Information: Bureau Public Reporting Practices of Consumer Complaint Information* (June 20, 2018), https://www.regulations.gov/document?D=CFPB-2018-0006-0188.
[12] *See, e.g.*, U.S. PIRG, *Tell Acting Director Mulvaney: Keep the Payday Lending Rule* (last visited June 15, 2020), https://uspirg.webaction.org/p/dia/action4/common/public/?action_KEY=24569&uid=[[supporter_KEY]]&utm_source=salsa&utm_medium=email&tag=email_blast:[[email_blast_KEY]]&utm_campaign=USP4-FCON:FINREFORM-0518&utm_content=EM5:00C:0GH-AAP.
[13] *See, e.g.*, Ed Mierzwinski, *CFPB Report Confirms 2009 Credit Card Act Works to Protect Consumers*, U.S. PIRG (Oct. 2, 2013), https://uspirg.org/news/usp/cfpb-report-confirms-2009-credit-card-act-works-protect-consumers (excerpting testimony provided by U.S. PIRG at a CFPB field hearing in Chicago on the Credit CARD Act).

markets, and the subprime crisis. Ex. A (Engel Application to Taskforce). She currently holds a position as Research Professor of Law at Suffolk University. Prior to joining Suffolk University in 2009, Professor Engel taught at Cleveland-Marshall College of Law for ten years.

18.     Throughout her academic career, Professor Engel has engaged in research on an array of consumer finance issues, ranging from the attributes and risks of specific financial products to the delivery of financial services, the laws that regulate consumer financial products, and the structure of financial markets. *Id.* Her resulting expertise has been widely recognized in the form of numerous awards for her publications. *Id.* For example, she coauthored a book on the 2008 financial crisis—*The Subprime Virus: Reckless Credit, Regulatory Failure, and Next Steps*—that won Best Book from the American College of Consumer Financial Services Lawyers.[14] Her work has also informed critical legislation and regulations, including aspects of the Dodd-Frank Act. Ex. A.

19.     In addition to her academic experience, Professor Engel has held numerous public service positions at the state and federal level, including at the CFPB. *Id.* Specifically, Professor Engel has served as a member of (1) the Federal Reserve Board's Consumer Advisory Council, (2) the CFPB's Consumer Advisory Board, (3) the Community Affairs Research Board of the Federal Reserve Bank of Boston, and (4) the Federal Reserve Bank of Cleveland's Academic Advisory Council on Subprime Lending. *Id.* In those positions, she reviewed and assessed existing and proposed regulations governing consumer financial products, as well as empirical and legal research related to consumer finance, for the purpose of improving consumer finance regulations. *Id.* In addition to serving on these committees, she has also advised state

---

[14] *Writing Competition – 2011 Winners*, Am. Coll. Consumer Fin. Servs. Lawyers, http://www.accfsl.org/writing-competition/2011-winners/.

governments—including Ohio, Massachusetts, California, and Illinois—on a variety of issues related to consumer credit. *Id.*

20.     Having devoted her career to studying and improving consumer protection law and finance, Professor Engel has a significant interest in participating in the Taskforce's work, which will impact both her academic and applied professional activities. Consistent with that interest, Professor Engel applied to serve on the Taskforce, noting in her application that "[h]armonizing, modernizing, and updating consumer credit laws is long overdue" as the current laws and regulations frequently "do not take into account new realities of consumers' behavior" and could benefit from "consolidation and reorganiz[ation]." *Id.* Concluding that the Taskforce is a "laudable and important project," Professor Engel outlined several priorities that she would have focused on if selected to serve on the Taskforce. *Id.*

21.     Professor Engel was interviewed to serve on the Taskforce. However, her application was ultimately rejected.

22.     Professor Engel also has an interest in monitoring the Taskforce's work. That includes assessing any recommendations the Taskforce might make as well as understanding how the Taskforce produced those recommendations. To that end, Professor Engel would review the Taskforce's records, attend or review the Taskforce's meetings, and attempt to make her views known to the Taskforce. It will be harder for Professor Engel to monitor, study, and write on the Taskforce's activities, as she has on the CFPB's other efforts, if the Taskforce remains cloaked in secrecy.

23.     Defendant Kathleen Kraninger is sued in her official capacity as the Director of the CFPB. Her official address is 1700 G Street NW, Washington, DC 20552.

24.     Defendant CFPB is a federal agency headquartered in Washington, DC, at 1700 G Street NW, Washington, DC 20552. CFPB is an "agency" within the meaning of the Administrative Procedure Act. 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under federal law.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Plaintiff Professor Engel resides in Boston, Massachusetts.

27.     This Court has authority to grant the requested relief in this case pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

## LEGAL BACKGROUND

### I.     Federal Advisory Committee Act

28.     The Federal Advisory Committee Act is a "sunshine law," requiring that, when the Executive Branch establishes or uses non-federal bodies for the purpose of seeking advice and generating policy, it does so in a transparent way that allows for meaningful public participation.

29.     These requirements apply to all "advisory committee[s]," including those created by the Bureau, 12 U.S.C. § 5493(h), which are defined to include:

> any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . , which is . . . established or utilized by one or more agencies in the interest of obtaining advice or recommendations . . . , except that such term excludes . . . any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government[.]

5 U.S.C. App. 2 § 3(2).

30.     Title V and its implementing regulations, which govern federal employees, define a full-time employee as one who works more than 32 hours a week (or more than 64 hours during a biweekly pay period), while a part-time employee works 16 to 32 hours a week (or 32 to 64 hours during a biweekly pay period). 5 U.S.C. § 3401(2). Further, "part-time career employment" is employment "under a schedule consisting of an equal or varied number of hours per day . . . , but does not include employment on a temporary or intermittent basis." *Id.* "Intermittent employment" is, in turn, defined as "employment without a regularly scheduled tour of duty[.]" 5 C.F.R. § 340.401(b).

31.     A federal agency may form an advisory committee only after it has "determined as a matter of formal record . . . after consultation with the [General Services Administration] ("GSA")], with timely notice published in the Federal Register, [that the committee is] in the public interest in connection with the performance of duties imposed on that agency by law." 5 U.S.C. App. 2 § 9(a)(2). The agency must further issue a "[d]etermination of need in the public interest," including a finding that the committee is "essential to the conduct of agency business and . . . the information to be obtained is not already available through another advisory committee or source within the Federal Government." 41 C.F.R. § 102-3.30(a). These requirements help ensure that advisory committees are "established only when they are . . . essential" and that "Congress and the public [are] kept informed with respect to [their] . . . purpose[.]" 5 U.S.C. App. 2 § 2(b).

32.     A CFPB advisory committee cannot begin meeting until its charter has been approved by the Director of the Bureau and filed with the Bureau's Committee Management

11

Officer,[15] the House Committee on Financial Services, the Senate Committee on Banking,

Housing, and Urban Affairs, and the Library of Congress. 5 U.S.C. App. 2 § 9(c); 41 C.F.R.

§ 102-3.70(a).

33.     When it enacted FACA, Congress explained that "[o]ne of the great dangers in

th[e] unregulated use of advisory committees is that special interest groups may use their

membership on such bodies to promote their private concerns," citing in particular an Industrial

Waste Committee where "only representatives of industry were present," and "[n]o

representatives of conservation, environment, clean water, consumer, or other public interest

groups were present." H.R. Rep. No. 92-1017, at 6 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3491,

3496. Accordingly, Congress required in FACA that "the membership of [an] advisory

committee . . . be fairly balanced in terms of the points of view represented and the functions to

be performed by the advisory committee." 5 U.S.C. App. 2 § 5(b)(2), (c). Consistent with these

requirements, the CFPB must submit to GSA a "fairly balanced membership" plan "[b]efore

establishing . . . [an] advisory committee[.]" 41 C.F.R. § 102-3.60(a), (b)(3).

34.     Likewise, the advisory committee's charter must contain appropriate provisions to

"assure that the advice and recommendations of the advisory committee will not be

inappropriately influenced by the appointing authority or by any special interest, but will instead

be the result of the advisory committee's independent judgment." 5 U.S.C. App. 2 § 5(b)(3), (c).

35.     Once established, an advisory committee must include and facilitate public

comment and participation. An advisory committee must hold "[e]ach advisory committee

meeting . . . open to the public" and provide "timely notice" of those meetings. *Id.* § 10(a)(1),

---

[15] FACA requires each agency to designate an Advisory Committee Management Officer
responsible for, among other things, supervising the establishment, procedures, and
accomplishments of advisory committees. 5 U.S.C. App. 2 § 8(b).

(2). Further, advisory committees must allow interested persons to "attend, appear before, or file statements with [the] committee, subject to such reasonable rules or regulations as the Administrator [of GSA] may prescribe." *Id.* § 10(a)(3).

36.     The Administrator of GSA has implemented these statutory obligations by requiring advisory committees to publish notice of their meetings "at least 15 calendar days prior" to the meetings, unless documented "exceptional circumstances" require otherwise. 41 C.F.R. § 102-3.150. All meetings must be held "in a manner or place reasonably accessible to the public" and allow "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit." *Id.* § 102-3.140(a),(d).

