UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF CONSUMER ADVOCATES, et al., | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 20-11141-JCB |
| | ) |
| DAVE UEJIO, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,[1] et al., | ) ) ) |
| | ) |
| Defendants. | ) |

———————————————————————

ORDER ON DEFENDANTS' PARTIAL MOTION TO DISMISS[2]
[Docket No. 19]

February 25, 2021

Boal, M.J.

In this action, plaintiffs National Association of Consumer Advocates ("NACA"), U.S.

Public Interest Research Group ("U.S. PIRG"), and Professor Kathleen Engel (collectively, the

"Plaintiffs") challenge the Consumer Financial Protection Bureau's Federal Consumer Financial

Law Taskforce under the Federal Advisory Committee Act.  Defendants have moved to dismiss

the Complaint's First and Fourth Claims for Relief as well as the first, second, third, and fifth

elements of Plaintiffs' Prayer for Relief for lack of standing pursuant to Rule 12(b)(1) of the

Federal Rules of Civil Procedure.  Docket No. 19.  In addition, the Defendants argue that the

---

[1] Dave Uejio, who is now the Acting Director of the Consumer Financial Protection Bureau, is substituted for former Director Kathleen Kraninger as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d).

[2] On July 16, 2020, the parties consented to the jurisdiction of a U.S. Magistrate Judge for all purposes.  Docket No. 18.

Court lacks jurisdiction with respect to those claims as well as the Second Claim for Relief, because they have been rendered moot by the release of the Taskforce's report on January 5, 2021 and the subsequent resignation of all the members of the Taskforce. Docket No. 40. For the following reasons, I deny the Defendants' motion to dismiss and find that the case is not moot.

I.      BACKGROUND

        A.      Procedural History

        Plaintiffs filed their complaint on June 16, 2020. Docket No. 1. On August 17, 2020, Defendants filed the instant motion to dismiss. Docket No. 19. Plaintiffs filed an opposition on September 14, 2020. Docket No. 23. Defendants filed a reply on September 29, 2020. Docket No. 26. On October 5, 2020, the Plaintiffs filed a notice of supplemental authority. Docket No. 29. I heard oral argument on January 6, 2021.

        After the January 6, 2021 hearing, the parties submitted briefs addressing whether any part of the case became moot due to the release of the Taskforce's report. Docket Nos. 39, 40.

        B.      Federal Advisory Committee Act

        The government has a statutory duty to ensure transparency and a balanced membership in forming advisory committees. The Federal Advisory Committee Act ("FACA"), enacted in 1972, was "born of a desire to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch of the Federal Government.'" Pub. Citizen v. Dep't of Justice, 491 U.S. 440, 445-446 (1989) (quoting 5 U.S.C. app. 2 § 2(a)). One of FACA's purposes is to "provide uniform standards for the creation, operation, and management of [advisory] committees." Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 16 (1st Cir. 2020)

(quoting S. Rep. No. 92-1098, at 1S. Rep. No. 92-1098, at 1 (1972)).  FACA followed on the heels of a disclosure that an agency, without statutory authority, had established a close liaison with an advisory council composed entirely of business officials from each of the major industries but not consumer, labor, or small business representatives.  Id.

To achieve its ends, FACA imposes several requirements on advisory committees. Unless "specifically authorized by statute or by the President," an advisory committee cannot be established without an agency head "determin[ing] as a matter of formal record" that the committee is "in the public interest in connection with the performance of duties imposed on that agency by law."  5 U.S.C. App. 2 § 9(a)(2).  In addition, an advisory committee subject to FACA cannot meet until a "charter has been filed" with the head of the agency to which it reports and with the House and Senate committees having legislative jurisdiction over that agency.  5 U.S.C. App. 2 § 9(c).  The charter must also be filed with the Committee Management Secretariat of the General Services Administration ("GSA").  41 C.F.R. § 102-3.70(a)(3)-(4).  Each committee also must have a "designated [] officer or employee of the Federal Government to chair or attend each meeting."  5 U.S.C. App. 2 § 10(e).  The designated federal officer serves as the primary contact for members of the public who seek more information about the advisory committee's meetings and hearings.  41 C.F.R. § 102-3.150(a)(5).  Moreover, advisory committees must give notice of any meetings in the Federal Register at least fifteen days before the meeting is held.  5 U.S.C. App 2 § 10(a)(2); 41 C.F.R. § 102-3.150(a).  Meetings must be open to the public, 5 U.S.C. App. 2 § 10(a)(1), and each committee must make its records and drafts publicly available.  Id. § 10(b)-(c).

In addition, FACA requires a committee's implementing legislation to "require the membership of [any] advisory committee to be fairly balanced in terms of the points of view

represented and the functions to be performed by the advisory committee." 5 U.S.C. App. 2 §

5(b)(2).  It also requires that such legislation "contain appropriate provisions to assure that the

[committee's] advice and recommendations . . . will not be inappropriately influenced by the

appointing authority or by any special interest, but will instead be the result of the advisory

committee's independent judgment."  Id. § 5(b)(3).  Agency heads "shall" follow these

guidelines in creating an advisory committee.  Id. § 5(c).

FACA contains no private right of action.  The Administrative Procedure Act ("APA"),

however, provides a vehicle for review of agency decisions taken allegedly in violation of

federal law.  Union of Concerned Scientists, 954 F.3d at 17.

C.      The Consumer Financial Protection Bureau's
        Federal Consumer Financial Law Taskforce

In 2010, in the wake of the 2008 financial crisis, Congress created the Consumer

Financial Protection Bureau (the "Bureau") as an independent financial regulator within the

Federal Reserve System.  Seila Law LLC v. Consumer Financial Protection Bureau, 140 S. Ct.

