**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL ASSOCIATION OF CONSUMER ADVOCATES, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> DAVID UEJIO, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, et al., <br><br> *Defendants*. | No. 1:20-cv-11141 (JCB) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Kristen Miller (D.C. Bar No. 220627)*
John Lewis (D.C. Bar No. 1033826)*
Sean Lev (D.C. Bar No. 449936)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kmiller@democracyforward.org
jlewis@democracyforward.org
slev@democracyforward.org

*admitted *pro hac vice*

David A. Nicholas (BBO# 553996)
Of Counsel
Wolf Popper LLP
20 Whitney Road
Newton, MA 02460
(617) 964-1548
dnicholas@wolfpopper.com

August 20, 2021

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... ii

Introduction ........................................................................................................... 1

Background ............................................................................................................ 3

    I.        The Federal Advisory Committee Act ............................................. 3

    II.      The Taskforce on Federal Consumer Financial Law ....................... 5

    III.    Plaintiffs and Procedural History ..................................................... 6

Legal Standard ...................................................................................................... 7

Argument ............................................................................................................... 8

    I.        Plaintiffs have standing to challenge the creation and operation of the Taskforce. 8

    II.      The Taskforce is subject to FACA ................................................. 10

        A.      The Taskforce was established and utilized by the Bureau. .................... 10

        B.      FACA's exemption for government employees does not apply. .............. 11

            1.      None of the Taskforce members were full-time employees. ........ 11

            2.      None of the Taskforce members were permanent part-time employees. ................................................................................... 13

    III.    The Taskforce violated FACA. ...................................................... 16

        A.      Defendants have stipulated that the Taskforce violated FACA's pre-chartering and transparency requirements. ................................. 17

        B.      The Taskforce was not fairly balanced, as FACA requires. .................... 17

    IV.    The Court should order complete relief. ......................................... 21

Conclusion ........................................................................................................... 25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*,
   26 F.3d 1103 (11th Cir. 1994) ................................................................................22

*Aluminum Co. of Am. v. FTC*,
   589 F. Supp. 169 (S.D.N.Y. 1984) .........................................................................13

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton ("AAPS")*,
   997 F.2d 898 (D.C. Cir. 1993) .......................................................................3, 4, 12

*Becker v. FEC*,
   112 F. Supp. 2d 172 (D. Mass. 2000) .....................................................................8

*Bryan v. Am. Airlines, Inc.*,
   988 F.3d 68 (1st Cir. 2021)......................................................................................7

*Cargill, Inc. v. United States*,
   173 F.3d 323 (5th Cir. 1999) .................................................................................24

*Cummock v. Gore*,
   180 F.3d 282 (D.C. Cir. 1999).........................................................................16, 24

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
   958 F.3d 38 (1st Cir. 2020).....................................................................................10

*Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence ("EPIC")*,
   466 F. Supp. 3d 100 (D.D.C. 2020) .................................................................15, 16

*Idaho Wool Growers Assoc. v. Schafer*,
   637 F. Supp. 2d 868 (D. Idaho 2009) ...................................................................23

*Minuteman Health, Inc. v. HHS*,
   291 F. Supp. 3d 174 (D. Mass. 2018) .....................................................................7

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
   2020 WL 6392777 (D.D.C. 2020) .........................................................................23

*NAACP Legal Def. & Educ. Fund, Inc. v. Barr*,
   496 F. Supp. 3d 116 (D.D.C. 2020) .......................................................................24

*NRDC v. Pena*,
   147 F.3d 1012 (D.C. Cir. 1998) ........................................................................22, 23

*PETA v. Barshefsky*,
 925 F. Supp. 844 (D.D.C. 1996) ...................................................................................3

*Physicians for Social Resp. v. Wheeler*,
 956 F.3d 634 (D.C. Cir. 2020) .....................................................................................14

*Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*,
 886 F.2d 419 (D.C. Cir. 1989) (Friedman, J., concurring in judgment) ......................17

*Union of Concerned Scientists v. Wheeler*,
 954 F.3d 11 (1st Cir. 2020) .....................................................................................13, 18

*VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*,
 992 F.3d 1097 (D.C. Cir. 2021) ............................................................................10, 11

*W. Org. of Res. Councils v. Bernhardt ("WORC I")*,
 362 F. Supp. 3d 900 (D. Mont. 2019) ..........................................................................9

*W. Org. of Res. Councils  v. Bernhardt ("WORC II")*,
 412 F.Supp.3d 1227 (D. Mont. 2019) .....................................................................22, 23

*Yanko v. United States*,
 869 F.3d 1328 (Fed. Cir. 2017) ....................................................................................11

**Statutes, Rules, and Regulations**

5 U.S.C. §§ 701-704 ...................................................................................................7

5 U.S.C. §§ 706(1) ......................................................................................................7

5 U.S.C. §§ 706(2)(A) .................................................................................................7

5 U.S.C. §§ 706(2)(D) .................................................................................................7

5 U.S.C. § 3372 .........................................................................................................13

5 U.S.C. § 3401(2) .....................................................................................................15

5 U.S.C. § 6101(2) .....................................................................................................11

5 U.S.C. App. 2 § 3(2) .........................................................................................3, 10, 11

5 U.S.C. App. 2 § 5(b)(2), (c) ...................................................................................5, 17

5 U.S.C. App. 2 § 9(a)(2) ........................................................................................4, 8, 17

5 U.S.C. App. 2 § 10(a)(1), (2), (3) ..........................................................................4, 17

5 U.S.C. App. 2 § 10(b) ............................................................................................4, 17

18 U.S.C. § 202(a) .................................................................................................12, 13

5 C.F.R. § 340.401 ....................................................................................................12

5 C.F.R. § 610.111 ..............................................................................................11, 12

41 C.F.R. pt. 102-3, subpt. B, app. A at III...............................................................5

41 C.F.R. § 102-3.30(a) ...................................................................................4, 8, 17

41 C.F.R. § 102-3.60 .............................................................................................4, 8

41 C.F.R. § 102-3.60(a), (b)(3)................................................................................17

41 C.F.R. § 102-3.65 .................................................................................................5

41 C.F.R. § 102-3.65(a) .............................................................................................4

41 C.F.R. § 102-3.140(a) ...................................................................................4, 17

41 C.F.R. § 102-3.140 (c), (d)..................................................................................17

Fed. R. Civ. P. 56(a) .................................................................................................7

## Other Authorities

Comment by FTC Commissioner Rohit Chopra on DOT's Proposed Rule
    Defining Unfair or Deceptive Practices, www.regulations.gov under Docket
    No. DOT-OST-2019-0182-0225...................................................................21

