### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL ASSOCIATION OF
CONSUMER ADVOCATES, et al.,

*Plaintiffs*,

v.

No. 1:20-cv-11141 (JCB)

DAVID UEJIO, in his official capacity as
Acting Director of the Consumer Financial
Protection Bureau, et al.,

*Defendants*.

### DECLARATION OF EDMUND MIERZWINSKI

I, Edmund Mierzwinski, declare under penalty of perjury as prescribed in 28 U.S.C.

§ 1746:

1.      The facts contained in this declaration are known personally to me and, if called

as a witness, I could and would testify competently thereto under oath. I submit this sworn

declaration in support of Plaintiffs' motion for summary judgment.

2.      I am currently senior director for federal consumer programs for United States

Public Interest Group ("U.S. PIRG") and U.S. PIRG Education Fund. I have served as a

consumer advocate for U.S. PIRG since 1989, advocating on improvements to a variety of

consumer financial laws and regulations which became subject to the Consumer Financial

Protection Bureau's jurisdiction on July 21, 2011. Before the Bureau was created, I testified on

the need for its establishment before Congress several times. I was also a founding member and a

leader of the Americans for Financial Reform coalition created to support Wall Street reform and

creation of the Bureau. I continue to lead U.S. PIRG's efforts to protect and grow the Bureau. I

also continue to be active in Americans for Financial Reform, and have chaired its CFPB issues

1

group and its weekly member calls since 2010. I am also chair of the board of the now-incorporated Americans for Financial Reform.

I.   **U.S. PIRG's Mission**

3.      U.S. PIRG is a non-profit consumer advocacy organization with tens of thousands of members across the United States. To create a safer and heathier world, U.S. PIRG draws on a strong network of researchers, advocates, organizers, and students to improve government transparency and to stand up to powerful special interests on behalf of the public on a variety of issues. Among other things, U.S. PIRG has a long history of working to improve and reform consumer financial laws and regulations, including by defending the Bureau's core mission against efforts to unwind consumer protections.

4.      U.S. PIRG accomplishes its objectives through several activities. First, U.S. PIRG offers free education and information to its members and to the general public regarding the Bureau's regulatory activities, as well as the ongoing need for improvements in consumer protections.

5.      For example, the U.S. PIRG Education Fund has published extensive reports on a wide variety of problems faced by consumers in the financial services marketplace. Most recently, these include a series of reports examining trends in consumer complaints received by the Bureau since its inception in 2011. Recent reports include a report that analyzed virtual wallets and payment apps, a report that tracked skyrocketing complaint levels—led by credit reporting complaints—during the pandemic, a study of debt-collection complaints to expose the worst debt-collection companies, and a report informing the public about the need for continued

public access to the Bureau's Consumer Complaint Database.[1] U.S. PIRG also educates the

public through blog posts,[2] emails to its members, webinars, and social media.[3]

      6.      Second, U.S. PIRG provides an independent voice for consumers, advocating for

improved consumer finance laws and regulations in a number of ways. Specifically, U.S. PIRG

has regularly testified before Congress,[4] submitted comments in response to CFPB Requests for

Information and on CFPB proposed rulemakings,[5] organized comment campaigns by its

---

[1] *Reports: the CFPB Gets Results for Consumers*, U.S. PIRG,
https://uspirg.org/page/usp/reports-cfpb-gets-results-consumers (last updated June 2021).

[2] The website posts are also often cross-posted to Medium and LinkedIn and posted to Twitter
and Facebook.

[3] *See, e.g.*, Ed Mierzwinski, *Virtual Wallet, Payment App Complaints Skyrocket*, U.S. PIRG
(June 22, 2021), https://uspirg.org/blogs/eds-blog/usp/virtual-wallet-payment-app-complaints-
skyrocket; *Should We Fire The Big 3 Credit Bureaus?*, U.S. PIRG (December 11, 2020),
https://uspirg.org/blogs/blog/map/should-we-fire-big-3-credit-bureaus; *I'm Reading the CFPB's
Mail About the Pandemic's Effect of Family Finances*, U.S. PIRG (May 31, 2020),
https://uspirg.org/blogs/eds-blog/usp/i%E2%80%99m-reading-cfpb%E2%80%99s-mail-about-
pandemic%E2%80%99s-effect-family-finances (blog post highlighting the CFPB's failure to
address the increasing numbers of credit reporting and debt collection complaints submitted by
consumers since March 1, 2020).