37.     In addition to FACA's requirement for public notice and participation, an advisory committee must also make available "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for or by" the committee. 5 U.S.C. App. 2 § 10(b). "Timely access to advisory committee records is an important element of the public access requirements of the Act. Section 10(b) . . . provides for the *contemporaneous* availability of advisory committee records that, when taken in conjunction with the ability to attend committee meetings, provide a meaningful opportunity to comprehend fully the work undertaken by the advisory committee." 41 C.F.R. § 102-3.170 (emphasis added); *see also Food Chem. News v. HHS*, 980 F.2d 1468, 1472 (D.C. Cir. 1992) (records must be released before or at the relevant meeting, so that the public can "follow the substance of the [committee's] discussion"). Notably, "agencies may not require members of the public or other interested parties to file requests for non-exempt advisory committee records." 41 C.F.R. § 102-3.170.

II.     **The Administrative Procedure Act**

38.     The Administrative Procedure Act ("APA") allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702. Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or that are taken "without observance of procedure required by law," *id.* § 706(2)(D).

39.     Cases involving FACA are adjudicated under the standards set forth in the APA. *See* 5 U.S.C. § 701(a); *Judicial Watch, Inc. v. U.S. Dep't of Com.*, 736 F. Supp. 2d 24, 30-31 (D.D.C. 2010).

## FACTUAL ALLEGATIONS

I.     **The History and Purpose of the Consumer Financial Protection Bureau**

40.     The CFPB was created in the wake of the 2008 financial crisis as part of a major overhaul of financial regulation that culminated in the Dodd-Frank Act.

41.     Prior to the creation of the CFPB, the federal regulatory regime for consumer financial protection suffered from several structural flaws.

42.     First, federal consumer protection laws were implemented by multiple federal agencies.[16] This fragmented regulatory regime "made consumer protection an orphan mission that tended to fall between the cracks."[17]

---

[16] Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*, 32 Rev. of Banking & Fin. L. 321, 327 (2012) [hereinafter Levitin].
[17] *Id.* at 330.

43.     Second, many of the responsible agencies had missions that conflicted with consumer protection.[18] For example, the primary mission of federal financial institution regulators (*e.g.*, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the National Credit Union Administration) is to ensure bank safety and soundness, which requires banks to be profitable.[19] But that mission can conflict with consumer protection because unfair, deceptive, and abusive practices that harm consumers are often quite profitable.[20] Accordingly, consumer protection concerns were "routinely . . . subordinated to bank profitability concerns."[21]

44.     Third, the regulatory environment was plagued by a "race to the bottom," a symptom of national banks' ability to switch between different federal bank charters,[22] with banks drawn to the most lax regulator.[23] Because bank regulators received a majority of their budgets from chartering fees rather than Congressional appropriations, regulators were incentivized to "attract more chartering business" by taking a relaxed approach to consumer protection regulation.[24] The competition between the banking regulators to attract banks meant that none of the regulatory agencies "had the incentive to develop deep expertise in consumer finance" or to collect the data necessary to conduct empirical analysis of practices in the mortgage market and develop sound policy.[25]

---

[18] *Id.* at 330-31.

[19] *Id.*

[20] *Id.*

[21] *Id.* at 331.

[22] *Id.* at 332. Prior to the Dodd-Frank Act, national banks were regulated by one of two federal agencies:  the Office of Thrift Supervision ("OTS") and the Office of the Comptroller of the Currency ("OCC")  The Dodd-Frank Act eliminated OTS, forcing all national banks to obtain their charters from OCC.

[23] *Id.* at 332-33.

[24] *Id.* at 333.

[25] *Id.* at 331-32.

45.     By the 2000s, the need for regulatory reform was fast becoming apparent: consumers were increasingly submitting complaints about credit card companies and payday lenders, taking on risky and exotic mortgage products, and filing for bankruptcy.[26]

46.     While federal regulators were in some cases aware of these issues,[27] they simply failed to take action, even when obligated to by statute.[28] Indeed, even before the 2008 financial crisis, experts in consumer finance law—led by then-Professor Elizabeth Warren—began calling for reform in the shape of a single agency whose driving purpose would be to protect consumers.[29]

47.     The 2008 financial crisis starkly demonstrated the need for such reform.

48.     In a post-crisis report, the Treasury Department explained that the pre-crisis financial services industry was "overshadowed by pervasive failures in consumer protection, leaving many Americans with obligations that they did not understand and could not afford."[30] This failure was a major contributing factor to the crisis, as some of the most sophisticated financial firms began to market, underwrite, and securitize increasingly predatory and exotic subprime mortgage loans to homebuyers who simply could not afford them.[31]

---

[26] Kathleen C. Engel & Patricia A. McCoy, *The Subprime Virus: Reckless Credit, Regulatory Failure, and Next Steps* 61, 64-65 (2011) [hereinafter Subprime Virus].

[27] Levitin at 328-39 (citing Julie L. Williams, Acting Comptroller of the Currency, Remarks at the BAI National Loan Review Conference 1 (Mar. 21, 2005), https://www2.occ.gov/news-issuances/speeches/2005/pub-speech-2005-34.pdf).

[28] Subprime Virus at 194-96 (noting the Federal Reserve Board's failure to adopt regulations mandated under the Home Owners Equity Protection Act).

[29] Levitin at 334-35 (citing Elizabeth Warren, *Unsafe at Any Rate*, Democracy (2007)).

[30] U.S. Dep't of Treasury, Financial Regulatory Reform: A New Foundation 2 (2009), https://www.treasury.gov/initiatives/Documents/FinalReport_web.pdf.

[31] Mark Jickling, Causes of the Financial Crisis 3, Cong. Res. Serv. (Apr. 9, 2010) (explaining that it is "generally accepted" that the 2008 crisis was caused in part by the relaxation of "credit standards in U.S mortgage lending," which lead to "rising rates of delinquency and foreclosures [that] delivered a sharp shock to a range of U.S. financial institutions").

49.     To get borrowers in the door, lenders would sell financial products that seemed affordable on the front end, but contained nasty surprises several years later.[32] For example, a hybrid adjustable rate mortgage, which accounted for a majority of non-traditional mortgages immediately prior to the crisis, usually charged an affordable fixed rate for the first few years, and then converted to a rate that would adjust every six months by adding a "margin" to an index rate, such as U.S. Treasuries or the LIBOR.[33] Because such products were complex—and often intentionally misrepresented by lenders—a consumer might take out a loan with an initial fixed rate of 5 percent, only to be caught off guard later by a rate that suddenly and dramatically increased to 9 percent (in the case of a 4 percentage point "margin" and a 5 percent LIBOR).[34]

50.     Such predatory financial products not only harmed consumers, but also seriously endangered the financial system by creating systemic exposure to the risk that homeowners would default on their loans.

51.     Such widespread risk was made possible by changes in the underwriting and origination of mortgage loans. Historically, mortgages were handled by a single entity, such as a community bank, that solicited an application and then underwrote, funded, and serviced the loan.[35] Because lenders bore the risk and would suffer losses if borrowers could not repay, lenders were careful to issue mortgage loans that consumers could afford.[36]

52.     That system was revolutionized by a financial tool and process called securitization, which greatly diminished banks' incentives to make affordable loans. This

---

[32] Subprime Virus at 34.
[33] *Id*. The LIBOR is the average rate at which banks lend to each other in the London international interbank market.
[34] *Id*.
[35] *Id*. at 4.
[36] *Id*. at 15.

outcome resulted from the fact that securitization allowed banks to quickly move loans out of their portfolios, meaning that they bore little or no risk if the borrowers defaulted.

53.     To illustrate how securitization works, the life of a loan typically began when an intermediary—usually a mortgage broker—would connect a consumer with a loan funded by a different entity, such as a bank or some other financial institution. The bank would then very quickly sell the loan to an investment bank for inclusion in a securitization deal. At that point, the investment bank would bundle multiple mortgage loans, repackage them into tranches of securities rated by credit rating agencies, and transfer the loans to a trust that would issue securities backed by the loans. Those securities were then purchased by investors who would receive income from the stream of loan payments.[37] At each stage of this "lending food chain," the brokers, lenders, investment banks, and credit rating agencies all "collected upfront fees and passed the risk of a bad loan down the line," thereby incentivizing each actor to issue, buy up, and repackage as many mortgages as possible with little consideration given to the risk of default.[38]

54.     This process "tapped huge new pools of capital . . . to finance home mortgages," allowing "[l]enders, in a continuous cycle, [to] make loans, sell those loans for securitization, and then plow the sale proceeds into a new batch of loans, which in turn could be securitized."[39] And, because each entity was motivated by the short-term profits associated with each new batch of loans and bore little exposure to the risk of default, lenders clamored to issue as many new loans as possible.[40]

---

[37] *Id.* at 17.
[38] *Id.* at 4-5.
[39] *Id.* at 18.
[40] *Id.* at 28.