2183, 2193 (2020) (citing Dodd-Frank Wall Street Reform and Consumer Protection Act, 124

Stat. 1376).  "Congress tasked the [Bureau] with 'implement[ing]' and 'enforc[ing]' a large body

of financial consumer protection laws to 'ensur[e] that all consumers have access to markets for

consumer financial products and services and that markets for consumers financial products and

services are fair, transparent, and competitive.'"  Id. (citing 12 U.S.C. § 5511(a)).

On October 11, 2019, the Bureau announced the establishment of the Federal Consumer

Financial Law Taskforce (the "Taskforce").  Complaint ¶ 80.  Its charter states that the Taskforce

is to:

> (1) examine  the  existing  legal  and  regulatory  environment  facing
> consumers  and  financial  service  providers;  and  (2)  report  its
> recommendations for ways to improve and strengthen consumer financial

> laws and regulations, including recommendations for resolving conflicting
> requirements or inconsistencies, reducing unwarranted regulatory burdens
> in light of market or technological developments, improving consumer
> understanding of markets and products, and identifying gaps in knowledge
> that should be addressed through future Bureau research.

Id. at ¶ 81 (quoting CFBP, Charter of the Bureau's Taskforce on Consumer Financial Law ¶ 3

(Jan. 8, 2020), https://files.consumerfinance.gov/f/documents/cfpb_taskforce-charter.pdf).  The

Charter also directs the Taskforce to deliver its findings to the Director of the Bureau "in the

form of one consensus final report," "no later than January 2021."  Id. at ¶ 82.  The Taskforce

will "operate until the final report is delivered."  Id.; see also Charter at ¶ 10.  The Charter

expires 90 days after the final report is delivered, unless renewed by appropriate action.  Charter

at ¶ 10.

　　　Under the Charter, the Taskforce reported to the Bureau's Director at the time, Kathleen

Kraninger, who was to appoint as Staff Director a full-time Bureau employee to "ensure that the

Taskforce operates in accordance with the terms of the charter[.]"  Id. at ¶ 83.  Bureau employee

Matt Cameron had been assigned as the Taskforce's Staff Director.  Id.

　　　Under the Charter's terms, the Director of the Bureau "shall select the members of the

Taskforce."  Id. at ¶ 84.  The Bureau selected five individuals to serve on the Taskforce: Todd

Zywicki, Howard Beales, Thomas Durkin, William MacLeod, and Jean Noonan.  Id. at ¶¶ 103,

108, 111, 113, 114.  According to the Plaintiffs, the Taskforce's members exclusively represent

deregulatory and industry views, while excluding the views of consumer advocates.  See

generally Complaint at ¶¶ 103-114.

　　　D.　　The Plaintiffs

　　　NACA is a non-profit association of more than 1,500 attorneys and consumer advocates

committed to representing consumer interests.  Complaint ¶ 9.  NACA's members include

private and public sector attorneys, legal services attorneys, law professors, and law students.  Id.
NACA's core mission is to advocate for the interests of consumers and for policies that protect consumers against predatory financial institutions.  Id.

To accomplish its mission, NACA engages in a variety of activities.  First, NACA educates and shares information with both its membership and its members' consumer clients on a variety of topics, including consumer rights, common issues faced by consumers in the marketplace for financial services, and best practices in consumer advocacy.  Id. at ¶ 10.
NACA's educational activities take on many forms, including blog posts, newsletters, webinars, and in-person trainings.  Id.

Second, NACA promotes the interests of consumers by serving as a voice for consumers to curb unfair and abusive practices by the financial services industry.  Id. at ¶ 11.  Among other things, NACA submits comments in response to Bureau Requests for Information and proposed rulemakings, organizes comment campaigns on rulemakings, meets with and educates financial services regulators on consumer issues, and interfaces with regulators in more formal capacities.
Id.

U.S. PIRG is a non-profit consumer advocacy organization with tens of thousands of members across the United States.  Id. at ¶ 13.  U.S. PIRG draws on a strong network of researchers, advocates, organizers, and students to improve government transparency and to stand up to powerful special interests on behalf of the public on a variety of issues.  Id.  Among other things, U.S. PIRG has a history of working to improve and reform consumer financial laws and regulations, including by defending the Bureau's core mission against efforts to unwind consumer protections.  Id.

U.S. PIRG offers free education and information to its members and to the general public regarding the Bureau's regulatory activities, as well as the ongoing need for improvements in consumer protections through the publication of reports.  Id. at ¶ 14.  U.S. PIRG also educates the public through blog posts, emails to its members, webinars, and social media.  Id.  In addition, U.S. PIRG advocates for improved consumer finance laws and regulations.  Id. at ¶ 15. Among other things, it has regularly testified before Congress, submitted comments in response to Bureau Requests for Information and proposed rulemakings, organized comment campaigns by its members, provided expert testimony at Bureau-hosted events, and met with the Bureau and other financial regulators to educate them on consumer issues.  Id.

Professor Engel is a nationally prominent scholar of consumer law and finance, having written extensively on the law and economics of mortgage markets, and the subprime crisis.  Id. at ¶17.  She is currently a Research Professor of Law at Suffolk University.  Id.  Prior to joining Suffolk University in 2009, Professor Engel taught at Cleveland-Marshall College of Law for ten years.  Id.