*Committee Members, Meetings and Advisory Reports: Academic Research
    Council*, GSA,
    https://www.facadatabase.gov/FACA/FACAPublicViewCommitteeDetails?id
    =a10t0000001gzkMAAQ .............................................................................14

*Guidance – Appointment of Consultants to FACA*, GSA,
    https://www.gsa.gov/policy-regulations/policy/federal-advisory-committee-
    management/advice-and-guidance/appointment-of-consultants-to-faca ................12

H.R. Rep. No. 92-1017 (1972)....................................................................................3

*Permanent*, Merriam-Webster, https://www.merriam-webster.com
    /dictionary/permanent ...............................................................................13

S Rep. No. 92-1098 (1972) .........................................................................................4

Webster's Third New International Dictionary (1981)................................................11

## INTRODUCTION

Congress established the Consumer Financial Protection Bureau to protect consumers from confusing, predatory financial products in the aftermath of the 2008 financial crisis. Twelve years later, the Bureau chartered a Taskforce on Federal Consumer Financial Law, purportedly to examine consumer finance laws and report its recommendations for how to improve them. The Federal Advisory Committee Act, or FACA, was designed to ensure that committees like the Taskforce serve the public interest. Yet the Bureau created the Taskforce without even attempting to comply with FACA's most basic requirements—the Bureau never showed any need for the Taskforce, the Taskforce largely conducted its operations in secret, and the Taskforce was composed of a biased slate of individuals with ties to the consumer finance industry that the Bureau was established to regulate.

To get around FACA's requirements, the Bureau claims to have designated the Taskforce's members as "full-time" or "permanent part-time" federal employees, purportedly rendering the Taskforce exempt from FACA's mandates. But that approach has no limiting principle: there is no reason why other agencies could not use a similar strategy to establish other advisory committees-in-all-but-name, rendering FACA a nullity.

The Bureau's approach is both legally and factually untenable. As a matter of both statutory text and common sense, the Taskforce's members were not full-time or permanent part-time federal employees. To the contrary, they were uniformly private citizens who provided short-term, intermittent help to the agency. They could not be full-time employees because each Taskforce member was precluded, by statute or agreement, from working a full-time schedule. Nor were they *permanent* part-time employees: the statutes governing their employment make clear that the members were working on a *temporary* basis. For example, the four non-chair members were designated "special government employees," a category of employee routinely

1

used by federal advisory committees and that, by statute, may only perform "temporary duties." The members' temporary status is further confirmed by their hiring forms, numerous Bureau communications, and the Taskforce Charter, which provided that the members would "work for a temporary period of time." In any event, none of the members qualified as *part-time*, which federal law defines to exclude employees, like the Taskforce members, who work intermittently.

The Taskforce was therefore subject to FACA, and Defendants violated that statute at every turn. Because they believed the statute to be inapplicable, Defendants have already stipulated that they made no effort to comply with its safeguards: that they did not make the requisite findings or engage in the requisite consultation before creating the Taskforce; that they did not provide contemporaneous access to all of the Taskforce's records and meetings; and that they never made a plan to ensure that the members of the Taskforce would be fairly balanced in terms of their views, rather than dominated by special interests. It is therefore no surprise that the Taskforce's membership was deeply unbalanced, composed solely of representatives of the financial services industry without a single proponent of robust consumer protections.

The need to monitor and respond to the Taskforce's biased and secretive work caused Plaintiffs—two consumer advocacy organizations and a consumer finance scholar—numerous personal, informational, and organizational injuries. And those injuries have been compounded by the issuance of the Taskforce's ultimate work product: a tainted Report that, unsurprisingly, parrots the preferred policies of the consumer finance industry. Unless the Court steps in, that Report will be used to advance those policies and inflict further harms on Plaintiffs, other proponents of consumer protections, and consumers writ large.

For these reasons, the Court should grant summary judgment to Plaintiffs and order all relief necessary to remedy Plaintiffs' harms and uphold FACA's purposes, including a use

2

injunction, a limited use injunction (in the form of a disclaimer on the Report's cover), the

release of all remaining Taskforce records, and a declaratory judgment.

## BACKGROUND[1]

I.  <u>**The Federal Advisory Committee Act**</u>

The Federal Advisory Committee Act was enacted to "regulat[e] the growth and use of

committees composed of outsiders called in to advise government officials." *Ass'n of Am.*

*Physicians & Surgeons, Inc. v. Clinton ("AAPS")*, 997 F.2d 898, 903 (D.C. Cir. 1993). While

Congress recognized that many committees provide "valuable expert advice," it "was also

cognizant of the fact that many advisory committees were created without adequate

justification." *PETA v. Barshefsky*, 925 F. Supp. 844, 847 (D.D.C. 1996). This failing permitted

"special interest groups [to] use their membership on such bodies to promote their private

concerns." H.R. Rep. No. 92-1017, at 6 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496.

To safeguard against these dangers, FACA establishes requirements for the creation and

operation of advisory committees. An advisory committee is "any committee, . . . task force, or

other similar group . . . established or utilized by one or more agencies[] in the interest of

obtaining advice or recommendations," unless the committee is "composed wholly of full-time,

or permanent part-time, officers or employees of the Federal Government." 5 U.S.C. App. 2

§ 3(2). The Senate Report for a precursor bill to FACA explained that, "[a]fter analysis of the

hearings and background material, it was felt that the main problems of proliferation, confusion

and operational abuse lay with those advisory committees *whose membership in whole or in part*

---

[1] The facts in this background statement are laid out in Plaintiffs' Statement of Undisputed
Material Facts (cited as "SUF ¶ #") and based on the parties' Joint Stipulation of Facts, the
certified administrative record, the supplemental administrative record, and the declarations filed
alongside this motion.

comes from the public [i.e., nongovernmental] sector." S Rep. No. 92-1098 at 8 (1972)

(emphasis added), as reprinted in Cong. Res. Serv., FACA Source Book: Legislative History,

Texts and Other Documents 158 (1978); see also AAPS, 997 F.2d at 903 ("[S]ubjecting [wholly

governmental committees] to FACA would fall outside Congress' purpose of regulating . . .

committees composed of outsiders called in to advise government officials.").