[4] *See, e.g.*, *House Holds Hearing on Legislative Proposals Relating to the CFPB*, Consumer Fin.
Monitor (May 28, 2014), https://www.consumerfinancemonitor.com/2014/05/28/house-holds-
hearing-on-legislative-proposal-relating-to-the-cfpb/ (noting U.S. PIRG's testimony).

[5] *See, e.g.*, Ed Mierzwinski, *Mulvaney Lobs One Last Softball To Industry Opponents of CFPB*,
U.S. PIRG (Dec. 31, 2018), https://uspirg.org/blogs/eds-blog/usp/mulvaney-lobs-one-last-
softball-industry-opponents-cfpb (describing an extensive series of Requests for Information that
U.S. PIRG responded to); U.S. PIRG, *Comment on CFPB Request for Information: Bureau
Public Reporting Practices of Consumer Complaint Information* (June 20, 2018),
https://www.regulations.gov/document?D=CFPB-2018-0006-0188.

members,[6] provided expert testimony at CFPB-hosted events,[7] and met with the Bureau and

other financial regulators to educate them on consumer issues.

      7.      With respect to the Bureau's Taskforce on Federal Consumer Financial Law (the

"Taskforce"), U.S. PIRG recently issued a January 2021 release titled "Illegitimate CFPB Task

"Farce" Issues Final Report Promoting Businesses Over Consumers," explaining why the

Taskforce's report would weaken consumer protections.[8]

## II.     U.S. PIRG's Injuries from the Unlawful Creation and Operation of the Taskforce

      8.      Consistent with this long track record of vigorous advocacy, U.S. PIRG has a

significant interest in the Taskforce's activities. The Taskforce was created to offer

recommendations concerning potential changes to consumer finance laws and regulations—a

subject core to U.S. PIRG's mission, and one with which U.S. PIRG has decades of expertise.

      9.      If the Taskforce had been operated transparently and in compliance with FACA, it

would have been easier for U.S. PIRG to monitor the Taskforce's activities, attend its public

meetings, participate in those meetings to advance consumer interests to the extent possible, and

educate its members and clients on the Taskforce's work. But because of the opaque process

through which the Taskforce was established, the secrecy with which it operated, and its lack of

---

[6] *See, e.g.*, *Tell Acting Director Mulvaney: Keep the Payday Lending Rule*, U.S. PIRG
https://uspirg.webaction.org/p/dia/action4/common/public/?action_KEY=24569&uid=[[supporte
r_KEY]]&utm_source=salsa&utm_medium=email&tag=email_blast:[[email_blast_KEY]]&utm
_campaign=USP4-FCON:FINREFORM-0518&utm_content=EM5:00C:0GH-AAP (last visited
Aug. 16, 2021).

[7] *See, e.g.*, Ed Mierzwinski, *CFPB Report Confirms 2009 Credit Card Act Works to Protect
Consumers*, U.S. PIRG (Oct. 2, 2013), https://uspirg.org/news/usp/cfpb-report-confirms-2009-
credit-card-act-works-protect-consumers (excerpting testimony provided by U.S. PIRG at a
CFPB field hearing in Chicago on the Credit CARD Act).

[8] Ed Mierzwinski, *Statement: Illegitimate CFPB Task 'Farce' Issues Final Report Promoting
Businesses Over Consumers*, U.S. PIRG (Jan. 6, 2021), https://uspirg.org/news/usp/statement-
illegitimate-cfpb-task-'farce'-issues-final-report-promoting-businesses-over.

a balanced composition of members, the Taskforce has impeded, and is impeding, U.S. PIRG's

mission-driven educational activities, thereby forcing it to divert resources in response.