55.     With less exposure to risk, banks and non-bank lenders began making ever riskier

mortgages to sell on Wall Street. Many borrowers entered into loans that the lenders knew would

become unaffordable once the interest rates on the loans reset. Brokers even targeted borrowers

who qualified for inexpensive, fixed rate loans and steered them into high-risk loans with

confusing and exploitative terms—a profitable practice that generated another round of

origination and other fees when borrowers were forced to refinance as their loans became

unaffordable.[41]

56.     Ultimately, access to these kinds of loans drove up the prices of homes until the

market peaked and then dropped. As prices plummeted, borrowers—who found themselves

holding loans that exceeded the value of homes—could no longer refinance when their loans

became unaffordable. This led to a dramatic rise in defaults and foreclosures, which in turn

caused alarm in financial markets and triggered the 2008 financial crisis—widely considered to

be the worst U.S. economic disaster since the Great Depression (at least before the COVID-19

pandemic).[42]

57.     The crisis wiped out nearly $8 trillion in value from the stock market, deprived

home-owners of $9.8 trillion in wealth due to the decrease in home values, cost millions of

Americans their jobs (with unemployment peaking at 10 percent in October 2009), and resulted

---

[41] *Id.* at 34.
[42] Renae Merle, *A Guide to the Financial Crisis—10 Years Later*, Wash. Post (Sep. 10, 2018), https://www.washingtonpost.com/business/economy/a-guide-to-the-financial-crisis--10-years-later/2018/09/10/114b76ba-af10-11e8-a20b-5f4f84429666_story.html.

in a loss of $2 trillion in global economic growth.[43] It also devastated many consumers, whose wages and opportunities may never recover.[44]

58.     While the crisis was caused by a combination of factors, key among them was the failure of bank regulators to exercise their enforcement, rule-making, and supervisory powers to curtail banks' unprecedented risk-taking and exploitation of consumers.

59.     Faced with the devastating consequences of regulatory failure, consumer advocate experts renewed their calls for an agency to protect consumers, arguing that the then-current regulatory system "was so flawed that it could not but produce the regulatory failures like the [housing] bubble that precipitated the financial crisis of 2008."[45] Then-Professor Elizabeth Warren argued that regulation was needed to protect consumers from dangerous financial products.[46] In the absence of regulation, she argued, the financial services industry had created "financial products [with] incomprehensible terms and sharp practices" that can result in "wiped-out savings, lost homes, higher costs for car insurance, denial of jobs, troubled marriages, bleak retirements, and broken lives."[47]

60.     Thereafter, Congress included the creation of the CFPB as a critical component in various proposals to overhaul the financial regulatory system. Ultimately, the CFPB was established by the Dodd-Frank Act in 2010.[48]

---

[43] *Id.*
[44] *See, e.g.*, Eduardo Porter & David Yaffe-Bellany, *New York Times, Facing Adulthood With an Economic Disaster's Lasting Scars*, N.Y. Times (May 19, 2020), https://www.nytimes.com/2020/05/19/business/economy/coronavirus-young-old.html.
[45] Levitin, at 36.
[46] Oren Bar-Gill & Elizabeth Warren, *Making Credit Safer*, 157 U. Pa. L. Rev. 1, 6-7, 98 (2008).
[47] *Id.* at 5.
[48] Levitin at 335-36.

61.     The Act's authorizing language provides that the purpose of the CFPB is to "ensur[e] that all consumers have access to markets for consumer financial products and services . . . [that] are fair, transparent and competitive." 12 U.S.C. § 5511(a).

62.     To achieve that purpose, Congress tasked the CFPB with five objectives: (1) to help consumers make responsible decisions about financial transactions by providing them with understandable information; (2) to protect consumers from unfair, deceptive, or abusive acts and practices and from discrimination; (3) to identify and address unwarranted regulatory burdens; (4) to enforce federal consumer financial law consistently to promote fair competition; and (5) to ensure that markets for consumer financial services and products operate transparently and efficiently. *Id.* § 1511(b).

63.     Notwithstanding the painful lessons of the financial crisis and the strong calls for reform, the financial services industry fiercely opposed the creation of the CFPB. Opponents argued, among other things, that the CFPB would be a "supernanny agency" that would "[m]ake it harder and more expensive for consumers to borrow," "substitute the choice of bureaucrats for those of consumers," and "[j]eopardize the financial recovery by reducing credit[.]"[49] Industry advocates and representatives, such as Todd Zywicki,[50] also argued that the creation of the CFPB would "threaten[] innovation as well as competition," and "could one day undermine the soundness of financial institutions[.]"[51]

---

[49] *See, e.g.*, David S. Evans & Joshua D. Wright, *The Effect of the Consumer Financial Protection Agency Act of 2009 on Consumer Credit*, 22 Loy. Consumer L. Rev. 280, 334 (2010).
[50] Lee Fang, *The Scholars Who Shill for Wall Street*, Nation (Oct. 23, 2013), https://www.thenation.com/article/archive/scholars-who-shill-wall-street/ (explaining that Mr. Zywicki, in addition to his academic career, was the Director of a consulting group with clients such as Visa, Bank of America, and Citigroup).
[51] Todd Zywicki, *Let's Treat Borrowers Like Adults*, Wall St. J. (July 8, 2009), https://www.wsj.com/articles/SB124701284222009065.

64.     Robust disagreement exists over the CFPB's role in regulating the financial services industry. On the one hand, consumer advocates and many consumer finance law experts believe that the CFPB, with its broad rulemaking and enforcement authority over consumer financial products, should exercise its regulatory authority aggressively to prevent the proliferation of complex financial products that exploit consumer misunderstanding. On the other hand, the financial services industry and its allies have criticized the very existence of the CFPB as paternalistic and argued that the regulation of financial products harms both consumers (by limiting choices and the availability of credit) and the industry (by undermining competition and innovation). A complete and balanced examination of the regulation of consumer financial products and services cannot neglect the former in favor of the latter.

## II.     CFPB's Leaders Have Sabotaged the CFPB's Mission From Within Since 2017

65.     Since the resignation of Richard Cordray in 2017, the leaders appointed to the CFPB by President Trump have systematically dismantled protections and stalled enforcement efforts, undermining the CFPB's core mission of protecting consumers.

66.     While searching for a permanent replacement, President Trump first installed Mick Mulvaney as Acting Director—a choice that clearly signaled the Administration's intention to pursue an agenda favorable to industry at the expense of consumers.

67.     Early in his political career, when he served in the South Carolina State Senate, Mulvaney voted against state legislation designed to protect consumers from payday loans, [52] a

---

[52] Nicholas Confessore, *Mick Mulvaney's Master Class in Destroying a Bureaucracy From Within*, N.Y. Times Mag. (Apr. 16, 2019), https://www.nytimes.com/2019/04/16/magazine/consumer-financial-protection-bureau-trump.html.

predatory financial product that intentionally traps consumers in a long-term debt cycle in order to extract exorbitant fees over time.[53]

68.     Similarly, while serving in the U.S. House of Representatives, Mulvaney criticized efforts by the CFPB to regulate payday lenders that donated tens of thousands of dollars to his congressional campaigns.[54]

69.     He also advocated for getting rid of the CFPB, which he described as a "joke . . . in a sick, sad kind of way," in part because (in his view) Congress could not protect the financial services industry from "overreach and abuse by [the Bureau]."[55]

70.     Consistent with these views, Mulvaney began his tenure at the Bureau with a hiring freeze, a hold on all enforcement cases, and a budget request for zero dollars.[56]

71.     Since then, Mulvaney and his successor, Kathleen Kraninger, have mounted a sustained effort to roll back consumer protections and dramatically reduce enforcement of protections in the interim.[57]

---

[53] To illustrate how it works, a typical payday loan customer might be a wage worker who needs to borrow a small sum to pay a routine expense, such as rent. In this example, the customer will pay a $55 fee to borrow $375, the full amount of which must be repaid in two weeks. When the loan comes due, many such borrowers cannot afford to pay back the full $375. They can, however, afford another $55 fee to take out a new loan to cover the old one. The average payday loan customer will repeat this cycle for five months, paying approximately $500 in fees just to cover the initial $375 loan. *Payday Loans Explained*, PEW Charitable Trusts (May 8, 2013), https://www.pewtrusts.org/en/research-and-analysis/video/2013/payday-loans-explained. In some instances, the fees can be even higher, costing consumers as much as $3,000 to pay back a $300 loan. Elizabeth Warren, *Unsafe at Any Rate*, Democracy (2007), https://democracyjournal.org/magazine/5/unsafe-at-any-rate/.

[54] Confessore, *supra* note 52.

[55] Credit Union Times, Interview with Mick Mulvaney, YouTube (Sept. 10, 2014), https://www.youtube.com/watch?v=RaVeNafdyVA.

[56] Confessore, *supra* note 52.

[57] Confessore, *supra* note 52.