Professor Engel has engaged in research on an array of consumer finance issues.  Id. at ¶ 18.  She has also held numerous public service positions at the state and federal level, including at the Bureau.  Id. at ¶ 19.  Specifically, Professor Engel has served as a member of the Federal Reserve Board's Consumer Advisory Council, the Bureau's Consumer Advisory Board, the Community Affairs Research Board of the Federal Reserve Bank of Boston, and the Federal Reserve Bank of Cleveland's Academic Advisory Council on Subprime Lending.  Id.  In addition, she has advised state governments, including Ohio, Massachusetts, California, and Illinois, on a variety of issues related to consumer credit.  Id.

Due to their work, the Plaintiffs all have a significant interest in monitoring the Taskforce's work.  Id. at ¶¶ 12, 16, 20, 22.  Professor Engel applied to serve on the Taskforce and was interviewed, but her application was rejected.  Id. at ¶¶ 20, 21.

 E.  The Plaintiffs' Complaint

The Plaintiffs allege that the Taskforce is subject to FACA but that the Defendants have not complied with FACA's requirements.  According to Plaintiffs, Defendants disregarded FACA's mandate to consult meaningfully with the GSA, including with respect to the requisite public interest findings.  Id. at ¶¶ 92-93.  Defendants also failed to provide the requisite preliminary findings in a Federal Register Notice before chartering the Taskforce, including findings that the Taskforce is "in the public interest," "essential to the conduct of agency business," and that the "information to be obtained is not already available through another advisory committee or source within the Federal government."  Id. at ¶ 94.

In addition, the Plaintiffs allege that the Defendants eschewed any attempt to ensure that the Taskforce's membership was "fairly balanced."  See id. at ¶¶ 102-122.  Rather, Defendants employed a biased process to select Taskforce members who exclusively represent deregulatory and industry views, while excluding the views of consumer advocates.  Id. at ¶¶ 102-114.  For example, Defendants appointed as chairman of the Taskforce Todd Zywicki, a lobbyist for the consumer financial industry and a longstanding opponent of consumer protections, as well as the creation of the Bureau itself.  Id. at ¶¶ 103-105.  Conversely, Defendants rejected numerous consumer finance law experts and advocates, such as Professor Engel.  Id. at ¶¶ 115-118.  The Plaintiffs allege, for example, that the Defendants interviewed Professor Engel "in an inquisitorial manner," for the purpose of "determin[ing] [her] stance on deregulation," without asking "about her qualifications and experience."  Id. at ¶ 121.

Finally, the Plaintiffs allege that Defendants operated the Taskforce in violation of FACA's transparency requirements. Despite multiple attempts by Plaintiffs to access the Taskforce's meetings and records, Defendants have not provided public notice of their meetings, held their meetings in public, or published Taskforce records. Id. at ¶¶ 123-138.

The Plaintiffs allege that their interests have been injured by the Defendants' unlawful creation and composition of the Taskforce. They allege that the Defendants' failure to consult with the GSA, including with respect to Defendants' fairly balanced membership plan and public interest findings, and to subsequently publish those findings, has injured Plaintiffs by depriving them of information to which they are statutorily entitled. Id. at ¶¶ 140, 143-145. By failing to make the requisite public interest findings and thereby depriving Plaintiffs of access to them, Defendants have made it more difficult for NACA and U.S. PIRG to keep the public informed, and for Engel to study and write, about the Taskforce's purpose and impact on consumer financial law. Id. at ¶¶ 139-155. As a result, the Plaintiffs have been forced to divert staff time towards monitoring the Taskforce and attempting to secure information that should be public. Id. at ¶¶ 139, 142.

Plaintiffs allege that they are also injured by Defendants' use of a biased selection process to create an imbalanced Taskforce. Professor Engel was injured when she was denied a fair opportunity to apply for the Taskforce by a biased screening process that disfavored consumer advocates. Id. at ¶ 150. In addition, all Plaintiffs were injured by the Taskforce's skewed competition, which denied Plaintiffs any representation by excluding the views of consumer advocates and experts who favor robust consumer protections. Id. at ¶ 148. In so doing, Defendants have exacerbated Plaintiffs' inability to follow along with or participate in the Taskforce's work and increased the likelihood that the Taskforce will produce biased

recommendations.  Id. at ¶¶ 148, 151-154.  According to Plaintiffs, this has caused, and will continue to cause, Plaintiffs to divert resources to monitor, participate in, and react to the Taskforce's work.  Id. at ¶¶ 139, 142, 155.

The Complaint contains four causes of action: (1) unlawful creation of a federal advisory committee in violation of 5 U.S.C. § 706, 5 U.S.C. App 2 § 9, 41 C.F.R. §§ 102-3.30, 102-3.60; (2) failure to provide public notice and participation in advisory committee meetings in violation of 5 U.S.C. § 706, 5 U.S.C. App. 2 § 10, 41 C.F.R. § 102-3.145; (3) failure to disclose advisory committee materials in a manner that provides for meaningful public participation in violation of 5 U.S.C. § 706, 5 U.S.C. App. 2 § 10; and (4) creation of an unfairly balanced advisory committee in violation of 5 U.S.C. § 706, 5 U.S.C. App. § 5.  See Complaint ¶¶156-170.