 To prevent the creation of biased and wasteful committees, FACA does not permit

agencies to charter a committee until "after consultation with the [General Services

Administration]." 5 U.S.C. App. 2 § 9(a)(2). As part of that consultation, agencies must explain

to the GSA "why the advisory committee is essential to the conduct of agency business" and

"why the advisory committee's functions cannot be performed by . . . other means"; the agency

must also lay out its "plan to attain fairly balanced membership." 41 C.F.R. § 102-3.60. After

consulting, agencies must "determine[] as a matter of formal record" in the Federal Register that

the committee is "in the public interest in connection with the performance of duties imposed on

that agency by law." 5 U.S.C. App. 2 § 9(a)(2); see also 41 C.F.R. § 102-3.65(a). As part of that

determination, the agency must also find that the committee is "essential to . . . agency business"

and that "the information to be obtained is not already available . . . within the Federal

Government." 41 C.F.R. § 102-3.30(a).

 Once established, committees must operate transparently. Each committee must hold its

meetings open to the public, 5 U.S.C. App. 2 § 10(a)(1); provide timely notice of its meetings in

the Federal Register, id. § 10(a)(2); allow interested persons to appear before and file statements

with the committee, id. § 10(a)(3); ensure that meetings are held at a time and place that is

reasonably accessible to the public, 41 C.F.R. § 102-3.140(a); and publish any records "made

available to or prepared for or by" the committee, 5 U.S.C. App. 2 § 10(b).

FACA also requires every advisory committee to "be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. App. 2 § 5(b)(2), (c). "In introducing the Senate debate on the bill, a Senator explained that 'the most important provision here is the one which requires fair representation of different points of view upon any advisory commission.'" *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 496 F. Supp. 3d 116, 143-44 (D.D.C. 2020) (quoting 118 Cong. Rec. 16,296 (1972)). The GSA has further outlined the factors for "achieving a 'balanced' . . . committee," which include "[t]he need to obtain divergent points of view." 41 C.F.R. pt. 102-3, subpt. B, app. A at III.

## II.    The Taskforce on Federal Consumer Financial Law

On January 8, 2020, the Bureau signed a charter "establish[ing] the Taskforce on Federal Consumer Financial Law." SUF ¶ 1. The Charter charged the Taskforce with "examin[ing] the existing legal and regulatory environment" and "report[ing] its recommendations for ways to improve and strengthen consumer financial laws and regulations." *Id.* ¶ 2.

Defendants have stipulated that they created and operated the Taskforce in a manner that did not comply FACA's requirements. *Id.* ¶ 17 (citing to stipulation). Specifically, Defendants agree that, prior to chartering the Taskforce, they did not meaningfully consult with the GSA and did not prepare a plan to attain fairly balanced membership. *Id*. ¶¶ 18-19. They also acknowledge their failure to make the requisite findings that the Taskforce was in the public interest, essential to agency business, and non-duplicative of work already being done within the government. *Id*. ¶ 20. Likewise, they concede that they did not comply with FACA's open meetings and record requirements. *Id.* ¶ 21.

To staff the Taskforce, Defendants assembled a group of lawyers, academics, and one retired economist, none of whom were currently serving in government. Those members exclusively represent deregulatory and industry views. For example, Todd Zywicki, who chaired

the Taskforce, believes that many consumer protections are paternalistic and has worked on behalf of several large financial institutions to influence the Bureau. The other Taskforce members hold similarly pro-industry views. *See infra* Part III.B.

Although Defendants received applications from 89 prospective members, including consumer finance experts and advocates for robust consumer protections, Defendants did not select any such applicants. SUF ¶¶ 29-35. Instead, Defendants employed a biased process to reject prominent scholars, including Plaintiff Professor Engel, who have devoted their careers to consumer protection and could have helped to balance the Taskforce. *Id.*

Two Senators voiced concerns with the Taskforce at the time that it was established. Specifically, they wrote to the Bureau to express doubts about the Taskforce's ability to "provide you with objective recommendations" given that it was "stacked . . . with representatives of payday lenders, Wall Street banks, and other industry interests." *Id.* ¶ 36. The Senators also worried that the Taskforce was "set up to evade [FACA]," and asked that the Bureau "immediately suspend the Taskforce." *Id.*

Defendants did not heed this advice. Instead, they continued to operate the Taskforce, which produced a final report on January 5, 2021. *Id.* ¶ 37. Confirming the Senators' fears, the 900-page Report includes recommendations that, if acted upon, would benefit the financial services industry at the expense of consumers. *Id.* ¶¶ 38, 51.

## III.    **Plaintiffs and Procedural History**

Plaintiffs in this case include two consumer advocacy organizations, the National Association of Consumer Advocates ("NACA") and the United States Public Interest Research Group ("U.S. PIRG"), as well as Professor Kathleen Engel, a nationally prominent consumer law and finance scholar devoted to improving protections for consumers. SUF ¶¶ 31-32, 39-42. Plaintiffs have a significant interest in the Taskforce's work and its compliance with FACA. *Id.*

¶ 43. These interests were harmed by the Defendants' across-the-board FACA violations, which caused Plaintiffs multiple personal, organizational, and informational injuries. *See infra* Part I.

Plaintiffs filed suit on June 16, 2020, alleging that the creation and operation of the Taskforce violated FACA. Complaint, ¶¶ 156-70, ECF No. 1. Defendants filed a motion to dismiss Plaintiffs' claims pertaining to the Taskforce's establishment and its lack of balance. ECF No. 19. This Court heard oral argument on January 6, 2021, and requested supplemental briefing to address whether the release of the Report rendered any of Plaintiffs' claims moot. On February 25, the Court denied Defendants' motion, finding that Plaintiffs had standing to assert the claims above and that the case was not moot. MTD Order at 2, ECF No. 43.

## LEGAL STANDARD

Because FACA does not provide its own standard or a cause of action, FACA cases are generally brought under the standards set forth in the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 701-704. Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). The reviewing court may also "hold unlawful and set aside agency action" that is "not in accordance with law," *id.* § 706(2)(A), or that was adopted "without observance of procedure required by law." *id.* § 706(2)(D).

Summary judgment is appropriate where the record "presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." *Bryan v. Am. Airlines, Inc.*, 988 F.3d 68, 74 (1st Cir. 2021); *see also* Fed. R. Civ. P. 56(a). In APA cases, "summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Minuteman Health, Inc. v. HHS*, 291 F. Supp. 3d 174, 189 (D. Mass. 2018).