10.     To start, the secrecy of the Taskforce—including its failures to publish the

requisite findings, consult with the GSA, and provide transparency into its records and

meetings—prevents U.S. PIRG from fully understanding how the Taskforce reached its

conclusions, assessing the Taskforce's ultimate recommendations, and communicating the nature

and significance of the Taskforce's work. Conversely, had the Bureau been forced to comply

with FACA's requirements, it might not have decided to create the Taskforce at all, thereby

sparing U.S. PIRG the need to monitor and react to the Taskforce's work.

11.     U.S. PIRG has nonetheless done the best it can to follow the Taskforce's activities

and understand the consequences of its work. For example, U.S. PIRG attended the March 10,

2020 meeting to express its concerns that the Taskforce was operating in violation of FACA and

to request that the Taskforce hold its meetings open to the public. That meeting, however, hardly

provided a robust opportunity for public input, considering that it was held in person at the

beginning of the COVID-19 pandemic. Similarly, the summer hearing scheduled by the

Taskforce provided very little advance information about the Taskforce's intentions, making it

difficult for consumer advocates to participate fully.

12.     U.S. PIRG is statutorily entitled to information about the Taskforce and would

seek to use it as part of U.S. PIRG's work and advocacy efforts, if made available. Specifically,

because U.S. PIRG has been denied access to the information necessary to assess the Taskforce's

activities and to determine how the Taskforce reached its ultimate recommendations, U.S. PIRG

has been unable to keep the public fully abreast of the Taskforce's efforts to reshape consumer

financial laws and regulations. If U.S. PIRG had access to that information, it would seek to

publicize the Taskforce's operations and decisions to its membership and others, as it has in the

past with respect to the Bureau. Indeed, U.S. PIRG routinely reads and responds to the Bureau's

work product, including statements, reports, data, and other publications. This information is no

less important now that the Taskforce has concluded its operations; it is necessary to give the

public a full picture of how the Taskforce conducted its business while it was in operation, and to

provide context to the Taskforce's ultimate report.

13.     The Taskforce's secrecy also prevented U.S. PIRG from participating in its work.

U.S. PIRG had very little visibility into the Taskforce's operations, and could not participate in

the Taskforce's meetings. Were the Taskforce operated transparently, it would have been easier

for U.S. PIRG to try to persuade the Taskforce to adopt recommendations for needed consumer

protections. Instead, the lack of access to information about the Taskforce's work hampered U.S.

PIRG's ability to advocate before the Taskforce and made it more likely that recommendations

favorable to industry will come to fruition, as they ultimately did. That lack of access is a stark

contrast to the level of access the Bureau has generally provided to consumer advocates since it

was created, including under the tenure of Directors Mulvaney and Kraninger.

14.     U.S. PIRG submitted a comment in response to the Taskforce's March 27, 2020

Request for Information. *See* Response to Request for Information (attached as Exhibit A).

Without access to the Taskforce records and meeting minutes, however, U.S. PIRG was in the

dark with respect to the recommendations the Taskforce may have been considering. If U.S.

PIRG had access to such information, it would have been able to tailor its comments to address

any issues under the Taskforce's consideration.

15.     These harms are exacerbated because the Taskforce did not include a member

who represents the interests of consumer advocates or academics who believe that regulating

dangerous financial products is essential to protect consumers and ensure the stability of the

economy, like a representative from U.S. PIRG. That view was necessarily not represented on

the Taskforce, increasing the likelihood that the Taskforce would recommend policies contrary

to U.S. PIRG's interests, as it ultimately did. Moreover, if consumer advocates had been able to

participate more fully in the Taskforce's work, they would have been able to provide helpful

information and input to the Taskforce and improve the ultimate quality of the Taskforce's work.

**III.     U.S. PIRG's Injuries from the Taskforce's Report.**

16.     Now that the Taskforce has completed its Report, its work will further inflict

concrete, imminent harms on U.S. PIRG. Indeed, it is notable that, after being blocked from fully

engaging in the Taskforce's activities, U.S. PIRG and members of the public were never given

the opportunity to review or comment on a draft version of the Report.