72.     For example, Mulvaney oversaw the initial development of a proposed rulemaking—later issued under Kraninger—that proposes to roll back the CFPB's ability-to-repay regulation, which would have prohibited payday lenders from making loans to consumers who could not afford them.[58] He also succeeded in having the implementation of those protections stayed while Defendants worked to develop the proposed rulemaking.[59]

73.     To justify these and other deregulatory actions, Mulvaney issued an extensive series of Requests for Information throughout his tenure—sometimes on a bi-weekly basis— designed to solicit feedback on how to further dismantle consumer protections.[60] Indeed, as various consumer advocacy organizations have noted, these requests were "slanted towards . . . weakening . . . the Bureau's role in protecting consumers," posing questions about the continued need for various consumer protection regulations without asking for comments on "how the Bureau should take stronger action against financial industry abuses."[61]

74.     Enforcement actions also lagged under Mulvaney's leadership. The Bureau announced eleven new lawsuits or settlements in 2018, which was fewer than a third of the number announced in 2016.[62] In those cases the Bureau did pursue, the Bureau settled with lenders for smaller fines than in the past and, in some cases, required lenders to pay no fines at all.[63]

---

[58] *Payday, Vehicle Title, and Certain High-Cost Installment Loans Notice of Proposed Rulemaking*, 84 Fed. Reg. 4252 (Feb. 14, 2019).

[59] Confessore, *supra* note 52; Order, *Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 18-cv-0295 (W.D. Tex. Nov. 6, 2018) ( ECF No. 53).

[60] Ed Mierzwinski, *Mulvaney Lobs One Last Softball to Industry Opponents of CFPB*, U.S. PIRG (Dec. 31, 2018), https://uspirg.org/blogs/eds-blog/usp/mulvaney-lobs-one-last-softball-industry-opponents-cfpb.

[61] *Id.*

[62] Confessore, *supra* note 52.

[63] Confessore, *supra* note 52.

75.     Mulvaney also fired every single member of the Consumer Advisory Board ("CAB")—a statutorily mandated advisory committee that advises the Bureau on its new regulations and policies—"days after some of its members criticized his leadership."[64] The Bureau explained that it was "revamp[ing]" the CAB with all new members, a move that was widely seen in the consumer advocacy community as an effort to undermine consumer protections and surround Mulvaney and the Bureau's leadership with views that were friendlier to their agenda.[65]

76.     These efforts have continued under Mulvaney's successor, Kraninger, who previously served under Mulvaney in the Office of Management and Budget.

77.     As noted above, Kraninger pushed the proposed rollback of CFPB's ability-to-repay rule over the finish line in February 2019. And, according to a memorandum written by a CFPB career economist, political appointees under Kraninger's watch went to great and inappropriate lengths to justify the proposed rulemaking, including by pressuring staff economists to "water down their findings on payday loans and use statistical gimmicks to downplay the harm [to] consumers[.]"[66]

78.     Kraninger has also continued Mulvaney's anti-enforcement trends. In her first six months, the Bureau obtained only $12 million in consumer relief, "a mere 6 [percent] of the $200 million reported by the Obama-appointed Director, Richard Cordray, during [a similar time

---

[64] Renae Merle, *Mick Mulvaney Fires All 25 Members of Consumer Watchdog's Advisory Board*, Wash. Post (June 6, 2018),
https://www.washingtonpost.com/news/business/wp/2018/06/06/mick-mulvaney-fires-members-of-cfpb-advisory-board/.
[65] *Id.*
[66] Nicholas Confessore & Stacey Cowley, *Trump Appointees Manipulated Agency's Payday Lending Research, Ex-Staffer Claims*, N.Y. Times (Apr. 29, 2020),
https://www.nytimes.com/2020/04/29/business/cfpb-payday-loans-rules.html?referringSource=articleShare.

period]."[67] An investigation by the U.S. House of Representatives Committee on Financial Services revealed that this trend was partly due to decisions by CFPB political appointees to settle enforcement actions without requiring the lenders to return ill-gotten gains to consumers.[68] These decisions were "contrary to [] Bureau precedent and in defiance of the recommendations of career . . . enforcement attorneys."[69]

79.     Even more troubling, Kraninger has continued to undermine consumer protections amidst the COVID-19 pandemic, when consumers are particularly vulnerable. Among other things, in the past two months she has led the Bureau to suspend enforcement of requirements that mortgage servicers assist homeowners who are behind in their payments,[70] to reduce the collection of fair lending data,[71] and to relax disclosure requirements for remittance transfer providers.[72]

---

[67] Settling For Nothing: How Kraninger's CFPB Leaves Consumers High and Dry 1, U.S. H.R. Comm. on Fin. Servs., (Oct. 2019), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=404524.

[68] *Id.* at 2.

[69] *Id.*

[70] Joint Statement on Supervisory and Enforcement Practices Regarding the Mortgage Servicing Rules in Response to the COVID-19 Emergency and CARES Act (Apr. 3, 2020), https://files.consumerfinance.gov/f/documents/cfpb_interagency-statement_mortgage-servicing-rules-covid-19.pdf.

[71] CFPB, *Home Mortgage Disclosure (Regulation C), Final Rule* (Apr. 16, 2020), prepublication copy available at https://www.consumerfinance.gov/policy-compliance/rulemaking/final-rules/regulation-c-home-mortgage-disclosure-act/.

[72] CFPB, *Remittance Transfers Under the Electronic Fund Transfer Act (Regulation E), Final Rule* (May 11, 2020), prepublication copy available at https://www.consumerfinance.gov/policy-compliance/rulemaking/final-rules/remittance-transfers-under-electronic-fund-transfer-act-regulation-e/.

### III. Defendants Have Illegally Established and Utilized the Taskforce

80.     On October 11, 2019, the Bureau announced that it would "establish" the

Taskforce and that it would begin to accept applications for members to serve on the Taskforce.[73]

81.     On January 8, 2020, Kraninger signed the Taskforce charter, which states that:

> The Taskforce will (1) examine the existing legal and regulatory environment
> facing consumers and financial service providers; and (2) report its
> recommendations for ways to improve and strengthen consumer financial laws and
> regulations, including recommendations for resolving conflicting requirements or
> inconsistencies, reducing unwarranted regulatory burdens in light of market or
> technological developments, improving consumer understanding of markets and
> products, and identifying gaps in knowledge that should be addressed through
> future Bureau research.

CFPB, *Charter of the Bureau's Taskforce on Consumer Financial Law* ¶ 3 (Jan. 8, 2020),

https://files.consumerfinance.gov/f/documents/cfpb_taskforce-charter.pdf [hereinafter Charter].

82.     The Charter also directs the Taskforce to deliver its findings to the Director of the

Bureau "in the form of one consensus final report," *id.* ¶ 4, "no later than January 2021," *id.* ¶

10.  The Taskforce will "operate until the final report is delivered," after which the Charter will

expire unless renewed. *Id.*

83.     Under the Charter, the Taskforce reports to Kraninger, *id.* ¶ 5, who is to appoint

as Staff Director a full-time CFPB employee to "ensure that the Taskforce operates in

accordance with the terms of the charter[.]," *id.* ¶ 6. CFPB employee Matt Cameron has been

assigned as the Taskforce's Staff Director.[74]

---

[73] Press Release, CFPB, *CFPB Announces Taskforce on Federal Consumer Financial Law* (Oct.
11, 2019), https://www.consumerfinance.gov/about-us/newsroom/cfpb-announces-taskforce-
federal-consumer-financial-law/.
[74] Press Release, CFPB, *CFPB Announces Membership of Taskforce on Federal Consumer
Financial Law* (Jan. 9, 2020), https://www.consumerfinance.gov/about-us/newsroom/cfpb-
announces-membership-taskforce-federal-consumer-financial-law/.

84.     Under the Charter's terms, the Director of the Bureau "shall select the members of the Taskforce." Charter ¶ 11. In two press releases dated January 9 and January 17, 2020, the Bureau announced that it had selected 5 individuals to serve on the Taskforce.[75]

85.     According to documents released by the Bureau under the Freedom of Information Act ("FOIA"), these members have been appointed to work on a temporary basis with intermittent and limited schedules. Ex. B (documents released under FOIA detailing that the Taskforce members have been appointed on a temporary basis, are working intermittent schedules, and may only work a certain number of days per year); *see also* Charter ¶ 11 (the "Director will select Taskforce members to work for a temporary period of time"); *id.* ¶ 10 (the Taskforce will dissolve in 2021 following the submission of its final report).

86.     Accordingly, they do not constitute "full-time or permanent part-time federal officers or employees of the Federal Government." *See* 5 U.S.C. App. 2 § 3(2).

87.     Under the Charter's terms, the Taskforce is directed to "meet as frequently as necessary to complete the [final] report" by January 2021. Charter ¶ 9.

88.     The Taskforce has begun to meet and conduct its work. *See, e.g.,* Ex. C (CFPB Invitation to non-public Taskforce meeting held March 10, 2020). The Taskforce also issued a Request for Information on March 27, 2020, inviting the public to comment broadly on the "areas of consumer protection on which it should focus its research and analysis during the balance of its one-year appointment."[76]

---

[75] *Id.*; Press Release, CFPB, *CFPB Announces Additional Member of Taskforce on Federal Consumer Financial Law* (Jan. 17, 2020), https://www.consumerfinance.gov/about-us/newsroom/cfpb-announces-additional-member-to-taskforce/.
[76] Press Release, CFPB, *CFPB Issues Request for Information to Assist Taskforce on Federal Consumer Financial Protection Law* (Mar. 27, 2020), https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-rfi-to-assist-taskforce-on-federal-consumer-financial-protection-

89.     Under FACA, the Taskforce is an "advisory committee." 5 U.S.C. App. 2 § 3(2).

90.     From the outset, and as set out further below, Defendants have violated FACA's requirements at every turn, allowing the Taskforce to operate in secrecy and to represent *only* the deregulatory views of the financial services industry—without any regard for the views of consumer advocates that led to the creation of the CFPB and informed its fundamental purpose.