The Plaintiffs' request that the Court: (1) declare that Defendants' creation and administration of the Taskforce violates the APA, FACA, and FACA's implementing regulations, and that the establishment of the Taskforce is therefore unlawful; (2) set aside the Taskforce's charter and all orders and decisions attendant to the Taskforce's creation, including the appointments of individual Taskforce members; (3) through the named Defendants, enjoin the Taskforce from meeting, advising the Director, and otherwise conducting Taskforce business; (4) order Defendants to immediately release all materials prepared for the Taskforce or its subcommittees, and to provide a Vaughn index for such material and those withheld from production for any reason; (5) enjoin Defendants from relying on and using any recommendation or advice from the Taskforce; (6) award Plaintiffs their costs, attorneys' fees, and other disbursements for this action; and (7) grant any other relief this Court deems appropriate. Complaint at Prayer for Relief.

F.     Issuance Of The Taskforce's Final Report

On January 5, 2021, after the filing of the Complaint and the Defendants' motion to dismiss, the Taskforce issued its final report.  Docket No. 40 at 2.  Four of the five members of the Taskforce resigned from the Bureau on January 8, 2021, and the fifth member resigned the following day.  See Declaration of Lawrence DeMille-Wagman (Docket No. 40-1) at ¶¶ 3-4.

II.     ANALYSIS

Defendants request that the Court dismiss the Plaintiffs' First and Fourth Claims for Relief, as well as the first, second, third, and fifth elements of their Prayer for Relief because the Plaintiffs lack standing to bring those claims and request such relief.  Docket No. 19.  In addition, they argue that those claims as well as the Second Claim for Relief, were rendered moot by the issuance of the Taskforce's report and the resignation of the Taskforce's members. See Docket No. 40.  For the following reasons, I disagree.

A.     Standard Of Review

Rule 12(b)(1) motions ask a court to dismiss a case for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  Article III standing may be challenged through a Rule 12(b)(1) motion to dismiss.  See Van Wagner Boston, LLC v. Davey, 770 F.3d 33, 36 (1st Cir. 2014).  At all times, the party asserting jurisdiction bears the burden of proving that it has standing to sue.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of litigation."  Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273, 1281-1282 (1st Cir. 1996) (quoting Lujan, 504 U.S. at 561).  That burden at the pleading stage means "establishing

sufficient factual matter to plausibly demonstrate . . . standing to bring the action." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016).

As when reviewing a motion for failure to state a claim, the Court "construe[s] the Complaint liberally and treat[s] all well-pleaded facts as true, according the plaintiff[s] the benefit of all reasonable inferences." Town of Barnstable v. O'Connor, 786 F.3d 130, 138 (1st Cir. 2016) (citations omitted). However, "[n]either conclusory assertions nor unfounded speculation can supply the necessary heft." Hochendoner, 823 F.3d at 731. Where the facts in the complaint "are illuminated, supplemented, or even contradicted by other materials in the district court record, [the Court] need not confine [its] jurisdictional inquiry to the pleadings, but may consider those other materials." Van Wagner Boston, LLC, 770 F.3d at 36 (quoting Aguilar v. U.S. ICE, 510 F.3d 1, 8 (1st Cir. 2007)).

B.      Standing

Federal courts are courts of limited jurisdiction. Article III restricts federal authority to hear only those disputes involving "cases" or "controversies." U.S. Const. Art. III, § 2. "[N]o principle is more fundamental to the judiciary's proper role in our system of government that the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Dantzler, Inc. v. Empresas Berrios Inventory and Operations, Inc., 958 F.3d 38, 46 (1st Cir. 2020) (quoting Massachusetts v. U.S. Dep't of Health and Human Servs., 923 F.3d 209, 221 (1st Cir. 2019)). "To 'assure[] respect' for this limitation, 'plaintiffs must 'establish that they have standing to sue.'" Id. (internal citations omitted). The "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017).[3]

---

[3] The First Circuit has held that a court need not determine the standing of all plaintiffs if at least

In order to show standing, Plaintiffs must plausibly allege "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision." Amrhein v. eClinical Works, LLC, 954 F.3d 328, 330 (1st Cir. 2020) (citing Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016)).

"The 'first and foremost' of those elements—'injury in fact'—is the 'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. An injury is "concrete" if it is real, and not abstract. Dantzler, Inc., 958 F.3d at 47 (citing Spokeo, Inc., 136 S. Ct. at 1548). "'Concrete injuries embrace not only tangible harms – like a picked pocket or a broken leg, – but also intangible ones, like the suppression of free speech or religious exercise, or '[t]he invasion of a common-law right (including a right conferred by contract)' actionable without wallet injury." Amrhein, 954 F.3d at 331 (internal citations omitted). "To be particularized, the plaintiff must have been affected 'in a personal and individual way' by the injurious conduct, and must allege 'that he, himself, is among the persons injured by that conduct.'" Id. (internal citations omitted). In order to be actual or imminent, the injury must either have happened or there must be a sufficient threat of it occurring. Id. (citing Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012)).

"The 'traceability' or causation element 'requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm.'" Id. That connection "cannot be overly attenuated." Id. "[C]ausation is absent if the injury stems from the independent action of a third party." Id.

---

one plaintiff has standing to maintain each claim. Dubois v. U.S. Dep't of Agriculture, 102 F.3d 1273, 1282 (1st Cir. 1996).

Finally, "the redressability element of standing requires that the plaintiff allege 'that a favorable resolution of [its] claim would likely redress the professed injury.'"  Id. "This means that it cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed."  Id. (citing Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 42-43 (1976)).