**ARGUMENT**

I.   <u>**Plaintiffs have standing to challenge the creation and operation of the Taskforce.**</u>

Plaintiffs have now shown, through prior filings and their attached declarations, that the unlawful creation and operation of the Taskforce caused them multiple personal, organizational, and informational injuries. That factual record corroborates the allegations that the Court found sufficient to establish standing on Plaintiffs' first and fourth claims in its previous decision. *See* MTD Order at 11-22. Defendants did not even contest Plaintiffs' standing to raise their second and third claims at the motion to dismiss stage, and for good reason—Plaintiffs' standing to assert those claims is obvious. Plaintiffs nonetheless address each of their claims in turn, explaining why each of the Bureau's legal violations caused them injury.

**First Claim for Relief.** To start, Plaintiffs have shown standing as to their first claim, which involves the Bureau's failure to make the requisite findings and take the requisite preliminary steps before chartering the Taskforce. Defendants have stipulated that they failed to meet those requirements, SUF ¶¶ 18-20, depriving Plaintiffs of what the Court has already held was "information to which they were entitled" as a matter of law. MTD Order at 16; *see* SUF ¶ 44; 5 U.S.C. App. 2 § 9(a)(2); 41 C.F.R. § 102-3.60; *id.* § 102-3.30(a); *id.* § 102-3.65. Plaintiffs have also shown, through the attached declarations, that Defendants' "failure to comply with FACA's requirements . . . 'perceptibly impaired' the Plaintiffs' activities and diverted at least some of the Plaintiffs' resources." MTD Order at 17-18; SUF ¶¶ 45-46. That is the sort of "concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources"—that is sufficient to establish standing. *Becker v. FEC*, 112 F. Supp.2d 172, 180 (D. Mass. 2000).

**Second and Third Claims for Relief.** Defendants have also stipulated that the Taskforce failed to provide Plaintiffs with access to its records and meetings while it was operating,

SUF ¶ 21—a classic form of informational injury. *See also id.* ¶ 47. The Taskforce's lack of

transparency further resulted in personal and organizational injuries by preventing Plaintiffs from

"participating in and following the Taskforce's work," MTD Order at 24, yielding a report that

harms their interests. *See* SUF ¶¶ 48, 50-57.

**Fourth Claim for Relief.** Finally, Plaintiffs have shown that they have standing to assert

their fourth claim, which pertains to the Taskforce's unlawful lack of balance. Specifically,

Plaintiffs have shown that Professor Engel "applie[d] for membership and [was] denied access"

pursuant to a "biased process," which the court already indicated would be sufficient to establish

standing. MTD Order at 20-21; *see* SUF ¶¶ 19, 33-34, 49. Instead, the CFPB decided to appoint

a slate of academics and lawyers uniformly opposed to consumer financial protections. *See* SUF

¶¶ 6, 22-26 (describing Taskforce members' experience); *id.* ¶ 36 (letter expressing Taskforce's

lack of balance); *see infra* Part III.B. Plaintiffs have also corroborated their allegations that "the

lack of representation [made] it harder for them to follow and influence the Taskforce's work."

MTD Order at 20; *see* SUF ¶ 50. That is all that is required to show that the "one-sided"

Taskforce is a "direct threat" to Plaintiffs' interests. *W. Org. of Res. Councils v. Bernhardt*

*("WORC I")*, 362 F. Supp. 3d 900, 909 (D. Mont. 2019).

The Taskforce Report has exacerbated these harms. As Plaintiffs have explained, many of

the Report's recommendations run counter to Plaintiffs' expert views on how best to protect

consumers. *See* SUF ¶¶ 38, 51. Yet those recommendations are likely to influence consumer

financial policy at the state and federal levels and provide additional firepower to the financial

services industry. *See id.* ¶ 52. Indeed, that prediction has already come to pass: the Report has

repeatedly been cited by industry representatives and others to support anti-consumer positions.

*See id.* ¶ 53. Plaintiffs will therefore be required to devote resources to exposing and rebutting

the Report—the product of an unlawful advisory committee from which they were shut out. *See id.* ¶ 54. The Taskforce's unlawful creation and operation caused, and is causing, each of these harms, satisfying the injury and causation elements of standing.

Finally, Plaintiffs have shown that the Court has the power to redress these injuries. "[T]he redressability element of standing requires that the plaintiff allege that a favorable resolution of [its] claim would likely redress the professed injury." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quotation omitted). As explained further below, Plaintiffs have sought multiple remedies—including a use injunction, a limited use injunction, the release of all Taskforce records, and a declaration—that, if granted, would redress these injuries. *See infra* Part IV; *cf.* MTD Order at 23-36 (holding that case was not moot because these remedies would provide relief). Plaintiffs therefore have standing.

## II.    **The Taskforce is subject to FACA.**

A Taskforce composed of private citizens and designed to provide recommendations to a federal agency is an advisory committee, plain and simple. Defendants nonetheless contend that, by attempting to hire the Taskforce members as employees, the Taskforce was able to circumvent FACA entirely. That assertion is baseless and would render FACA a nullity. Because the Taskforce was "established or utilized" by the Bureau in "the interest of obtaining advice or recommendations," it is subject to FACA. 5 U.S.C. App. 2 § 3(2). And, while FACA exempts committees "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government," *id.*, that exception does not—indeed, it must not—apply here.

### A.    **The Taskforce was established and utilized by the Bureau.**

To begin, the Taskforce was unquestionably "established" and "utilized" by the Bureau for the purpose of obtaining recommendations. It was established within the meaning of FACA because the Bureau "select[ed] the committee's members." *VoteVets Action Fund v. U.S. Dep't*

*of Veterans Affairs*, 992 F.3d 1097, 1105 (D.C. Cir. 2021) (internal quotations omitted); SUF ¶ 3 (charter explaining that the "Bureau establishe[d] the Taskforce" to obtain "recommendations" and providing that "[t]he Director shall select the members"); *id.* (letter from then-Director Kraninger stating that she "chose [the] five members").

The Taskforce was also utilized by the Bureau because it was "subject to the [Bureau's] actual management or control." *VoteVets*, 992 F.3d at 1103. The Taskforce Charter provided that "[t]he Taskforce shall report to the Director of the . . . Bureau." SUF ¶ 4. It further specified that the Taskforce would be overseen by a Staff Director—"a full-time employee who shall ensure that the Taskforce operates in accordance with the terms of the charter[.]" *Id.* ¶ 5.

### B.   FACA's exemption for government employees does not apply.

Contrary to the Bureau's suggestion, the Taskforce does not fall within FACA's exemption for committees "composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." 5 U.S.C. App. 2 § 3(2). For the exemption to apply, *every* Taskforce member would need to be either a full-time employee or a permanent part-time employee. *Id.* Here, none falls into either category.