17.     U.S. PIRG objects to many of the Taskforce's recommendations. For example:

a.     The Taskforce recommended that states eliminate usury limits on

predatory lending or that Congress allow fintech lenders to ignore them

and make loans with triple-digit interest rates even in states that have more

stringent interest rate limits.[9] U.S. PIRG has long supported usury limits,

and has issued numerous reports and advocated against high-cost

predatory lending. Specifically, U.S. PIRG supported the recent enactment

of SJR 15, signed by President Biden on June 30, to repeal a rule of the

Office of the Comptroller of the Currency that would have allowed

fintechs to "rent-a-bank" and evade state usury limits. U.S. PIRG also

---

[9] *Taskforce on Federal Consumer Financial Law Report, Volume II*, CFPB 93-94 (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-2_2021-01.pdf.

supports a national usury ceiling through enactment of the bipartisan

Veterans and Consumers Fair Credit Act, which would expand the

Military Lending Act to cover all consumers with a 36% APR ceiling.

b.     The Taskforce also recommended that Congress repeal provisions of the

highly successful 2009 Credit CARD Act.[10] But that law protects students

and other young adults from credit cards that they cannot afford to repay

and protects consumers with poor credit from predatory lenders' "fee

harvester" cards, which offer tiny credit lines and relatively large recurring

fees. U.S. PIRG has fought against predatory lenders for years, and will

need to spend further time and resources to rebut the report's

recommendations.

c.     Finally, the Report recommends that Congress cap allowable penalties

against credit bureaus and banks that violate the Fair Credit Reporting

Act,[11] despite record numbers of consumer complaints to the Bureau about

credit reporting errors affecting their credit scores.

18.     These flawed recommendations, and others, are likely to be particularly

influential because of the fanfare with which the Bureau celebrated the Report's release. The

Bureau described the Report as the successor to the much-lauded report of the National

Commission on Consumer Finance (NCCF) nearly fifty years ago.[12] However, the NCCF was a

---

[10] *Id.* at 76-77.

[11] *Id.* at 25-26.

[12] *Consumer Financial Protection Bureau's Taskforce on Federal Consumer Financial Law Releases Its Report*, CFPB (Jan. 5, 2021), https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureaus-taskforce-on-federal-consumer-financial-law-releases-its-report/.

truly independent commission that featured a diversity of membership and robust disagreement, unlike the Taskforce. The Bureau's effort to confer upon the Taskforce the legitimacy and the seriousness of the NCCF therefore makes it even more likely that the Taskforce's recommendations will be used to support policies that would harm consumers, as well as U.S. PIRG.

19.     Because the Taskforce's work is likely to be used to influence CFPB policy in a manner harmful to U.S. PIRG's interests, U.S. PIRG must expend further resources to monitor, and if necessary, advocate against harmful agency actions. Even if the Taskforce's recommendations are rejected by the Bureau, however, the financial services industry will use the Report to make arguments against the sort of protections for which U.S. PIRG advocates, further requiring U.S. PIRG to rebut them. As detailed above, many of the Report's recommendations represent key priorities for the financial services industry. Legislators at the state and federal level are also likely themselves to seize on the report's recommendations to inform their proposals for legislation.

20.     U.S. PIRG will be required to continue to divert resources to first understand how and why the Taskforce reached its final conclusions, what the impact of those will be, and second, to adapt their educational and advocacy work to this new reality. And this work will be made significantly more difficult by the Taskforce's lack of transparency, which has impaired U.S. PIRG's ability to participate and follow the work of the Taskforce. Consumer advocates are already on the back foot compared to the financial services industry, which is able to retain countless numbers of lawyers to further their goal of dismantling consumer protections nationwide. The Taskforce's biased Report adds yet another weapon to their arsenal.