### a. Defendants Illegally Chartered the Taskforce

91.     Under FACA, CFPB was required to meaningfully consult with GSA before creating the Taskforce. 5 U.S.C. App. 2 § 9(a)(2).

92.     On information and belief, Defendants did not engage in such meaningful consultation.

93.     The Taskforce is not listed in the database of advisory committees maintained by the GSA.[77]

94.     Nor did Defendants provide the requisite preliminary findings in a Federal Register Notice before chartering the Taskforce, including findings that this advisory committee is "in the public interest," 5 U.S.C. App. 2 § 9(a)(2), that it is "essential to the conduct of agency business," and that the "information to be obtained is not already available through another advisory committee or source within the Federal government," 41 C.F.R. § 102-3.30(a). Defendants have not published any notices in the Federal Register regarding the Taskforce. Nor does the Taskforce Charter, or any other announcement regarding the Taskforce, make such findings.

---

law/#:~:text=WASHINGTON%2C%20D.C.%20%E2%80%93%20The%20Consumer%20Financial,the%20federal%20consumer%20financial%20laws.
[77] *GSA Federal Advisory Committee Act Database: All Agency Accounts*, GSA, https://www.facadatabase.gov/FACA/apex/FACAPublicAgencyNavigation (last visited June 15, 2020).

95.     Moreover, the Taskforce is not "essential" within the meaning of FACA because the information the Bureau seeks from the Taskforce is "already available through another . . . source within the federal government."

96.     As noted above, the objective of the Taskforce is to provide recommendations on "ways to improve and strengthen consumer financial laws and regulations, including recommendations for resolving conflicting requirements . . . , reducing unwarranted regulatory burdens . . . , improving consumer understanding of markets and products, and identifying gaps in knowledge that should be addressed through future Bureau research." Charter ¶ 3.

97.     The Bureau already has offices that focus on these issues. For example, the Bureau has a Consumer Education and Engagement Division that could surely provide the Bureau with recommendations on "improving consumer understanding of markets and products" as the Taskforce has been tasked.[78] Indeed, that division contains an entire Office of Financial Education whose mission is to "strengthen[] the delivery of financial education throughout the entire United States and create[] opportunities for people to obtain the skills to build their financial well-being."[79]

98.     Similarly, the Bureau has a Division devoted to Research, Markets, and Regulations that provides subject matter expertise, market insights, and strategic direction for the Bureau's various rulemakings.[80] The Bureau has failed to explain why this Division cannot adequately provide the Bureau with the information it requested from the Taskforce regarding

---

[78] *Consumer Education and Engagement Division*, CFPB, https://www.consumerfinance.gov/about-us/the-bureau/bureau-structure/consumer-education-engagement/ (last visited June 15, 2020).
[79] *Id.*
[80] *Research, Markets & Regulations*, CFPB, https://www.consumerfinance.gov/about-us/the-bureau/bureau-structure/research-markets-regulation/ (last visited June 15, 2020).

how to "resolv[e] conflicting requirements . . . [and] reduc[e] unwarranted regulatory burdens[.]"
Charter ¶ 3.

99.     The Bureau thus has not made the public interest findings required by FACA.

**b.   Defendants Illegally Appointed Members to the Taskforce**

100.    FACA also requires "the membership of [an] advisory committee to be fairly
balanced in terms of the points of view represented and the functions to be performed by the
advisory committee." 5 U.S.C. App. 2 § 5(b)(2), (c). Consistent with this requirement, the
Bureau was required to include in its consultation with the GSA "a description of the agency's
plan to attain fairly balanced membership" before establishing the Taskforce. 41 C.F.R. § 102-
3.60(b)(3).

101.    On information and belief, the Bureau did not create a fairly balanced
membership plan before establishing the Taskforce.

102.    Nor did the Bureau select Taskforce members that are "fairly balanced in terms of
the points of views represented." Rather, the Taskforce is comprised solely of members who
have publicly adopted policy positions that expressly view regulation as paternalistic and
harmful to consumers and industry alike, or who have historically represented industry interests.

103.    Appointed as chairman of the Taskforce, Todd Zywicki's deregulatory and pro-
industry views are clear and longstanding. In 2009, Mr. Zywicki adamantly opposed the CFPB's
creation, arguing that the financial crisis was "not a crisis of consumer protection" and that
regulating consumer financial products would have "unintended consequences," such as stifling
innovation and potentially "undermin[ing] the soundness of financial institutions."[81]

---

[81] Zywicki, *supra* note 51.

104.     Since then, he has continued to deny the value of protecting consumers from dangerous financial products because, in his view, doing so would create moral hazards.[82] According to Mr. Zywicki, consumers who lost their homes to foreclosure following the financial crisis "were not victims," but instead were "rationally respond[ing] to incentives."[83] Against this background, he has been described as the "toughest critic of [CFPB]."[84]

105.     He has also worked as the Director of the Global Economics Group—a consulting firm hired by Visa, Bank of America, and Citigroup to influence the Bureau and other regulatory agencies[85]—and worked to defend Morgan Drexen, a debt relief company, from a Bureau investigation.[86]

106.     More recently, he has called the Bureau a "tragic failure"[87] and stated that the Bureau has "constantly expanded its power, promoted its own bureaucratic interests at the expense of the public, and trampled underfoot other public policies, such as consumer choice and financial innovation."[88]

107.     The other Taskforce members have expressed similar views on consumer finance regulation and come from backgrounds associated with industry interests.

---

[82] Todd Zywicki, *The Economic and Political Significance of the Dodd-Frank Act*, Hillsdale Coll. (Nov. 26, 2013), https://www.youtube.com/watch?v=49WLXiEoepk&feature=youtu.be&t=5138 (*see* 1:25:38).
[83] *Id.*
[84] *See* Lee Fang, *The Scholars Who Shill for Wall Street*, The Nation (Oct. 23, 2013), https://www.thenation.com/article/archive/scholars-who-shill-wall-street/.
[85] *Id.*
[86] *See* Decl. of Todd Zywicki, *Morgan Drexen, Inc. v. CFPB*, No. 13-cv-01112 (D.D.C. July 22, 2013) (ECF No. 3-4).
[87] Lorraine Woellert & Josh Dawsey, *Trump's Allies Building Case to Oust Consumer Protection Head*, Politico (Feb. 6, 2017), https://www.politico.com/story/2017/02/trump-richard-cordray-consumer-financial-protection-bureau-234699.
[88] Evan Weinberger & Lydia Beyoud, *Financial Watchdog's Conflicted Task Force Earning Top Dollar*, Bloomberg Law (May 11, 2020), https://news.bloomberglaw.com/banking-law/financial-watchdogs-conflicted-task-force-earning-top-dollar.

108.    Howard Beales, for example, has been described by the Wall Street Journal as "an academic whose studies have been used by a tobacco company and . . . consumer-goods makers to fight federal regulations."[89]

109.    Like Mr. Zywicki, Dr. Beales works for a consulting firm hired by industry,[90] and recently provided his services to a payday lender in bankruptcy proceedings,[91] who had previously been sued by the Bureau for servicing and collecting on loans with interest rates up to 448 percent that were void under state law.[92] In that capacity, he has argued that such loans were not "predatory," but were instead "beneficial to consumers."[93]

110.    In published studies, he has expanded on this position, arguing that payday loans are beneficial (because they "offer an alternative form of credit" and provide "consumers the freedom to choose products that best serve their needs") and should not be regulated with ability-to-repay requirements (because "affordability criteria risk[] substantial reductions in credit.").[94]

111.    Similarly, Thomas Durkin has partnered with Mr. Zywicki to author a book, academic articles, and op-eds that advocate for the rollback of financial regulation in favor of payday loans and other dangerous financial products. For example, in an op-ed titled *Why*

---

[89] Glenn R. Simpson & Gordon Fairclough, *New FTC Chief is Expected to Name Regulatory Skeptic to Consumer Post*, Wall St. J. (May 31, 2001), https://www.wsj.com/articles/SB991260563410239800.

[90] *Dr. J. Howard Beales III*, NERA Econ. Consulting, https://www.nera.com/experts/dr-howard-beales.html.

[91] Transcript of Hearing at 47-48, *In re Think Finance, LLC,* No. 17-33964 (Bankr. N.D. Tex. Oct. 11, 2018), (ECF No. 1069) (describing expert services provided by Mr. Beales to Think Finance) [hereinafter Think Finance Bankruptcy Transcript].