     C.     Organizational Standing

Organizational plaintiffs may demonstrate standing by: (1) showing associational standing, i.e., that a member of the organization would have standing to sue as an individual and the interests the organization seeks to protect are germane to its purposes; or (2) by showing that the organizational plaintiffs have standing to sue on their own.  See Equal Means Equal v. Dep't of Education, 450 F. Supp. 3d 1, 5-7 (D. Mass. 2020).  In either instance, the organization must demonstrate more than a "mere interest in a problem."  Sierra Club v. Morton, 405 U.S. 727, 739 (1972) (internal quotations omitted).  As such, they must make the same showing as is required in the case of an individual: injury, causation, and redressability.  Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-379 (1982).  Here, the Plaintiffs argue that NACA and U.S. PIRG have standing based on injury to their own organizational interests.  See Docket No. 23 at 18-20. In other words, their standing is not based on the standing of any individual member.

"It is well-accepted in the standing context that organizations may have interests of their own, separate and apart from the interests of their members."  Mass. Delivery Ass'n v. Coakley, 671 F.3d 33, 44 n. 7 (1st Cir. 2012).  Organizational standing is analyzed under the same inquiry as individual standing: "[h]as the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?"  Havens Realty Corp., 455 U.S. at 378-379 (internal quotation marks and citations omitted).  "Especially germane to the organizational injury inquiry is whether the injury is sufficiently concrete or merely an abstract

social interest." <u>Equal Means Equal v. Ferriero</u>, 478 F. Supp. 3d 105, 120 (D. Mass. 2020)

(citing <u>Havens Realty Corp.</u>, 455 U.S. at 378-379; <u>Abigail All. For Better Access to</u>

<u>Developmental Drugs v. Eschenbach</u>, 469 F.3d 129, 133 (D.C. Cir. 2006)).

An organization lacks standing when it asserts no injury other than an injury to its

advocacy.  <u>See</u> <u>Ctr. For Law & Educ. v. Dep't of Educ.</u>, 396 F.3d 1152, 1162 n. 4 (D.C. Cir.

2005).  An organization may establish Article III standing, however, if it can show that the

defendant's actions cause a "concrete and demonstrable injury to the organization's activities"

that is "more than simply a setback to the organization's abstract social interests."  <u>Havens</u>

<u>Realty Corp.</u>, 455 U.S. at 379.  "This is not a demanding standard, since 'only a perceptible

impairment of an organization's activities is necessary for there to be an injury in fact.'"  <u>Nat.</u>

<u>Res. Def. Council v. Dep't of Interior</u>, 410 F. Supp. 3d 582, 593 (S.D.N.Y. 2019) (quoting

<u>Nnebe v. Daus</u>, 644 F.3d 147, 157 (2nd Cir. 2011)).  The diversion of resources need not be

monetary.  <u>Id.</u> (citing <u>Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.</u>, 418

F.3d 168, 174-175 (2nd Cir. 2005)).  In addition, when a defendant's actions impede an

organization's ability to carry out its responsibilities, the plaintiff has suffered an injury in fact.

<u>Id.</u> (citations omitted).

> D. <u>The Plaintiffs Have Standing To Challenge The Creation Of The Taskforce</u>

In their first claim for relief, Plaintiffs allege that the Taskforce was unlawfully created in

violation of FACA.  Specifically, the Plaintiffs allege that, in creating the Taskforce, the

Defendants failed to comply with FACA by failing to make findings that the Taskforce is (1) "in

the public interest in connection with the performance of duties imposed on that agency by law,"

(2) "essential to the conduct of agency business," and (3) "the information to be obtained

[through the Taskforce] is not already available through another advisory committee or source

within the Federal Government."  Complaint ¶ 158(a).  In addition, the Plaintiffs allege that the

Defendants did not meaningfully consult with the GSA or prepare a Membership Balance Plan

before establishing the Taskforce.  Id. at ¶¶ 159(b), (c).  Defendants argue that the Plaintiffs have

not met their burden of establishing standing with respect to this claim.  Docket No. 20 at 10-12.

I disagree.

Plaintiffs allege that, as a result of the Bureau's failure to comply with FACA

requirements when they established the Taskforce, they were deprived of information to which

they were entitled.  Docket No. 23 at 15-19.  Specifically, the Plaintiffs allege that the "opaque

process through which the Taskforce was established" is "impeding NACA's and U.S. PIRG's

mission-driven educational activities" and "preventing Professor Engel from carrying out her

academic work."  Complaint ¶ 139.  They also allege that by creating the Taskforce in a non-

transparent manner, id. at ¶ 140, Defendants have interfered with the Plaintiffs' work, including

the organizational Plaintiffs' ability to "create educational and training programs that will

advance consumer interests," "advise" their members, and "keep the public abreast of the

Taskforce's efforts to reshape consumer financial laws and regulations," as well as Professor

Engel's ability to "study and write" about the Taskforce.  Id. at ¶¶ 144-145.  According to

Plaintiffs, had the Defendants complied with FACA, they would have been required to explain

why the Taskforce is "essential to the conduct of agency business" and why "information to be

obtained [from the Taskforce] is not already available through another . . . source."[4]  Id. at ¶¶ 94,

---

[4] Defendants argue that while FACA requires these findings, it does not require the public
disclosure of this information and, therefore, Plaintiffs were not entitled to receive this
information.  Docket No. 26 at 2-3, n. 1.  However, at least one court has held that FACA
requires agencies to make detailed disclosures regarding their reasons for creating an advisory
committee.  See Nat. Res. Def. Council, 410 F. Supp. 3d at 594.  In addition, in deciding the
standing question, this Court cannot decide the merits of the underlying claims.  Dubuisson v.
Stonebridge Life Ins. Co., 887 F.3d 567, 574 (2nd Cir. 2018); see also City of Waukesha v.