### 1.   None of the Taskforce members were full-time employees.

Although FACA does not define "full-time," that phrase typically means "employed for or working the amount of time considered customary or standard." Webster's Third New International Dictionary 919 (1981). For federal employees, the normal amount of time is 40 hours per week on a regular schedule. *See* 5 U.S.C. § 6101(2) (directing agencies to "establish a basic administrative workweek of 40 hours for each full-time employee"); 5 C.F.R. § 610.111 (requiring further that such workweek be on a "regular schedule"); *Yanko v. United States*, 869 F.3d 1328, 1332 (Fed. Cir. 2017) (federal full-time employees "work a 40-hour week").

Every member of the Taskforce fails that test. Chairman Todd Zywicki's Assignment

11

Agreement specified a year-long assignment as chair of the Taskforce, during which he would work "200 days at 8 hours each day, for a total of 1600 hours." SUF ¶¶ 7-8. The Agreement noted that this was "75% of a full-time schedule of 2080 working hours in a year." *Id*. ¶ 8. A percentage of a full-time schedule is obviously not a full-time schedule.

The remaining four members were designated special government employees ("SGE"), *id.* ¶ 10, a category of employee prohibited by statute from working more than 130 days in a year, 18 U.S.C. § 202(a). With a 130-day limit, these members were capped at working 1040 hours per year, or 20 hours per week on average, which is not a full-time schedule. *See AAPS*, 997 F.2d at 915 (expressing skepticism that "FACA's definition of 'full-time' extends to a person who works . . . less than 130 days out of a year.").

Moreover, the record confirms that none of the members worked full-time in any meaningful sense of the term. Rather, each of the members worked an intermittent schedule, SUF ¶ 16—*i.e.*, without the regular schedule required for full-time employees. *Compare* 5 C.F.R. § 610.111 (directing agencies to establish a "regular schedule" for full-time employees), *with* 5 C.F.R. § 340.401 (defining intermittent employment as "employment without a regularly scheduled tour of duty"). That lack of a regular schedule is why the GSA treats intermittent employees as distinct from full-time employees in its guidance on appointing experts to committees under FACA.[2] "FACA would be rather easy to avoid if an agency could simply appoint 10 private citizens as special government employees for two days, and then have the committee receive the section 3(2) exemption." *AAPS*, 997 F.2d at 915. Thus, none of the

---

[2]*See Guidance – Appointment of Consultants to FACA*, GSA https://www.gsa.gov/policy-regulations/policy/federal-advisory-committee-management/advice-and-guidance/appointment-of-consultants-to-faca (noting that experts will earn leave if they work full-time or part-time, but not if they work intermittently).

members was a full-time employee.

### 2. *None of the Taskforce members were permanent part-time employees.*

Nor did any of the Taskforce members work on a "permanent part-time" basis. To the contrary, both the statutes under which they were hired and the documents associated with their appointments reflect their *temporary* service. Even if the members were somehow deemed permanent employees, they also did not serve as *part-time* employees, as FACA requires.

**a.** The statutory hiring authority for the Taskforce's members rendered their service temporary. The Intergovernmental Personnel Act, the authority used for Todd Zywicki, SUF ¶ 9, prohibits assignments from "exceed[ing] two years," 5 U.S.C. § 3372. That is, by definition, not "permanent." *See Permanent*, Merriam-Webster, https://www.merriam-webster.com /dictionary/permanent ("continuing or enduring without fundamental or marked change").

As for the remaining members, the statute defining SGEs states that "'special government employee' shall mean an officer or employee . . . who is retained . . . for . . . *temporary duties*[.]" 18 U.S.C. § 202(a) (emphasis added). Congress created this category of employee because it "recognized the government's need to hire specialists for *short-term* projects." *Aluminum Co. of Am. v. FTC*, 589 F. Supp. 169, 175 (S.D.N.Y. 1984) (emphasis added). To "facilitate" this goal, Congress "reliev[ed] [SGEs] from restrictions inappropriate to their role and status, including . . . restrictions on outside employment," *id.* (citing 28 Fed. Reg. 985 (1963)), making the SGE category ideal for hiring outsiders to serve temporarily on advisory committees.

As the First Circuit has recognized, "advisory-committee members" under FACA often "are considered 'special government employees[.]'" *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 14 (1st Cir. 2020). For example, the Bureau itself runs an advisory committee known as the Academic Research Council that is subject to FACA and is composed wholly of

SGEs.[3] *See also Physicians for Social Resp. v. Wheeler*, 956 F.3d 634, 640 (D.C. Cir. 2020) (noting that the FACA advisory committee members in that case were SGEs "who perform *temporary duties* for the federal government") (emphasis added). If the Bureau's arguments were correct, then many of the advisory committees in use today (including one of the Bureau's) would, unbeknownst to anyone, not constitute advisory committees, and agencies would be gifted an easy mechanism for avoiding FACA's requirements in the future.

      **b.**      The documents associated with the Taskforce members' appointments also reflect their temporary status. Each of their hiring forms describes their service as "temporary." *See* SUF ¶ 11 (Zywicki was assigned to "a time-limited temporary position"); *id.* (Box 24 of the non-chair members' Standard Form 50s indicates that they had no tenure and Box 45 describes their appointments as "temporary").

      While the Bureau nominally changed the tenure of the four non-chair members to "permanent" on subsequent Standard Form 50s issued on February 2, 2020, after the Taskforce began operating, *id.* ¶ 12, this technical designation does not render the members permanent employees for the purpose of FACA. As noted just above, their appointments as SGEs were temporary by statute. Moreover, it is clear from every other part of the record that the members and the Bureau understood that the appointments were temporary, suggesting that the Bureau made these eleventh-hour form changes to avoid complying with FACA.

      Indeed, the Taskforce Charter, which was not changed, specifies that the "members [will] work for a *temporary* period of time" and "shall serve for the duration of the Taskforce," which was "expected to operate from January 2020 until . . . no later than January 2021." *Id.* ¶ 13

---

[3] *Committee Members, Meetings and Advisory Reports: Academic Research Council*, GSA, https://www.facadatabase.gov/FACA/FACAPublicViewCommitteeDetails?id=a10t0000001gzk MAAQ (FACA database listing the Council and denoting the members as SGEs).