9

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: August 19, 2021

Cheverly, Maryland

_____
Edmund Mierzwinski

# EXHIBIT A

June 1, 2020

*Submitted to eRulemaking Portal*
Director Kathleen L. Kraninger
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

      Re: Request for Information from Taskforce on Federal Consumer Financial Law, Docket No.
      CFPB-2020-0013

Dear Director Kraninger,

The 27 undersigned consumer, community, and civil rights groups write in response to the request for information from Taskforce on Federal Consumer Financial Law (Taskforce).[1]

We view this Taskforce as illegitimate, one-sided, and highly inappropriate during a pandemic.  The Taskforce consists solely of five outside conservative academics and industry lawyers, including those who have represented payday lenders or others in CFPB enforcement actions and consumer litigation, and has no consumer representatives.[2] We are aware of several well-qualified academics who have a track record of working to advance consumer protections who were rejected, some after hostile interrogations. The absence of anyone to hold the Taskforce accountable makes it especially concerning that it was created in apparent evasion of the Federal Advisory Committee Act, even though Congress explicitly mandated that the CFPB follow FACA.[3]

At a time when the Bureau and all of our organizations should be focused on protecting consumers – and our own organizations and staff – from the impacts of the COVID-19 economic and health crisis, the Bureau has asked the public to comment on broad, far-reaching questions that go to fundamental questions about how to protect consumers. The Bureau has also provided a short 60-day comment window, even though the Bureau recently extended a separate, much narrower, comment request on time-barred debt disclosures because "the pandemic makes it difficult to respond to the [proposed rule]

---

[1] CFPB, Request for Information: Assist the Taskforce on Federal Consumer Financial Law, 85 Fed.Reg.18214 (Apr. 1, 2014), https://www.regulations.gov/document?D=CFPB-2020-0013-0001.

[2] Evan Weinberger, Bloomberg Law, Financial Watchdog's Conflicted Task Force Earning Top Dollar (May 11, 2020) ("E. Weinberger, Conflicted Task Force"), https://news.bloomberglaw.com/banking-law/financial-watchdogs-conflicted-task-force-earning-top-dollar (noting that the Taskforce has no consumer representation and "consists of five outside conservative academics and industry lawyers who have represented payday lenders in CFPB enforcement actions and consumer litigation, as well as banks and other companies in regulatory matters.").

[3] Congress passed 12 U.S.C. § 5493(h) specifically mandating that CFPB advisory committees be subject to the Federal Advisory Committee Act (FACA) after Republicans on the House Financial Services Committee criticized the CFPB for not holding public meetings. *See* Trey Garrison, Hensarling calls on CFPB to open closed meetings (March 17, 2014), https://www.housingwire.com/articles/29332-hensarling-calls-on-cfpb-to-open-closed-meetings/;Trey Garrison, Bill would force full transparency at CFPB (March 19, 2014), https://www.housingwire.com/articles/29366-bill-would-open-cfpb-regulators-advisors-to-full-transparency/. Yet the CFPB Taskforce is styled as an intra-governmental committee not subject to FACA "a CFPB spokesperson confirmed."  E. Weinberger, Conflicted Task Force, *supra.*

thoroughly and to determine when stakeholders will be able to do so."[4] Yet even a time extension would not make this an appropriate endeavor. The CFPB should focus on preventing harm to consumers during the pandemic, rather than on an effort to rethink its mission and promote ideas to undo consumer protections.

Many of the questions the Taskforce poses hint at deeply disturbing ideological preconceptions that focus more on undoing consumer protections than enhancing them.  Contrary to the subtext of the Bureau's questions, education, disclosures and competition are not enough to protect consumers. Enforcement must be more than a backstop that is limited to only the most abusive practices.  The amount of industry profits or skewed industry cost estimates should not be used to block rules that provide important protection to consumers, even if the consumer benefits are not always quantifiable. Access to credit does not justify preserving predatory lending or destructive practices that leave consumers worse off.   States are important backstops against inaction at the federal level. Indeed, Congress already made decisions about how to balance the competing interests on many of the questions the Bureau has posed, such as the important role of states in enforcing CFPB rules.