[92] Complaint ¶¶ 1, 15, 18, *CFPB v. Think Finance, LLC,* No. 17-cv-00127-BMM (D. Mont. Nov. 15, 2017) (ECF No. 1), *available at* https://files.consumerfinance.gov/f/documents/cfpb_think-finance_complaint_112017.pdf.

[93] *See* Think Finance Bankruptcy Transcript at 48.

[94] J. Howard Beales, III & Anand M. Goel, Small-Dollar Installment Loans: An Empirical Analysis 58 (Mar. 20, 2015), *available at* https://www.consumerfinancemonitor.com/wp-content/uploads/sites/14/2015/03/Navigant-Economics-Report-3.pdf.

*Everything Elizabeth Warren Told You About Consumer Credit Is Wrong*, Mr. Durkin and Mr.

Zywicki argue that payday loans are "legal, high-cost [credit] options," that benefit consumers,

while protective regulations of such loans are "paternalistic" and "make credit more expensive

and less available."[95] The two partners have made similar arguments in various articles and a

book titled *Consumer Credit and the American Economy*.[96]

112.    Mr. Zywicki, Dr. Beales, and Mr. Durkin also collectively appeared on a panel

together in 2014 at the Research Integrity Council's first academic forum where they expressed

pro-industry or deregulatory views.[97] There, Mr. Durkin, for example, criticized the CFPB for

not sufficiently coordinating with industry when conducting its research.[98] Dr. Beales, for his

part, criticized the CFPB's Payday Loan Report (later used to support its regulation of payday

lenders),[99] which he argued was based on a flawed survey.[100]

113.    The remaining two Taskforce members are partners at law firms where they have

represented industry and taken deregulatory stances. William MacLeod is a partner at Kelley

Drye, where he "[fights] onerous regulations" and defends corporations from government

---

[95] Todd Zywicki & Thomas Durkin, *Why Everything Elizabeth Warren Told You About Consumer Credit Is Wrong*, Forbes (Oct. 10, 2014), https://www.forbes.com/sites/realspin/2014/10/10/why-everything-elizabeth-warren-told-you-about-consumer-credit-is-wrong/.

[96] Thomas Durkin et al., *Consumer Credit and the American Economy* (2014), https://www.amazon.com/Consumer-Financial-Management-Association-Synthesis/dp/0195169921; *see also, e.g.*, Thomas Durkin et al., *Consumer Credit and the American Economy: An Overview*, J. of L. Econ. & Pol'y (2015).

[97] Kim Phan, *Independent Research Could Improve the CFPB Rulemaking Process*, Consumer Fin. Monitor: Ballard Spahr (June 13, 2014), https://www.consumerfinancemonitor.com/2014/06/13/independent-research-could-improve-the-cfpb-rulemaking-process/.

[98] *Id.*

[99] CFPB, Payday Lending and Deposit Advance Products (Apr. 24, 2013), https://files.consumerfinance.gov/f/201304_cfpb_payday-dap-whitepaper.pdf.

[100] Phan*, supra* note 97.

investigations.[101] In addition to his activities as a law firm partner, Mr. MacLeod has publicly

adopted pro-industry, deregulatory views. For example, in 2011, he moderated a panel titled

"Consumer Protection: The Demise and Return (?) of the 'Nanny State,'" which included Dr.

Beales as a panelist.[102]

114.    Similarly, Jean Noonan is a partner at Hudson Cook,[103] a law firm that primarily

serves clients in the banking and consumer financial services industry.[104] In that capacity, she

represents consumer financial services companies, including payday lenders, who have been

investigated and sued by the Bureau for predatory anti-consumer practices.[105] She is also a

founding member of the American College for Consumer Financial Services Lawyers,[106] an

association of lawyers who represent the financial services industry.[107]

115.    Conversely, none of the selected Taskforce members has a background

advocating for consumers, nor does any appear to believe that the CFPB should vigorously

protect consumers from dangerous and confusing financial products.

---

[101] *William C. MacLeod*, Kelley Drye, https://www.kelleydrye.com/Our-People/William-C-MacLeod.

[102] Geo. Mason Univ., Agenda: Lessons Since the Reagan Revolution at the FTC (Sep. 30, 2011), *available at* http://masonlec.org/site/files/2011/06/Reagan-FTC-at-30-AGENDA-of-8-9-11.pdf.

[103] *L. Jean Noonan*, Hudson Cook, https://www.hudsoncook.com/attorney/jean-noonan/.

[104] Hudson Cook, https://www.hudsoncook.com/index.cfm.

[105] *L. Jean Noonan*, Hudson Cook, https://www.hudsoncook.com/attorney/jean-noonan/; Government Investigations, Examinations and Enforcement, Hudson Cook, https://www.hudsoncook.com/practices/government-investigations-examinations-enforcement/index.cfm.

[106] *L. Jean Noonan*, Hudson Cook, https://www.hudsoncook.com/attorney/jean-noonan/.

[107] *About the College*, Am. Coll. Consumer Fin. Servs. Lawyers, http://www.accfsl.org/about-the-college/; *see also* Press Release, Ballard Spahr LLP, *Ballard Spahr's Mark Furletti Named a Fellow in the American College of Consumer Financial Services Lawyers* (Apr. 1, 2019), https://www.ballardspahr.com/eventsnews/pressreleases/2019-04-01-mark-furletti-named-fellow-in-accfs-lawyers (announcing the College's recognition of a law firm partner and explaining that the College is an invitation-only association of attorneys in the consumer financial services industry).

116.    The absence of members with these views is notable given that CFPB received numerous applications from such candidates, including from Professor Engel. As noted above, Professor Engel has engaged in research on many aspects of consumer finance and has won awards for her extensive work on the role subprime mortgages played in the 2008 financial crisis. *See supra* ¶ 18. As part of that research, Professor Engel has explained that the 2008 financial crisis could have been avoided if federal regulators had stepped in to protect consumers from abusive and predatory loans.[108]

117.    Drawing lessons from this experience, she has argued, among other things, that responsible consumer finance regulations should require that lenders ensure that borrowers can afford to repay their loans,[109] prevent lenders from ambushing borrowers with nasty surprises (such as hybrid adjustable rate mortgages),[110] and help ensure that consumers understand the available financial products in order to make informed decisions.[111]

118.    CFPB received applications from at least four other applicants who have similarly argued in support of robust consumer protections and acknowledged the value of regulations that protect against abusive and predatory products.[112]

---

[108] Subprime Virus at 149.
[109] *Id.* at 228.
[110] *Id.* at 229.
[111] *Id.* at 230-31.
[112] Such applicants included, for example, Professor Prentiss Cox, who currently teaches at the University of Minnesota Law School. Ex. D-1. Like Professor Engel, Professor Cox has devoted much of his career to improving consumer protection laws, including by drafting protective legislation. He was the primary drafter of Minnesota's anti-predatory lending law, which was enacted in 2007 and provided an early model for ability-to-repay regulatory requirements. *Id.* at 2. He also assisted in drafting a Minnesota law that restricted foreclosure rescue and equity stripping scams. *Id.* Additionally, Professor Cox has extensive practical experience advocating on behalf of consumers, including his time as an Assistant Attorney General in Minnesota where he enforced consumer protection laws. *Id.* at 1. Similarly, in his current position at the University of Minnesota Law School, he runs a consumer protection clinic where he and his students have

119.    In sum, Defendants have set up a Taskforce that is comprised wholly of members who have either publicly criticized consumer protections as paternalistic and harmful to industry or who have historically represented industry interests. The makeup of the Taskforce excludes *any* representation of advocates committed to ensuring that consumers are protected from dangerous financial products.

120.    On information and belief, this imbalanced composition was the result of a biased selection process designed to ensure that the Taskforce and its recommendations reflect the views of the Bureau's leadership, who have systematically worked to dismantle consumer protections since 2017, as shown above.

121.    Indeed, Defendants appear to have intentionally screened applicants based on whether they supported deregulation. For example, before her application was declined, Professor Engel was interviewed by Chris Muffirage, a political appointee, who "posed questions in an inquisitorial manner" for the purpose of "determin[ing] [Professor Engel's] stance on deregulation." Ex. E (letter of complaint submitted to Kraninger). Notably, Professor Engel was not asked about her qualifications and experience. *Id.*

122.    Defendants' decision to establish such an imbalanced advisory committee is especially striking given that the CFPB was created to protect consumers in the wake of a crisis caused, in part, by what Congress determined was a deeply flawed consumer protection regulatory regime.

---

advocated on behalf of consumers under the Fair Debt Collections Practices Act, the Electronic Funds Transfer Act, and the Fair Credit Reporting Act. *Id.*

### c.   Defendants Have Unlawfully Refused to Provide Public Notice and Participation in Meetings

123.    FACA requires that an agency provide "timely notice" of and hold open to the public "each advisory committee meeting." *Id.* § 10(a)(1)-(2). An agency must also allow interested persons to "attend, appear before, or file statements with [the] committee." *Id.* § 10(a)(3).

124.    GSA's implementing regulations further specify that agencies are required to publish notice of their meetings "at least 15 calendar days prior" to the meetings, unless documented "exceptional circumstances" require otherwise. 41 C.F.R. § 102-3.150. Further, all meetings must be held "in a manner or place reasonably accessible to the public" and allow "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit." *Id.* § 102-3.140(a),(d).