97-98.  These harms, which are exacerbated by the "secrecy with which [the Taskforce] has operated," id. at ¶ 139, have compelled Plaintiffs to expend time and resources monitoring the Taskforce and pursuing information that should already have been public, including by sending staff to meet with the Taskforce and by requesting the Bureau to release Taskforce records.  Id. at ¶ 142.

Plaintiffs also allege that the unlawful creation of the Taskforce itself has forced them to divert resources.  Docket No. 23 at 19.  Specifically, Plaintiffs allege that if Defendants had followed the legally required procedures for the formation of the Taskforce, including consultation with the GSA, they may well have determined that the Taskforce was not "actually useful and beneficial to the public," Complaint ¶ 6, or that its work could be handled by existing government offices.  Id. at ¶¶ 91-99.  Alternatively, that consultation could have led to a more balanced Taskforce composition.  Id. at ¶¶ 5-6, 101, 116-121.  Because the Defendants elected to rush through an unnecessary and unjustified Taskforce on a subject that bears directly on Plaintiffs' missions, Plaintiffs must now "expend time and organizational resources" monitoring, reporting on, and addressing the "likely consequences," id. at ¶ 142, of a Taskforce that is "single-minded [in its] focus on protection the [financial services] industry.  Id. at ¶ 6; see also id. at ¶¶ 154-155.

At this stage, these allegations are sufficient to plausibly allege that the Defendants' alleged failure to comply with FACA's requirements concerning the creation of an advisory committee "perceptibly impaired" the Plaintiffs' activities and diverted at least some of the

---

E.P.A., 320 F.3d 228, 235 (D.C. Cir. 2003) (citing Warth v. Seldin, 422 U.S. 490, 502 (1975); Am. Fed'n of Gov't Employees v. Pierce, 697 F.2d 303, 305 (D.C. Cir. 1982)) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.").

Plaintiffs' resources to remedy the harms allegedly caused by the Defendants' conduct.  See, e.g., Nat. Res. Def. Council, 410 F. Supp. 3d at 594-595.

It is often premature to assess, on a motion to dismiss, whether Plaintiffs are entitled to their requested remedies, should they prevail.  See, e.g., Owens v. Hous. Auth. of Stamford, 394 F. Supp. 1267, 1274 (D. Conn. 1975).  In any event, because I have found that the Plaintiffs have standing to bring their first claim for relief, I find that they also have standing to seek their first, second, third, and fifth elements of their prayer for relief.  If, as the Plaintiffs allege, the Taskforce was in fact created unlawfully in violation of FACA requirements, then the Plaintiffs have a basis for requesting a declaration that the Defendants' creation and administration of the Taskforce violated FACA and its implementing regulations; that the Taskforce's charter and all orders and decisions be set aside; and that the Taskforce be enjoined from meeting, advising the Director, or otherwise conduct business.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 353 (2006) (citation omitted) (a plaintiff's standing to seek relief "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff[s] ha[ve] established."); accord Gill v. Whitford, 138 S. Ct. 1916, 1934 (2018) ("[A] plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

Similarly, violations of FACA's requirements can provide a basis for enjoining the use of a committee's recommendations.  See, e.g., Alabama-Tombigbee Rivers Coalition v. Dep't of Interior, 26 F.3d 1103, 1107 (11th Cir. 1994) ("[T]o allow the government to use the product of a tainted procedure would circumvent the very policy that serves as the foundation of [FACA]."); California Forestry Ass'n v. U.S. Forest Serv., 102 F.3d 609, 614 (D.C. Cir. 1996) (A use injunction might be appropriate "if the unavailability of an injunctive remedy would effectively render FACA a nullity.").  Thus, at this stage, it is also inappropriate to dismiss the Plaintiffs'

18

fifth request for relief, which seeks to enjoin the Defendants from relying on and using any recommendations or advice from the Taskforce.

     E.    <u>Plaintiffs Have Standing To Challenge The Taskforce's Lack Of Balance</u>

The Defendants also challenge the Plaintiffs' standing with respect to their fourth claim for relief: that the Taskforce is unfairly balanced in violation of FACA.  <u>See</u> Complaint ¶¶ 167-170.  Plaintiffs allege that the Taskforce does not include any representation of consumer advocates or consumer finance law experts who endorse consumer protections despite the fact that the Bureau received numerous applications from such candidates, including Professor Engel. <u>Id.</u> at ¶ 116.  According to Plaintiffs, Defendants intentionally screened applicants based on whether they supported deregulation.  <u>Id.</u> at ¶ 121.  Defendants' decision to exclude consumer advocates is notable given that the Bureau was created to protect consumers in the wake of a crisis caused, in part, by what Congress determined was a deeply flawed consumer protection regulatory regime.  <u>Id.</u> at ¶ 122.

The legislative history makes clear that FACA's "'fairly balanced' requirement was designed to ensure that the persons or groups directly affected by the work of a particular advisory committee would have some representation on the committee."  <u>Public Citizen v. Dep't of Health and Human Servs.</u>, 795 F. Supp. 1212, 1217 (D.D.C. 1992).  Thus, when the fairly balanced requirement is ignored, persons having a direct interest in the committee's purpose suffer an injury in fact sufficient to confer standing.  <u>Id.</u>; <u>see also</u> <u>Western Org. of Resource Councils v. Bernhardt</u>, 362 F. Supp. 3d 900, 909 (D. Mont. 2019).  For example, courts have found standing based on lack of balance where the plaintiffs "lack of representation on the [committee] has further contributed to their monitoring costs" because "representation on the [committee] would improve their ability to keep abreast of [its] activities and increase access to

information and documents relating to [its] work." Nat. Res. Def. Council, 410 F. Supp. 3d at 602. "If the concrete interest at stake is participation in and oversight for advisory committees, . . . having an allegedly one-sided committee [is a] direct threat to that interest." Western Org. of Resource Councils, 362 F. Supp. 3d at 909.