(emphasis added); *see also Elec. Privacy Info. Ctr. v. Nat'l Sec. Comm'n on Artificial Intelligence ("EPIC")*, 466 F. Supp. 3d 100, 121 (D.D.C. 2020) (holding that a committee fell outside of FACA's exemption where its members, "as employees 'appointed for the life' of a 'temporary' federal organization, [were] 'temporary' federal employees"). Further, the Bureau repeatedly communicated elsewhere that the Taskforce, and any appointments to it, were time-limited.[4] Tellingly, the Taskforce members no longer work for the Bureau. As planned, they all resigned following the release of the Taskforce's final report in January 2021. SUF ¶ 15. The Bureau's attempt to paper over its error cannot displace how the members' appointments were understood from the inception of the Taskforce all the way through its ultimate conclusion.

c.     Although the lack of permanent employment is enough to conclude that this exception does not apply, the members were also not "part-time" employees. While FACA itself does not define "part-time," federal law defines "part-time career employment" as "employment of 16 to 32 hours a week . . . under a schedule consisting of an equal or varied number of hours per day, . . . but *does not include employment on [an] . . . intermittent basis*." 5 U.S.C. § 3401(2) (emphasis added); *see also EPIC*, 466 F. Supp. 3d at 121 (holding that a committee did not fall within FACA's exemption because its members were intermittent, and thus not part-time). Consistent with that definition, and as noted above, the GSA treats intermittent employees as distinct from part-time employees in its FACA-specific guidance. Here, every single member of

---

[4] *See, e.g.*, SUF ¶ 14(a) (offer letter sent to Macleod explaining that he would be serving in a "temporary, excepted service position not to exceed 1 year as an SGE"); *id.* ¶ 14(b) (appointment letters describing the Taskforce as a "one-year effort" and noted that as SGEs, the members would be "employed to perform temporary duties"); *id.* ¶ 14(c) (orientation emails explaining that "the group will have one year from kickoff to produce its report"); *id.* ¶ 14(d) (MOU signed by Macleod stating that his "appointment is not to exceed 1/20/2021" and that this "temporary appointment carries no . . . commitment that [he would] be considered for . . . a permanent appointment").

the Taskforce was working an intermittent schedule. *See supra* page 12 & note 2.

* * *

Permitting agencies to hire private citizens and deem them government employees during their brief tenure on an advisory committee would frustrate the fundamental purpose of FACA. FACA was enacted to prevent the "proliferation of costly committees . . . dominated by representatives of industry and other special interests[.]" *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999). As representatives of the financial services industry hired temporarily by the Bureau solely to serve on the Taskforce, *see infra* Part III.B, the members of the Taskforce pose precisely the risk of agency capture about which Congress was concerned. Worse still, several of the Taskforce members maintained their private employment throughout. SUF ¶ 27 (describing various record documents explaining that Macleod and Noonan could continue practicing at their law firms because they were SGEs rather than regular government employees). FACA should not be interpreted to permit the very activity Congress sought to prohibit.

Again, "FACA 'would be rather easy to avoid' if the Government is right that private-citizen members of short-term advisory groups are always 'permanent part-time' employees of the Federal government." *EPIC*, 466 F. Supp. 3d at 122 (quoting *AAPS*, 997 F.2d at 915). That is precisely why the Bureau's attempt to circumvent FACA fails as both a matter of statutory language and intent.

## III.    The Taskforce violated FACA.

Simply put, if FACA applies, then the Bureau cannot prevail. With respect to the first three claims, Defendants acknowledge that they paid no heed to Section 9's pre-chartering requirements or Section 10's transparency requirements for meetings and records. As to the fourth claim, the facts show that Defendants assembled an imbalanced Taskforce in violation of Section 5(b)(2). Plaintiffs are therefore entitled to summary judgment on each of their claims.

16

**A.      Defendants have stipulated that the Taskforce violated FACA's pre-chartering and transparency requirements.**

Defendants admit that they "created and operated the [Taskforce] in a manner that did not comply with requirements that apply to advisory committees under [FACA]." SUF ¶ 17 (citing Stip. ¶ 1). With respect to the pre-chartering requirements, Defendants concede that they did not consult with the GSA, prepare a fairly balanced membership plan, or make the necessary public interest findings. *Id.* ¶¶ 18-20 (stipulation cites 5 U.S.C. App. 2 § 9(a)(2); 41 C.F.R. § 102-3.60(a), (b)(3); 41 C.F.R. § 102-3.30(a)). As to FACA's transparency requirements, Defendants also agree that they did not hold Taskforce meetings open to the public, provide timely notice of meetings, ensure that meetings were held at a reasonable time and place, permit interested persons to file statements before the Taskforce, or make Taskforce records available to the public. *Id.* ¶ 21 (stipulation cites 5 U.S.C. App. 2 § 10(a)(1), (2), (3); *id.* § 10(b); 41 C.F.R. § 102-3.140(a), (c), (d)). Plaintiffs are therefore entitled to judgment on their first three claims.

**B.      The Taskforce was not fairly balanced, as FACA requires.**

Although they do not expressly concede the point, the record demonstrates that Defendants also violated FACA's fairly balanced requirement. *See* 5 U.S.C. app. 2 § 5(b)(2), (c). "The appropriate inquiry in determining whether [a] Committee's membership satisfies" this standard "is whether the Committee's members 'represent a fair balance of viewpoints given the function to be performed.'" *Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 423 (D.C. Cir. 1989) (Friedman, J., concurring in judgment). To achieve this balance, agencies must "consider a cross-section of those directly affected, interested, and qualified," as well as "the need for divergent points of views on the issues before the advisory committee." *NAACP*, 496 F. Supp. 3d at 143-44.

With respect to the Taskforce, the Bureau was obligated to include "divergent points of

view," *NAACP*, 496 F. Supp. 3d at 144, on "ways to improve and strengthen consumer financial laws and regulations," SUF ¶ 2, including the views of both the financial services industry *and* consumer advocates. There is no reasonable dispute that both groups are "directly affected, interested, and qualified." *NAACP*, 496 F. Supp. 3d at 143. These groups have engaged in a longstanding debate over the CFPB's role in regulating the industry. On the one hand, industry and its allies have criticized the Bureau's very existence, arguing that regulation harms both consumers and industry. *See, e.g.*, *infra* page 19. On the other hand, consumer advocates like Plaintiffs believe that the Bureau should engage in robust regulation to prevent the proliferation of predatory financial products that harm consumers. SUF ¶ 28.

To include industry, while excluding consumer advocates, is "precisely the type of imbalance that FACA sought to prevent." *NAACP*, 496 F. Supp. 3d at 143 (committee on "improving American policing" was imbalanced where composed solely of "law enforcement" while excluding representatives of policed communities). As the First Circuit has explained, if an agency "announced that only persons paid by a regulated interested business could serve on a committee, we would expect that FACA's fair balance and inappropriate influence standards would supply a meaningful tool for review[] [.]" *Union of Concerned Scientists*, 954 F.3d at 19.