Moreover, the CFPB already consumed thousands of hours of our organizations' time by posing many of these same questions in the 12 requests for information that Acting CFPB Director Mick Mulvaney put out in 2018 on a wide range of aspects of the Bureau's operations and the laws and regulations it oversees:
- Civil investigative demands;[5]
- Administrative adjudications;[6]
- Enforcement processes;[7]
- Supervision program;[8]
- External engagements;[9]

[4] CFPB, Supplemental notice of proposed rulemaking; extension of comment period, 85 Fed. Reg. 30890, 30891 (May 21, 2020).
[5] *See, e.g.,* Americans for Financial Reform et al., https://www.nclc.org/images/pdf/rulemaking/coalition-cid-rfi-2018.pdf (April 26, 2018) (coalition overview comments); Americans for Financial Reform et al., https://www.nclc.org/images/pdf/rulemaking/cfpb-crl-cfa-rfi-2018.pdf (April 26, 2018) (longer comments); Public Citizen, https://www.regulations.gov/document?D=CFPB-2018-0001-0074 (April 25, 2018); Legal Academics, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Legal-Academic-on-Civil-Investigatory-Demands.pdf (April 25, 2018); Appleseed Network, https://www.regulations.gov/document?D=CFPB-2018-0001-0081 (April 26, 2018); National Association of Consumer Advocates, https://www.regulations.gov/document?D=CFPB-2018-0001-0073 (April 26, 2018).
[6] *See, e.g.,* Center for Responsible Lending et al, https://www.regulations.gov/document?D=CFPB-2018-0002-0027 (May 7, 2018); Financial Services Scholars, https://www.regulations.gov/document?D=CFPB-2018-0002-0024 (May 7, 2018)
[7] *See, e.g.,* Allied Progress, et al., https://www.nclc.org/images/pdf/rulemaking/coalition-34-cfpb-enforcement.pdf (May 14, 2018) (coalition overview comments); Americans for Financial Reform, et al., https://www.nclc.org/images/pdf/rulemaking/cfpb-enforcement-rfi-group.pdf (May 14, 2018) (longer comments).
[8] *See, e.g.,* National Consumer Law Center, et al., https://www.nclc.org/images/pdf/legislation/43-group-comments-cfpb-superv.pdf (May 21, 2018) (coalition overview comments); Americans for Financial Reform, et al., https://www.nclc.org/images/pdf/legislation/natl-group-detailed-comments-cfpb-superv.pdf (longer comments).
[9] *See, e.g.,* Allied Progress, et al., https://www.nclc.org/images/pdf/rulemaking/group-comm-rfi-external-engagements.pdf (May 29, 2018). CAB: Consumer Lending Subcommittee, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/CAB-Comment-on-External-Engagement.pdf (April 18, 2018); Consumers Union, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Consumer-Union-Comment-on-External-Engagement.pdf (May 25, 2018); Legal Academics, https://ourfinancialsecurity.org/wp-

- Consumer complaint information;[10]
- Rulemaking process;[11]
- Adopted regulations;[12]
- Inherited regulations;[13]

---

content/uploads/2018/06/Legal-Academic-on-External-Engagements.pdf (May 29, 2018); Appleseed, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Appleseed-Comment-on-External-Engagements.pdf (May 29, 2018); Consumer Action, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Consumer-Action-Comment-on-External-Engagements.pdf (May 29, 2018); National Association of Consumer Advocates, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/NACA-Comment-on-External-Engagements.pdf (May 29, 2018).

[10] *See, e.g.,* Alaska Public Interest Research Group, et al., https://www.nclc.org/images/pdf/regulatory_reform/cfpb-complaint-db-rfi-sign-on-2018.pdf (June 4, 2018); Veterans and Military Service Leaders, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Veterans-and-Military-Leaders-comment-on-RFI.pdf (June 4, 2018); National Consumers League, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/National-Consumers-Leagues-comments-on-RFI-regarding-public-reporting-practices.pdf (June 4, 2018); AARP, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/AARP-Comment-on-RFI-regarding-public-reporting-practices-and-consumer-complaint-infromation.pdf (June 4, 2018); Legal Academics, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Legal-Academic-on-Complaint-Reporting.pdf (June 4, 2018), The Indiana Assets & Opportunity Network, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/The-Indiana-Assests-Opportunity-Network-.pdf (June 4, 2018).