125.    CFPB has violated each of these requirements. On March 10, 2020, the Taskforce held a meeting to seek input from certain stakeholders on "ways to harmonize and modernize federal consumer financial laws." *See* Ex. C. Prior to the meeting, Defendants failed to provide public notice.

126.    Likewise, they did not hold the meeting in a manner accessible to the public or allow any members of the public to address the Taskforce.

127.    Instead, Defendants expressly restricted attendance to invited stakeholders, who were limited to industry representatives and certain consumer advocacy groups. *Id.* (noting that the meeting was "closed press, off the record, not for attribution in social media, and open to invitees only"). Director Kraninger recently testified that the March 10 meeting was attended only by those groups. *Consumer Financial Protection Bureau's Semi-Annual Report to Congress*, Hearing Before the U.S. S. Comm. on Banking, Hous., and Urban Aff., (Mar. 10,

38

2020), https://www.banking.senate.gov/hearings/02/21/2020/the-consumer-financial-protection-bureaus-semi-annual-report-to-congress.

128.    Upon information and belief, the Taskforce has met on other occasions in closed sessions to discuss matters related to the Taskforce's final report and recommendations. *Id.* at 1:55 (indicating that the Taskforce's March 10, 2020 meeting was the "first" of such meetings, that the Taskforce would meet with other CFPB advisory committees later that week, and that both such meetings were part of "an ongoing process"); Charter ¶ 9 (directing the Taskforce to "meet as frequently as necessary to complete the [final] report" by January 2021).

129.    Defendants have not provided notice of these meetings, nor allowed the public to attend.

130.    At the March 10 meeting, a U.S. PIRG representative expressly asked whether the Taskforce would hold future meetings open to the public. Both Mr. Zywicki, the chair of the Taskforce, and Matt Cameron, the Staff Director assigned to the Taskforce by the CFPB, declined to answer in the affirmative.

131.    On June 4, 2020, Plaintiffs NACA and Professor Engel sent a letter to the Bureau requesting that the Taskforce provide notice of and hold open to the public all future meetings. Ex. F. To date, the Bureau has not responded.

132.    On June 8, 2020, Mr. Zywicki published a blog post announcing the Taskforce's intent to hold a public hearing later this summer.[113] The blog post also announced a public

---

[113] Todd Zywicki, *Taskforce on Federal Consumer Financial Law Chartering a Path Ahead*, CFPB (June 8, 2020), https://www.consumerfinance.gov/about-us/blog/taskforce-federal-consumer-financial-law-charting-path-ahead/.

listening session with the Bureau's four other advisory committees at an unspecified date this fall.[114]

133.    While the blog post claims that these events are intended to "ensur[e] that the public can inform [the Taskforce's] work," it does not state that the Taskforce will make its other meetings open to the public.[115] Nor does it state that the public hearing and listening session are the only meetings it intends to hold.[116] And, of course, this belated notice does nothing to undo the damage from the Taskforce's prior closed meetings.

### d.  Defendants Have Unlawfully Withheld Taskforce Records

134.    FACA requires Defendants to make available for public inspection "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents … made available to or prepared for or by" the committee. 5 U.S.C. App. 2 § 10(b). Moreover, when such records are relevant to a particular meeting, they must be made available in advance or at the meeting, so that the public can "follow the substance of the [Taskforce's] discussions." *Food Chem. News*, 980 F.2d at 1472.

135.    Defendants have violated this requirement with respect to records relevant to the March 10, 2020 meeting. Prior to that meeting, Defendants circulated to invited attendees a list of questions that would be discussed at the meeting. Ex. C. Defendants have not made this list public. Defendants also heard from various stakeholders at the meeting, but did not announce in advance who would be speaking or presenting. Nor have copies of their remarks or the meeting minutes been made publicly available.

---

[114] *Id.*
[115] *Id.*
[116] *Id.*

136.    As explained above, the Taskforce has met on other occasions in closed sessions to discuss matters related to the Taskforce's final report and recommendations. Minutes, notes, and other records from these meetings have not been made publicly available.

137.    Defendants have not provided any of the other records made available to or prepared by the Taskforce. To date, the only records made publicly available are the Taskforce Charter, various press releases announcing the establishment of the Taskforce and the selection of its members, and a March 27 Request for Information.[117]

138.    On June 4, 2020, Plaintiffs NACA and Professor Engel sent a letter to the Bureau requesting that the Taskforce's records be made available. Ex. F. To date, the Bureau has not responded. In sum, Defendants have operated the Taskforce outside the public eye. The lack of notice for any of the Taskforce meetings, combined with Defendants' failure to make available *any* records beyond those that establish the existence of the Taskforce, has made it impossible for the public to follow along with the Taskforce's work.

## IV.    The Taskforce Has Harmed Plaintiffs and Advocates for Consumer Protection

139.    Because of the opaque process through which the Taskforce was established, the secrecy with which it has operated, and its lack of a balanced composition of members, the Taskforce is already causing Plaintiffs to suffer harm by impeding NACA's and U.S. PIRG's mission-driven educational activities, thereby forcing both to divert resources in response, and by preventing Professor Engel from carrying out her academic work. In turn, Plaintiffs' ability to meaningfully participate in the Taskforce's work and advocate for policies consistent with their

---

[117] *See generally Taskforce on Federal Consumer Financial Law*, CFPB, https://www.consumerfinance.gov/about-us/taskforce-federal-consumer-financial-law/ (last visited on June 15, 2020).

interests has been, and will continue to be, compromised by Defendants' noncompliance with FACA.

140.    To start, the secrecy of the Taskforce—including its failures to publish the requisite findings, consult with the GSA, and provide transparency into its records and meetings—prevents Plaintiffs from studying how the Taskforce's work may impact the regulation of consumer financial products and from informing the public about these issues.

141.    While the Taskforce belatedly announced on June 9, 2020 that it would hold two events designed to *solicit* public feedback, *supra* ¶¶ 132-133, this decision falls well short of the transparency FACA requires, which is intended to provide insight into the Taskforce's work. As an initial matter, the decision does nothing to undo the damage of prior non-public meetings. Nor do these measures provide sufficient transparency or public participation going forward—the Taskforce has provided no indication that it will hold *all* of its future meetings open to the public or make its records publicly available as required by FACA. Accordingly, much, if not most, of the Taskforce's work—*i.e.*, the process of arriving at recommendations for "improving" consumer financial laws and regulations—will remain outside of the public eye.

142.    Plaintiffs are thus left to their own devices to try to keep abreast of the Taskforce's activities and likely consequences of its work, and are required to expend time and organizational resources pursuing Taskforce records that should already be public. For example, as noted above, Plaintiffs NACA and Professor Engel sent a letter to CFPB requesting that the Bureau release the Taskforce's records and hold its meetings open to the public. Ex. F. Similarly, both NACA and U.S. PIRG attended the March 10, 2020 meeting to express their concerns that the Taskforce was operating in violation of FACA and to request that the Taskforce hold its meetings open to the public.

143.     Plaintiffs are statutorily entitled to information about the Taskforce and would seek to use it as part of their work and advocacy efforts, if made available. By mandating that advisory committees like the Taskforce provide transparency into their affairs, Congress sought to equip Plaintiffs and others with the information necessary to protect and advocate for their interests.

144.     Specifically, because they have been denied access to the information necessary to determine how the Taskforce's work will shape the CFPB's policies under consumer financial protection laws, NACA is unable to know how best to create educational and training programs that will advance consumer interests, or advise others on the same, given the potentially shifting landscape. Similarly, U.S. PIRG is unable to keep the public abreast of the Taskforce's efforts to reshape consumer financial laws and regulations. If both organizations had access to that information, they would seek to publicize the Taskforce's operations and decisions to its membership and others, as they have in the past with respect to the CFPB.

145.     Likewise, Professor Engel cannot study and write about records she cannot access. The Taskforce's lack of transparency therefore prevents her from doing her work as an academic, work that is both part of her career and deeply meaningful to her.

146.     The Taskforce's secrecy also prevents Plaintiffs from participating in its work. As currently operated, Plaintiffs have no visibility into the Taskforce's operations, and cannot participate in the Taskforce's meetings. Were the Taskforce operated transparently, it would be easier for Plaintiffs to try to persuade the Taskforce to adopt recommendations for needed consumer protections. Instead, the lack of access to information about the Taskforce's work hampers Plaintiffs' ability to advocate before the Taskforce and makes it more likely that recommendations favorable to industry will come to fruition.

147.    For example, all three Plaintiffs have submitted comments in response to the Taskforce's March 27, 2020 Request for Information. Ex. G (Responses to Request for Information). Without access to the Taskforce records and meeting minutes, Plaintiffs are in the dark with respect to the recommendations the Taskforce may be considering. If Plaintiffs had access to such information, they would have been able to tailor their comments to address any issues under the Taskforce's consideration.

148.    These harms are exacerbated because the Taskforce does not include a member who represents the interests of consumer advocates or academics, like Plaintiffs, who believe that regulating dangerous financial products is essential to protect consumers and ensure the stability of the economy.