That is precisely what Plaintiffs allege in their Complaint. Specifically, they allege that, due to the nature of their work, they have significant interests in monitoring, reporting on, influencing, and responding to the Taskforce's work. See Complaint at ¶¶ 9-17, 20, 22. They also allege that due to the Taskforce's "lack of a balanced composition of members, coupled with its lack of transparency, the Plaintiffs must "divert resources in response." Id. at ¶ 139. These deficiencies also "prevent Professor Engel from carrying out her academic work." Id. Plaintiffs further allege that the Taskforce's secrecy and insularity is "exacerbated because the Taskforce does not include a member who represents the interests of consumer advocates or academics," meaning that "Plaintiffs' views are necessarily not represented on the taskforce." Id. at ¶¶ 147-148. Thus, Plaintiffs argue that the lack of representation will be make it harder for them to follow and influence the Taskforce's work. These kinds of allegations have been found to sufficiently allege standing at the pleading stage. See, e.g., Nat. Res. Def. Council, 410 F. Supp. at 602.

In addition, denial of access to representation on an advisory committee may constitute an injury in fact under FACA. NAACP Legal Defense & Educational Fund, Inc., v. Barr ("NAACP I"), __ F. Supp. 3d __, 2020 WL 5833866, at *7 (D.D.C. Oct. 1, 2020) (citations omitted); Nat. Res. Def. Council, 410 F. Supp. 3d at 601. If a party with a direct interest in the committee's work applies for membership and is denied access, that party has standing to challenge the denial. Nat. Res. Def. Council, 410 F. Supp. 3d at 301 (citing cases).

Here, Professor Engel alleges that she has a direct interest in the work of the Taskforce and that she applied for membership in the Taskforce but her application was denied.  Complaint at ¶¶ 17-18, 20-21.  She also alleges that she has significant expertise in relevant areas and was qualified for the position.  Id. at ¶¶ 17-20, 116-117.  However, Defendants rejected not just Professor's Engel's application but applications from other candidates with similar qualifications apparently because they allegedly did not support deregulation of the industry.  Id. at ¶¶ 116, 121.

Defendants argue that Professor Engel has not suffered an injury because she has no entitlement to Taskforce membership.  Docket No. 20 at 13.  "Yet, as alleged, the harm arises not because a given individual is entitled to a seat on an advisory committee, but rather because she is entitled to a fair adjudication of her application for membership."  Nat. Res. Def. Council, 410 F. Supp. 3d at 602.  That is because "a plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity."  Teton Historic Aviation Foundation v. U.S. Dep't of Defense, 785 F.3d 719, 724 (D.C. Cir. 2015) (citation omitted; emphasis in original).[5]  Here, the Plaintiffs allege that Professor Engel was not given a fair opportunity to apply for membership in the Taskforce because the Defendants employed a biased process to select Taskforce members who exclusively represent deregulatory and industry views, while excluding the views of consumer advocates.  Complaint ¶¶ 102-114.

---

[5] In addition, this Court notes that the cases cited by Defendants appear to rely on the conclusion that FACA's fairly balanced requirement is nonjusticiable, a conclusion recently rejected by the First Circuit.  See Union of Concerned Scientists, 954 F.3d at 17-20 (noting that the First Circuit's approach accords with the majority view).

Defendants also argue that Professor Engel's injuries are not redressable because the Complaint does not specifically request that she be appointed to the Taskforce.  Docket No. 20 at 13-14.  However, Professor Engel's injuries, which relate to the operation of a secretive, unlawful committee from which she was allegedly purposefully excluded, would be redressed by the Plaintiffs' request that the Court "set aside the Taskforce's charter and all orders and decisions attendant to the Taskforce's creation, *including the appointments of individual Taskforce members*."  Complaint at Prayer for Relief, ¶ 2 (emphasis added).  Accordingly, I find that the Plaintiffs have also sufficiently alleged standing with respect to their Fourth Claim for Relief.

      F.     <u>Plaintiffs' Claims Are Not Moot</u>

 "Article III prohibits federal courts from deciding 'moot' cases or controversies—that is, those in which the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  <u>Union de Empleados de Muelles de Puerto Rico, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO</u>, 884 F.3d 48, 57 (1st Cir. 2018) (citation omitted).  "Another way of putting this is that a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party."  <u>American Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops</u>, 705 F.3d 44, 52 (1st Cir. 2013) (citations omitted).  "[I]f events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case."  <u>Id.</u> (citation omitted).

As discussed above, the Plaintiffs had standing when they initiated this action.  Nevertheless, I must determine whether the Plaintiffs' claims have been rendered moot by the issuance of the Taskforce's final report and the resignation of its members.  Mootness is "the doctrine of standing set in a time frame: [t]he requisite personal interest that must exist at the

commencement of the litigation (standing) must continue throughout its existence (mootness)."

Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n. 22 (1997) (quoting United States

Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)).  "Mootness usually results when a

plaintiff has standing at the beginning of a case, but, due to intervening events, loses one of the

elements of standing during litigation."  WildEarth Guardians v. Pub. Serv. Co. of Colorado, 690

F.3d 1174, 1182 (10th Cir. 2012).  "Intervening events must 'have completely and irrevocably

eradicated the effects' of the parties' conduct in order for a case to be deemed moot."  Town of

Barnstable v. O'Connor, 786 F.3d 130, 142 (1st Cir. 2015) (quoting Cnty. Of Los Angeles v.