Given that Defendants have conceded that they never prepared a plan to ensure balance, as FACA requires, SUF ¶ 19, the only way the Taskforce could be fairly balanced is if it happened by accident. It did not. Each of the five Taskforce members they selected has held positions representing the financial services industry, and most have expressly endorsed pro-industry, deregulatory views. *See NAACP*, 496 F. Supp. 3d at 133 ("Congress accepted that a person's viewpoints c[an] be inferred from his or her background and employment status" and "one can presume that industry representatives will tend to represent industry interests").

18

1. **Todd Zywicki**, the Chair of the Taskforce and a Professor at the George Mason University Antonin Scalia School of Law, SUF ¶ 22, has spent his career advancing industry interests. In his time off-campus, Todd Zywicki has served as a director of "Global Economics Group, a consulting firm hired by Visa, Bank of America, and Citigroup to influence the Bureau and . . . was paid $500 an hour to help defend Morgan Drexen, a debt relief company, from a Bureau investigation." *Id*. Moreover, his public remarks and scholarship reveal that he opposes consumer finance regulation. For example, he opposed the Bureau's very creation, arguing that that Bureau would "increase the cost of . . . consumer and small-business credit, and [] increase the regulatory burden on financial institutions." *Id.* He further contended that regulating consumer financial products leads to "unintended consequences," such as "undermin[ing] the soundness of financial institutions." *Id.*

2. **Thomas Durkin**, a retired economist, *id.* ¶ 23, has also worked to promote the interests of the financial services industry. He spent the better part of a decade as the Chief Economist at the American Financial Services Association, "the primary trade association for the consumer credit industry." *Id.* Consistent with his work experience, Thomas Durkin has coauthored (with Todd Zywicki) books, articles, and op-eds that advocate deregulation of predatory financial products, such as payday loans, which he has referred to as "legal, high-cost" credit options. *Id.*[5]

3. **Howard Beales III** is a professor at George Washington University, where he has produced scholarship that cautions against certain regulation of credit markets. *Id.* ¶ 24.[6] He "has

---

[5] *See also, e.g.*, *id.* ¶ 23(b) (noting an article in which Durkin dismisses as an "ancient and medieval view" the argument based on behavioral economics that "there are limitations on the economic rationality of consumer borrowers that must be guarded against with regulation").

[6] *See, e.g.*, *id.* ¶ 24(a) (noting an article in which Beales argues that behavioral economics should not be used to justify robust regulation in credit markets).

been described by the Wall Street Journal as 'an academic whose studies have been used by a tobacco company and consumer-goods makers to fight federal regulations.'" *Id*. Like Todd Zywicki, Howard Beales "works for a consulting firm where he sells his 'expertise' to industry." *Id*. (noting Beales' work for NERA Economic Consulting). In that capacity, he has "argu[ed] that payday loans with interest rates of up to 448 percent were 'beneficial to consumers.'" *Id*.

4.      **William Macleod** represents industry as chair of the antitrust and competition practice group at the law firm Kelley Drye & Warren. *Id*. ¶ 25. His clients include "trade associations," "major household-name retailers, manufacturers and financial services companies." *Id*. In his capacity as a partner, he has used an "encyclopedic knowledge of antitrust and consumer protection law" and to "resolutely [fight] onerous regulations." *Id*.

5.      **Linda Jean Noonan** also represents the financial services industry. *Id*. ¶ 26. As a partner at the law firm Hudson Cook, she "counsels financial institutions, national mortgage companies, consumer reporting agencies and others in complying with laws related to consumer credit, privacy, e-commerce and unfair trade practices." *Id*. As part of that work, she represents "clients in law enforcement proceedings before . . . the Federal Trade Commission, the Consumer Financial Protection Bureau, and the Department of Justice." *Id*. Noonan also serves as president of the American College of Consumer Financial Services Lawyers, a group whose executive board is composed entirely of lender-side financial services lawyers. *Id*.

Conversely, none of the Taskforce members represents the views of consumer advocates, even though Defendants received more than enough applications to fill that role.[7] In fact,

---

[7] While Beales, Noonan, and Macleod held positions at the Federal Trade Commission ("FTC") that involved enforcing consumer protection laws, SUF ¶¶ 24(d), 25(c), 26(d), that experience does not indicate that they represent the views of consumer advocates. First, all three *currently* represent industry and in that capacity have advanced pro-industry views. Second, Durkin and Noonan's years at the FTC were largely spent under the Reagan, Bush Sr., and Bush Jr.

Defendants rejected several dedicated consumer advocates. These included Plaintiff Professor Engel, a Research Professor at Suffolk University who has written extensively on how to improve consumer law to protect consumers and who has served in numerous public service positions concerning consumer finance, including at the Bureau. *Id.* ¶¶ 31-33. That she was rejected through a biased selection process is clear from Professor Engel's interview experience, during which Defendants questioned her "'in an inquisitorial manner' for the purpose of 'determin[ing] [her] stance on deregulation,'" without asking "about her qualifications and experience." *Id* ¶ 34. Defendants also declined to appoint Professor Prentiss Cox, a law professor who has devoted much of his career to consumer protection, including by drafting protective legislation and running a consumer protection clinic. *Id.* ¶ 35.

In sum, Defendants concededly never developed a plan to ensure that the Taskforce would be fairly balanced and, as a result, only selected members who are uniformly known for their pro-industry, anti-regulatory positions. They thus violated FACA in this respect as well.

## IV.    <u>The Court should order complete relief.</u>

The Bureau created and operated an advisory committee that is subject to FACA without even attempting to comply with the statute. Unsurprisingly, that committee produced a biased report—one which will be used to further the interests of the consumer financial services industry. The Court should therefore order all relief necessary to remedy Plaintiffs' harms and to

---

administrations, *id.*, during which the agency was less aggressive in its enforcement. *See, e.g.*, Comment by FTC Commissioner Rohit Chopra on DOT's Proposed Rule Defining Unfair or Deceptive Practices ("Chopra Comment") at 1-2, *available* at www.regulations.gov under Docket No. DOT-OST-2019-0182-0225 (noting that the FTC's enforcement actions and rulemakings "plummeted" in the 1980s). For example, one of Durkin's achievements at the FTC was the Deception Policy Statement, SUF ¶ 24(d), which has been criticized by Rohit Chopra—a current FTC commissioner and President Biden's nominee for Director of the Bureau—as narrowing the FTC's ability to bring enforcement actions. Chopra Comment at 9.

vindicate FACA. Specifically, the Court should order (1) a use injunction, (2) a limited use injunction (a disclaimer on the Report whenever disseminated), (3) the release of all remaining Taskforce records, and (4) appropriate declaratory relief. SUF ¶¶ 55-57.[8]

      **1.**      **Use injunction.** To start, the Court should bar the Bureau from any future use of the Taskforce's Report or other work product. "FACA was designed by Congress to prevent the use of any advisory committee as part of the process of making important federal agency decisions unless that committee is properly constituted and produces its report in compliance with the procedural requirements of FACA." *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994). "[T]o allow the government to use the product of a tainted procedure would circumvent the very policy that serves as the foundation of [FACA]." *Id.* at 1107. A use injunction is therefore the "only vehicle that carries the sufficient remedial effect to ensure future compliance with FACA's clear requirements. Anything less would be tantamount to nothing." *Id.* This is particularly true where, as here, the agency did not even attempt to comply with significant FACA requirements.