[11] *See, e.g.,* Americans for Financial Reform et al., https://www.nclc.org/images/pdf/rulemaking/letter-group-cfpb-rfi-2018.pdf (June 7, 2018) (coalition overview comments); https://www.nclc.org/images/pdf/rulemaking/comment-afr-crl-nclc-cfpb-rulemaking-rfi.pdf (June 7, 2018) (longer comments); Appleseed, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Appleseed-Comment-on-Rulemaking-processes.pdf (June 7, 2018); Woodstock Institute, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Woostock-Comment-on-Rulemaking-Processes.pdf (June 7, 2018); Consumers Union, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Consumers-Union-Comment-on-Rulemaking-Processes.pdf (June 7, 2018); Public Citizen, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Public-Citizen-Comment-on-Rulemaking-Processes.pdf (June 7, 2018), Legal Academics, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Legal-Academic-on-Rulemaking-Processes.pdf (June 7, 2018).

[12] *See, e.g.,* Americans for Financial Reform et al., https://www.nclc.org/images/pdf/rulemaking/comments-adopted-regulations-coalition-rfi-cfpb.pdf (June 19, 2018) (overarching comments); National Consumer Law Center et al., https://www.nclc.org/images/pdf/regulatory_reform/comments-cfpb-rfi-housing-rulemaking.pdf (June 19, 2018) (mortgages); National Consumer Law Center et al., https://www.nclc.org/images/pdf/rulemaking/comm-cfpb-rfi-adopted-rules-prepaid-cards.pdf (June 19, 2018) (prepaid accounts); National Consumer Law Center et al., https://www.nclc.org/images/pdf/rulemaking/comm-cfpb-rfi-adopted-rules-remittances.pdf (June 19, 2018) (remittances and credit cards); National Consumer Law Center et al., https://www.nclc.org/images/pdf/rulemaking/comm-cfpb-rfi-adopted-rules-debt-coll.pdf (June 19, 2018) (upcoming debt collection regulations); Legal Academics, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Legal-Academic-on-Adopted-Regulations.pdf (June 19, 2018).

[13] *See, e.g.,* Americans for Financial Reform, et al. https://www.nclc.org/images/pdf/rulemaking/cfpb-inherited-regs-all-regs.pdf (June 25, 2018) (overarching comments); National Consumer Law Center et al., https://www.nclc.org/images/pdf/rulemaking/cfpb-inherited-regs-and-non-lending.pdf (June 25, 2018) (Regulation E, overdraft fees and bank account issues); Americans for Financial Reform, et al, https://www.nclc.org/images/pdf/rulemaking/cfpb-inherited-regs-disparate-impact.pdf (June 25, 2018) (fair lending); National Consumer Law Center, et al. https://www.nclc.org/images/pdf/rulemaking/cfpb-inherited-regs-electronic-communications.pdf (June 25, 2018) (electronic communications); National Consumer Law Center, et al., https://www.nclc.org/images/pdf/rulemaking/cfpb-inherited-regs-pace.pdf (June 25, 2018) (Property Assessed Clean Energy (PACE) loans); National Consumer Law Center, et al.,

3

- Guidance materials;[14]
- Financial education programs[15]
- Consumer complaints and inquiries.[16]

We have attached over 500 pages of comments that our groups and others submitted – on top of hundreds of additional pages of comments on other Bureau rulemakings and information requests – in response to those 2018 requests for information.   Yet the Bureau appears to have largely ignored the lengthy and detailed responses that our organizations submitted.  We urge you to review those comments and others by the multitude of other organizations, academics, and members of the public who provided suggestions on things that the CFPB can do, within its jurisdiction, to improve the protection of consumers.

We do not intend to spend more time rebutting the implications in the Taskforce's questions; in many cases, even a single question – such as whether we can count on disclosures and consumer "choice" to protect people – has been the subject of extensive research, commentary and debate over decades. Nor do we intend to embark on a project to justify the entire federal statutory consumer protection framework. Our organizations have thin resources that have already been severely strained by the need to respond to the coronavirus crisis. While some organizations and members of the public may submit brief responses to Taskforce questions, the Taskforce should not view those responses – or the absence of rebuttals to those who support weakening consumer protections – as legitimizing this enterprise.