149.    Plaintiffs' views are necessarily not represented on the Taskforce.

150.    Professor Engel was also injured by the Taskforce's rejection of her application through a biased process that yielded an imbalanced slate.

151.    Once the Taskforce has completed its final report, its work will further inflict concrete, imminent harms on Plaintiffs. Given the statements and public positions of its members, the Taskforce is likely to issue a report that adopts the views of several Taskforce members, including Chairman Zywicki, that protecting consumers from abusive financial products is paternalistic and harmful. And because the Taskforce does not contain members who would represent the contrary view, the Taskforce's report would fail to represent the views of many consumer finance experts—*i.e.*, that consumer protections are beneficial to both consumers and the broader economy. That failure stands in stark contrast to the history and purpose of the CFPB as set forth in the Dodd-Frank Act.

152.     Specifically, the Taskforce's report is likely to recommend deregulatory measures that will allow the proliferation of harmful consumer financial products, such as payday lending—a product that both Mr. Zywicki and Mr. Durkin have endorsed.[118] Such a result is the predictable consequence of the Bureau appointing to the Taskforce individuals holding well-established deregulatory positions, and failing entirely to include consumer advocacy perspectives that were foundational to the CFPB's purpose and that are shared by many consumer finance experts, like Plaintiffs.

153.     The Taskforce's report will likely be used to influence CFPB policy. In the press release announcing the Taskforce, Defendants state that the Taskforce was inspired by a prior commission established in 1968 whose recommendations "led to significant legislative and regulatory developments in consumer finance."[119] Given the tremendous resources already invested in the Taskforce (including by paying the members extremely generous pro-rated salaries[120] and by assigning multiple CFPB employees to support and facilitate the Taskforce's work), the Taskforce's recommendations will likely serve as a blueprint for unwinding consumer protections.

154.     Thus, the Taskforce is likely to issue recommendations that will influence CFPB policy in a manner harmful to Plaintiffs' interests, causing Plaintiffs to expend further resources to monitor, and if necessary, advocate against harmful agency actions. Even if the Taskforce's

---

[118] Zywicki & Durkin, *supra* note 95.

[119] Press Release, CFPB, *CFPB Announces Taskforce on Federal Consumer Financial Law* (Oct. 11, 2019), https://www.consumerfinance.gov/about-us/newsroom/cfpb-announces-taskforce-federal-consumer-financial-law/.

[120] Evan Weinberger & Lydia Beyoud, *Financial Watchdog's Conflicted Task Force Earning Top Dollar*, Bloomberg Law (May 11, 2020), https://news.bloomberglaw.com/banking-law/financial-watchdogs-conflicted-task-force-earning-top-dollar (explaining that the Taskforce members' pro-rated salaries are near the top of the CFPB's payscale).

recommendations are rejected, the financial services industry might seek to use those recommendations for legislative advocacy efforts, further requiring Plaintiffs to rebut them.

155.    In the midst of this potentially new landscape, NACA and U.S. PIRG will be required to divert resources to first understand how and why the Taskforce reached its final conclusions, what the impact of those will be, and second, to adapt their educational and advocacy work to this new reality. This work will be made significantly more difficult by the Taskforce's current lack of transparency, which has impaired the ability of Plaintiffs to participate and follow the work of the Taskforce. Professor Engel will similarly be forced to analyze the Taskforce's biased recommendations and, potentially, refocus her academic efforts accordingly.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Unlawful Creation of a Federal Advisory Committee in Violation of
### 5 U.S.C. § 706, 5 U.S.C. App. 2 § 9, 41 C.F.R. §§ 102-3.30, 102-3.60

156.    Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if fully set forth herein.

157.    The Taskforce is an advisory committee subject to the requirements of FACA.

158.    FACA and its implementing regulations require certain findings and procedures before an agency may create an advisory committee. Defendants failed, in multiple respects, to comply with such requirements. In particular:

      a.   Defendants have not made the requisite findings concerning whether: (1) the Taskforce is "in the public interest in connection with the performance of duties imposed on that agency by law," 5 U.S.C. App. 2 § 9(a)(2); (2) the Taskforce is "essential to the conduct of agency business," 41 C.F.R. § 102-3.30(a); and (3)

"the information to be obtained [through the Taskforce] is not already available through another advisory committee or source within the Federal Government," *id.*

    b.    Defendants did not meaningfully consult with GSA before creation of the Taskforce. 5 U.S.C. App. 2 § 9(a)(2).

    c.    Defendants did not prepare a Membership Balance Plan before establishing the Taskforce. 41 C.F.R. § 102-3.60(a), (b)(3).

159.   Accordingly, Defendants' creation of the Taskforce was done without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

**Second Claim for Relief**
**Failure to Provide for Public Notice and Participation in Advisory Committee Meetings**
**in Violation of 5 U.S.C. § 706, 5 U.S.C. App. 2 § 10, 41 C.F.R. § 102-3.145**

160.   Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if fully set forth herein.

161.   FACA and its implementing regulations require that Defendants be transparent when conducting advisory committee business.

162.   Defendants have failed to meet those requirements. Specifically, Defendants have failed to provide adequate notice of all Taskforce meetings, 5 U.S.C. App. 2 § 10(a)(2), 10(d); 41 C.F.R. § 102-3.145, or to allow meaningful public participation at all Taskforce meetings, 5 U.S.C. App. 2 § 10(a)(1), (a)(2), 10(d); 41 C.F.R. § 102-3.145.

163.   Defendants' failures, described above, are arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority, and/or constitute agency action unlawfully withheld. 5 U.S.C. § 706(1), (2).

**Third Claim for Relief**
**Failure to Disclose Advisory Committee Materials In a Manner That Provides for**
**Meaningful Public Participation in Violation of 5 U.S.C. § 706, 5 U.S.C. App. 2 § 10**

164.    Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if

fully set forth herein.

165.    Contrary to FACA, Defendants have failed to make available to the public the

"[r]ecords, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda,

[and] other documents . . . made available to or prepared for or by" the Taskforce. 5 U.S.C. App.

2 § 10(b).

166.    Defendants' failures, described above, are arbitrary, capricious, an abuse of

discretion, not in accordance with law, and in excess of statutory authority, and/or constitute

agency action unlawfully withheld. 5 U.S.C. § 706(1), (2).

**Fourth Claim for Relief**
**Unfairly Balanced Advisory Committee**
**In Violation of 5 U.S.C. § 706, 5 U.S.C. App. 2 § 5**

167.    Plaintiffs repeat and incorporate by reference each of the forgoing allegations as if

fully set forth herein.

168.    FACA requires that an advisory committee be "fairly balanced in terms of the

points of view represented and the functions to be performed by the advisory committee." 5

U.S.C. App. 2 § 5(b)(2).

169.    The Taskforce's stated function is to provide recommendations on "ways to

improve and strengthen consumer financial laws and regulations[.]" Charter ¶ 3. The Taskforce

does not include representation of consumer advocates or consumer finance law experts who

endorse consumer protections despite the fact that the Taskforce is tasked with advising the

agency on how to improve laws and regulations intended to protect consumers. Failure to include

48

these perspectives leaves the Taskforce incapable of considering this much-disputed topic with integrity.

170.     Defendants' actions in appointing the Taskforce members are arbitrary, capricious, an abuse of discretion, not in accordance with law, and in excess of statutory authority. 5 U.S.C. § 706(2).

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

1.     Declare that Defendants' creation and administration of the Taskforce violates the APA, FACA, and FACA's implementing regulations, and that the establishment of the Taskforce is therefore unlawful;

2.     set aside the Taskforce's charter and all orders and decisions attendant to the Taskforce's creation, including the appointments of individual Taskforce members;

3.     through the named Defendants, enjoin the Taskforce from meeting, advising the Director, and otherwise conducting Taskforce business;

4.     order Defendants to immediately release all materials prepared for the Taskforce or its subcommittees, and to provide a *Vaughn* index for such material and those withheld from production for any reason;

5.     enjoin Defendants from relying on and using any recommendations or advice from the Taskforce;

6.     award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and

7.     grant any other relief this Court deems appropriate.

DATED this June 16, 2020.

Respectfully submitted,

/s/ David A. Nicholas

Kristen Miller (D.C. Bar No. 229627)*
John Lewis (D.C. Bar No. 1033826)*
Sean Lev (D.C. Bar No. 449936)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 601-2483
kmiller@democracyforward.org
jlewis@democracyforward.org
slev@democracyforward.org

*Counsel for Plaintiffs*

David A. Nicholas (BBO# 553996)
Of Counsel
Wolf Popper LLP
20 Whitney Road
Newton, MA 02460
(617) 964 - 1548
dnicholas@wolfpopper.com

*Counsel for Plaintiffs*

Michael Landis*
The Center for Public Interest Research
1543 Wazee St., Ste. 400
Denver, CO 80202
(303) 573-5995 ext. 389
mlandis@publicinterestnetwork.org

*Counsel for U.S. PIRG*

**Pro Hac Vice* Motion forthcoming