Davis, 440 U.S. 625, 631 (1979)).  "The Supreme Court has placed the 'heavy burden of

persuasion' with respect to mootness on the party advocating for it."  Id. (quoting United States

v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968)).

       1.      Plaintiffs' Alleged Harms Are Redressable By An Order
                Preventing The Defendants From Relying On the Report Or
                Requiring Them To Add A Disclaimer

The Defendants argue that the Plaintiffs' First, Second, and Fourth Claims for Relief are

moot because the Court can no longer grant any meaningful relief to the Plaintiffs with respect to

those claims.  See generally Docket No. 40 at 5-11.  However, the Court can redress Plaintiffs'

alleged injuries resulting from each of the Defendants' alleged FACA violations by issuing an

order prohibiting Defendants from relying on the Taskforce's report or by requiring them to add

a disclaimer indicating that the report was produced in violation of FACA.

The Plaintiffs allege that the issuance of the Taskforce's report itself will injure them.

See Complaint at ¶¶ 151-155.  Specifically, with respect to their First Claim for Relief, the

Plaintiffs allege that the failure to consult with the GSA and make the requisite public interest

findings allowed Defendants to create an unnecessary and unbalanced Taskforce that would

produce a report that would reflect the views of the financial industry to the detriment of consumers.  See id.  According to the Plaintiffs, had the Defendants complied with FACA's consultation and other pre-chartering requirements, they may not have created the Taskforce or produced a report at all.  See id. at ¶¶ 6, 91-99.  In the alternative, they may have established a balanced and fair committee that would not have issued a flawed and biased report.  Id. at ¶¶ 5-6, 101, 116-121.

Similarly, the Defendants' alleged failure to make the Taskforce's records and meetings public—at issue in the Second and Third Claims for Relief—prevented the Plaintiffs from participating in and following the Taskforce's work.  Id. at ¶ 146.  This failure "hamper[ed] Plaintiffs' ability to advocate before the Taskforce and [made] it more likely that recommendations favorable to industry will come to fruition."  Id.  It is reasonable to infer that, had Plaintiffs and others with similar backgrounds and interests were able to participate, the content of the report would be different.

Finally, in their Fourth Claim for Relief, the Plaintiffs allege that the Taskforce's lack of balance contributed to the biased nature of the report by excluding the Plaintiffs' views from the Taskforce and making it harder for Plaintiffs to "follow and influence the Taskforce's work."  Id. at ¶¶ 147-148.  Now that the report has been issued, the Plaintiffs "will be required to divert resources to first understand how and why the Taskforce reached its final conclusions, what the impact of those will be, and second, to adapt their educational and advocacy work to this new reality."  Id. at ¶ 155.

All of these alleged injuries can be redressed by a use injunction, prohibiting the Defendants from relying on the report.  See, e.g., Alabama-Tombigbee Rivers Coalition, 26 F.3d at 1107; California Forestry Ass'n, 102 F.2d at 614.  In the alternative, the Court could require

24

the Defendants to attach a disclaimer to the report stating that it was produced in violation of FACA.  See, e.g., NAACP Legal Def. & Educ. Fund, Inc. v. Barr ("NAACP II"), No. 20-cv-1132, 2020 WL 6392777, at *2 (D.D.C. Nov. 2, 2020).  Such relief would redress Plaintiffs' injuries, which "stem from [their] inability to influence the [Taskforce's] work by scrutinizing the [Taskforce's] activities and having access to a representative voice on the [Taskforce]," because "the disclaimer would give [Plaintiffs] ammunition in the arena of public opinion."  Id.

        2.    The Court May Also Issue Declaratory Relief

The Plaintiffs have also requested declaratory relief in the form of a declaration that the "Defendants' creation and administration of the Taskforce violates the APA, FACA, and FACA's implementing regulations, and that the establishment of the Taskforce [was] therefore unlawful."  Complaint, Prayer for Relief, ¶ 1.  Thus, Plaintiffs' claims are not moot if they "retain[] sufficient interests and injury as to justify the award of declaratory relief."  Union de Empleados de Muelles de Puerto Rico, Inc., 884 F.3d at 58 (quoting Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 122 (1974)).  The Court must "examine whether 'there is a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of declaratory judgment."  Id.

As discussed above, the Plaintiffs have sufficiently alleged an injury resulting from the issuance of the report.  Declaratory relief would provide the Plaintiffs with ammunition for any future attack on the Taskforce's findings or any action taken in reliance on those findings.  See, e.g., NAACP I, 2020 WL 5833866, at *9 (finding injuries to be redressable even if subject commission was terminated).  For example, if successful in this case, the Plaintiffs could point to the Taskforce's imbalance and failure to satisfy FACA's procedural requirements in challenging the report or future Bureau actions.  See id.  Accordingly, I find that the controversy over

Defendants' alleged FACA violations is sufficiently real and immediate to warrant the issuance of a declaratory judgment should the Plaintiffs succeed in the merits of their claims.

III.  <u>ORDER</u>

For the foregoing reasons, I deny the Defendants' motion to dismiss.  I also deny the Defendants' request to dismiss the Plaintiffs' claims for mootness.  Within two weeks, the parties shall submit, jointly if possible and separately if necessary, a proposed schedule for the remainder of the case.

  /s/ Jennifer C. Boal               
JENNIFER C. BOAL
U.S. MAGISTRATE JUDGE