      Some courts have nonetheless held that a use injunction is proper only if necessary to avoid "render[ing] FACA a nullity" in light of "FACA's principal purposes—(1) avoidance of wasteful expenditures and (2) public accountability." *NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998). "Because the FACA violation at issue here goes to the very creation and existence of the advisory committee, a use injunction is appropriate" under that standard as well. *W. Org. of Res. Councils v. Bernhardt ("WORC II")*, 412 F.Supp.3d 1227, 1242-43 (D. Mont. 2019). Like

---

[8] To the extent the requirements for permanent injunctive relief apply to Plaintiffs' requests, *cf. WORC II*, 412 F. Supp. 3d at 1243 n.7, those factors are also met: Plaintiffs' harms are irreparable, including by legal remedies like damages, and the flagrancy of the Taskforce's violations mean that both the equities and the public interest would be served by an injunction.

in *WORC II*, "the Committee's very existence was tainted" by its failure to comply with FACA's

chartering and fairly balanced requirements. *Id.* at 1243. If anything, the Bureau's violations in

this case were far more severe than those in *WORC II* because the Taskforce's secrecy further

inhibited "public participation and accountability." *Id.* at 1243; *see also Idaho Wool Growers*

*Assoc. v. Schafer*, 637 F. Supp. 2d 868, 880 (D. Idaho 2009) ("Because Plaintiffs were denied

their right to participate in the Committees' processes, FACA's purposes are advanced by

limiting the future use of the Committees' reports."). If the Court were to decline to issue a use

injunction here, it would send a powerful signal to agencies that they can flagrantly dispense

with FACA's most basic requirements without consequence.

Nor would a use injunction lead to "wasteful expenditures." *NRDC*, 147 F.3d at 1026.

For the reasons explained above, the Taskforce's FACA violations contributed to an

irredeemably tainted report. Whatever amount the Bureau expended on the Taskforce is

outweighed by the need to ensure that the work of an unlawful advisory committee does not

continue to harm Plaintiffs and that agencies comply with FACA moving forward. Besides, the

Bureau cannot trumpet the importance of the Taskforce's work when it expressly made no

finding of the Taskforce's utility in the first place, nor concluded that the information provided

by the Taskforce could not be obtained through other parts of the federal government.

2.      **Limited use injunction (disclaimer).** In addition, the Court should issue a

limited use injunction requiring the Bureau to place a disclaimer on the Report whenever it is

disseminated. "[I]nvoking advisory committee recommendations lends 'political legitimacy' to

those decisions." *NAACP Legal Def. & Educ. Fund, Inc. v. Barr*, 2020 WL 6392777, at \*4

(D.D.C. 2020). Placing "[a] conspicuous disclaimer on the [Taskforce's] report will qualify that

legitimacy by ensuring that everyone who views the report learns it was produced unlawfully by

a non-representative body." *Id.* The frequency with which the Report has been cited by industry

underscores the need for a disclaimer. *See* SUF ¶ 53.

A disclaimer does not preclude the need for a use injunction, however. A disclaimer

would not prevent the Bureau from relying on the Taskforce's recommendations—particularly in

secret, for actions that do not require notice and comment, or in spite of public opposition to the

Report's usage. In other words, a use injunction prevents the Bureau from using the fruit of an

unlawful advisory committee, while a disclaimer alerts the public to the committee's illegality.

    **3.**    **Release of records.** While the release of the Taskforce's records now cannot

rectify how the Bureau unlawfully inhibited public participation while the Taskforce was in

operation, the Bureau must release *all* remaining Taskforce records—not just the limited

documents available online or otherwise. "[T]here is no question . . . that members of the public

possess enforceable rights to obtain information under FACA," or that "FACA rights are

enforceable even after an advisory committee has been disbanded." *Cummock*, 180 F.3d at 292.

The Taskforce's obligation to produce its records therefore survived its dissolution and should be

enforced by the Court.

    **4.**    **Declaratory relief.** Finally, because the Taskforce violated FACA, "the Plaintiffs

have a basis for requesting a declaration that the Defendants' creation and administration of the

Taskforce violated FACA and its implementing regulations." MTD Order at 18, 25-26; *see, e.g.*,

*NAACP*, 496 F. Supp. 3d at 146 (declaring that the committee at issue was subject to and

violated FACA). Such relief would supplement the other forms of relief requested above.

    "If FACA has no teeth, the work product of spuriously formed advisory groups may

obtain political legitimacy that it does not deserve." *Cargill, Inc. v. United States*, 173 F.3d 323,

341 (5th Cir. 1999). The Bureau cannot parade around a report produced by an unnecessary,

secretive, biased—and unlawful—advisory committee as the work of a neutral panel of experts. The Court should therefore order relief commensurate to the scale of the Taskforce's violations.

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment; enjoin CFPB to refrain from using the Taskforce's Report or other work product, to place a disclaimer on the Taskforce's Report, and to publish any unlawfully withheld Taskforce records; and declare that the CFPB Taskforce was unlawfully created and operated.

August 20, 2021

Respectfully submitted,

_/s/ Kristen P. Miller_

Kristen Miller (D.C. Bar No. 220627)*
John Lewis (D.C. Bar No. 1033826)*
Sean Lev (D.C. Bar No. 449936)*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kmiller@democracyforward.org
jlewis@democracyforward.org
slev@democracyforward.org

David A. Nicholas (BBO# 553996)
Of Counsel
Wolf Popper LLP
20 Whitney Road
Newton, MA 02460
(617) 964-1548
dnicholas@wolfpopper.com

_Counsel for Plaintiffs_

* admitted _pro hac vice_