The Taskforce claims to be inspired by the National Commission on Consumer Finance created in 1968. But the CFPB's Taskforce has only five members, all with a track record of pushing for de-regulation – and, in some cases, conflicts of interests in the clients they have represented and may represent in the future.[17]  In contrast, the National Commission on Consumer Finance was specifically authorized and funded by Congress; its work was bipartisan; a majority of its 12 members, supported by dozens of staff and student researchers, were members of Congress accountable to the public; its work spanned four years and drew on multiple public hearings with hours of testimony from leading consumer advocates as well as individual consumers and lenders.[18] Whereas the National Commission concerned itself with problems in the consumer financial market, the Taskforce asks about the burdens of compliance with consumer protections.

---

https://www.nclc.org/images/pdf/rulemaking/cfpb-inherited-regs-tila-respa-mortg.pdf (June 25, 2018) (Regulation Z (TILA) and Regulation X (RESPA); National Consumer Law Center, et al., https://www.nclc.org/images/pdf/rulemaking/cfpb-inherited-regs-tila-respa-mortg.pdf (June 25, 2018) (FTC mortgage rules); Legal Academics, https://ourfinancialsecurity.org/wp-content/uploads/2018/06/Legal-Academic-on-Inherited-Regulations.pdf (June 25, 2018).

[14] *See, e.g.,* Alabama Appleseed Center for Law & Justice, et al., https://www.nclc.org/images/pdf/rulemaking/coalition-comm-guidance-cfpb-rfi.pdf (July 2, 2018).

[15] *See, e.g.,* Allied Progress, et al., https://www.nclc.org/images/pdf/regulatory_reform/Comments-CFPB-on-Financial-Education-RFIs.pdf (July 9, 2018).

[16] *See, e.g.,* Allied Progress, et al., https://www.nclc.org/images/pdf/rulemaking/grp-comments-rfi-cfpb-cons-inquiry-process.pdf (July 16, 2018); California Reinvestment Coalition (July 13, 2018), https://californiareinvestmentcoalitio.app.box.com/s/i31q75dqg7o4k12ualcxqz504zbxexph.

[17] E. Weinberger, Conflicted Task Force, *supra* (noting that the Taskforce has no consumer representation and "consists of five outside conservative academics and industry lawyers who have represented payday lenders in CFPB enforcement actions and consumer litigation, as well as banks and other companies in regulatory matters.").

[18] *See* National Commission on Consumer Finance, Consumer Credit in the United States (December 1972), https://babel.hathitrust.org/cgi/pt?id=uc1.31822024338451&view=1up&seq=1.

Even responsible industry players will be harmed by this diversion. Banks and other companies are overwhelmed trying to assist their customers seeking help due to the COVID-19 crisis. That's where their attention needs to be, not on this academic exercise, opining on the theoretical virtues of principle-based versus prescriptive regulation or on regulation versus deregulation. And if the CFPB actually implements any recommendations of the Taskforce, companies will face the prospect of see-sawing regulatory frameworks that, in light of the illegitimacy of this Taskforce, may well be undone by the next change of leadership.

The CFPB has received record-setting numbers of complaints by consumers crying out for help in dealing with abusive companies and the impacts of the coronavirus economic crisis. The CFPB should listen to and respond to those cries, not spend time proposing harmful changes to the consumer protection framework that protects the American public.

Yours very truly,

Allied Progress
Americans for Financial Reform Education Fund
Arkansans Against Abusive Payday Lending
California Reinvestment Coalition
Center for Digital Democracy
Center for Economic Integrity
Center for Responsible Lending
Consumer Action
Consumer Federation of America
Interfaith Center on Corporate Responsibility
Jacksonville Area Legal Aid, Inc.
Kentucky Equal Justice Center
Maryland Consumer Rights Coalition
Mississippi Center for Justice
NAACP
National Association of Consumer Advocates
National Consumer Law Center (on behalf of its low income clients)
National Fair Housing Alliance
National Housing Law Project
North Dakota Economic Security and Prosperity Alliance
Public Citizen
Public Counsel
Reinvestment Partners
Texas Appleseed
U.S. PIRG
Virginia Citizens Consumer Council
Virginia Poverty Law Center